**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 14-00052-11 |
| | ) | |
| | ) | Chapter 11 |
| **DEERFIELD RETIREMENT** | ) | |
| **COMMUNITY, INC.** | ) | |
| | ) | Judge: |
| | ) | |
| Debtor. | ) | |

_____

**DECLARATION OF SCOTT M. HARRISON IN SUPPORT OF
THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Scott M. Harrison, hereby declare under penalty of perjury:

1.      I am the President and Chief Executive Officer of Deerfield Retirement

Community, Inc., the debtor and debtor-in-possession in the above-captioned bankruptcy case

(the "**Debtor**").  I have been employed since 2002 in this position by the Debtor.   In this

capacity, I am familiar with the day-to-day operations, business, and financial affairs of the

Debtor.

2.      I also currently serve (and have served since 2002) as President and Chief

Executive Officer of Lifespace Communities, Inc. ("**Lifespace**"), the current manager of the

Debtor as well as owner and manager of several other life care retirement communities.  Prior to

these positions,  I served as President of SecureCare of Iowa, a health insurance company based

in Des Moines, IA, Corporate Vice President of Mercy Medical Center, also in Des Moines and

was Senior Vice President of BroMenn Healthcare located in Bloomington, IL.

3.      I submit this declaration (i) in support of the petition of the Debtor for relief under

Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) in support of

the following applications and motions filed contemporaneously herewith by the Debtor (the

"**First Day Motions**"):

- *Application by Debtor for Entry of an Order Approving the Retention of Dorsey & Whitney LLP As Bankruptcy Counsel ("**Application to Employ Dorsey & Whitney**")*
- *Debtor's Application to Employ and Retain North Shores Consulting Inc. as Financial Advisor to Debtor and Debtor-In-Possession Pursuant to Sections 327(A), 328, 330, 331 and 1107(B) of the Bankruptcy Code Nunc Pro Tunc to the Petition Date ("**Application to Employ North Shores**")*

- *Debtor's Motion For an Order Authorizing Debtor to Continue Use of its Cash Management System, Existing Accounts and Business Forms (the "**Cash Management Motion**")*

- *Debtor's Motion For an Order (I) Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expense Reimbursement and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course, and (II) Authorizing and Directing Applicable Banks to Honor and Pay All Checks and Payment Requests with Respect Thereto (the "**Employee Wages Motion**")*

- *Debtor's Motion for Entry of Interim Order (1) Authorizing Interim Use of Cash Collateral Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code; (2) Granting Adequate Protection to Trustee Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code; and (3) Scheduling a Final Hearing ("**Cash Collateral Motion**")*

- *Debtor's Emergency Motion for Order Granting Authority to File Separate Creditor Matrix and Schedule F Containing Patient Information Under Seal ("**HIPAA Motion**")*

- *Debtor's Motion under 11 U.S.C. § 333 to Determine Appointment of Patient Care Ombudsman is Unnecessary ("**Ombudsman Motion**")*

- *Debtor's Motion Under 11 U.S.C. §§ 105, 341, 1125, 1126, and 1129 and Fed. R. Bankr. P. 2002, 3017, 3018, and 3020 For An Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan and Approving the Form and Manner of Notice Thereof, (II) Setting Deadline to Object to Adequacy of the Disclosure Statement and Confirmation of Plan, (III) Approving Solicitation of Acceptances on a Plan of Reorganization and Solicitation Procedures With Respect Thereto(*"**Disclosure Statement Approval/Plan Confirmation Motion**"*)*

4.      I also file this declaration to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of this Chapter 11 case.  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtor's business and to the Debtor's reorganization.

5.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge and information concerning the operations of the Debtor and the life care retirement community industry as a whole.  If called upon to testify, I would testify completely to the facts set forth in this declaration.

## BACKGROUND

6.      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 10, 2014 (the "**Petition Date**").

7.      The Debtor was formed as a nonprofit corporation in Iowa in 2000 for the purpose of owning and operating a life care retirement community known as "Deerfield Retirement Community" located at 13731 Hickman Road, Urbandale, Iowa (the "**Facility**").

8.      The Facility is comprised of 32 townhomes and 138 independent living apartments, common areas, a residential care facility with 24 residential care living units, and a health center with 30 skilled nursing care beds.

9.      As a nonprofit corporation, the Debtor does not have shareholders.  The Debtor's sole "member" is Lifespace Communities, Inc. ("**Lifespace**") which sole benefit is that in a liquidation all proceeds after payments to the Debtor's creditors are made, are directed to be paid

to Lifespace so long as Lifespace is then a 501(c)(3) nonprofit entity.  Lifespace itself is

currently an Iowa nonprofit corporation.

10.     Lifespace provides management services to the Debtor at the Facility in exchange

for a monthly management fee equal to 5% of the Debtor's revenues pursuant to an Amended

and Restated Management Agreement (the "**Management Agreement**").  Lifespace also

provides management services to eleven (11) other continuing care retirement communities in

six (6) other states.  In total, Lifespace provides management services to over 5,000 residents.

### A.  Capital Structure

11.     To finance the construction and development of the Facility, the Debtor had the

Iowa Finance Authority issue its Revenue Bonds (Deerfield Retirement Community, Inc.

Project) Series 2003A and Series 2003B (the "**2003 Bonds**").  In 2007, the Debtor repaid the

2003 Bonds through the issuance by the Iowa Finance Authority of its (i) Senior Living Facility

Revenue Refunding Bonds (Deerfield Retirement Community, Inc.) Series 2007A in the original

principal amount of $40,955,000 and (ii) Senior Living Facility Revenue Refunding Bonds

(Deerfield Retirement Community, Inc.) Series 2007B Extendable Rate Adjustable Securities in

the original principal amount of $3,210,000 (collectively, the "**2007 Bonds**"), pursuant to an

Indenture of Trust dated as of May 1, 2007 (the "**Indenture**") between the Iowa Finance

Authority and Bankers Trust Company, N.A. as trustee.  As of the Petition Date, the

Series 2007A Bonds are outstanding in an aggregate principal amount of $37,715,000 and the

Series 2007B Bonds are outstanding in an aggregate principal amount of $3,210,000.

12.     Under that certain Loan Agreement dated as of May 1, 2007 (the "**Loan**

**Agreement**") between the Debtor and the Iowa Finance Authority, the Debtor became obligated

to make payments sufficient to discharge the 2007 Bonds as they became due.  To secure the

Debtor's obligations under the Loan Agreement and its obligations under certain parity debt, the Debtor (i) granted a security interest in all income, revenues, receipts and other moneys received by or on behalf of the Debtor from the Facility or its operations and all rights to receive the same, with certain exceptions and (ii) executed a Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Financing Statement, dated as of May 1, 2007, granting (i) a mortgage lien on the real property associated with the Facility, and (ii) a security interest in the personal property and fixtures included in the Facility.

13.     To provide support to the Debtor, Lifespace entered into (i) that certain Subordinated Loan Agreement dated as of May 15, 2007 between Lifespace, the Debtor and the trustee under the Indenture (the "**Bond Trustee**") pursuant to which Lifespace provided $4,300,000 of subordinated loans to the Debtor and (ii) that certain Support Agreement dated as of May 1, 2007 among the Debtor, Lifespace and the Bond Trustee pursuant to which Lifespace provided $3,000,000 of advances to the Debtor.  As of the Petition Date, the Debtor owes Lifespace an approximate amount of (i) $6,600,000 in principal and interest under the Subordinated Loan Agreement, (ii) $3,000,000 under the Support Agreement and (iii) $8,900,000 in respect of other additional advances made by Lifespace to the Debtor from time to time.

**B.  Events Leading to Bankruptcy Filing**

14.     The recent economic downturn had significant adverse impacts on the Debtor. Many factors, including the steep decline in the residential real estate market, which impaired the ability of some potential residents to sell their houses and then move into the Facility, and increased competition, resulted in the Debtor's failure to attract residents as quickly as was

forecasted.  This slower occupancy and the resulting utilization of working capital to fund debt

service meant less revenue and cash available for the Debtor to pay operating expenses.

15.     In April 2013, the Debtor commenced discussions with certain holders of the

2007 Bonds regarding a restructuring of the bond debt.  These discussions accelerated in June

2013 when the Debtor failed to make its monthly payments to the Bond Trustee under the Loan

Agreement, which was an event of default under the Indenture and the 2007 Bonds.

16.     A group of the holders of the majority of the outstanding 2007 Bonds entered into

a forbearance agreement with the Debtor while such negotiations were on-going and such

bondholders agreed to certain modifications to the Loan Agreement to allow Lifespace to make

certain advances to the Debtor as secured "Parity Debt" under the Loan Agreement.

Accordingly, the Debtor obtained $2,500,000 in loans from Lifespace as Parity Debt under the

Loan Agreement.

17.     Following the negotiations, the Debtor agreed to a term sheet and entered into a

Bondholder Restructuring Plan and Support Agreement (the "**Plan Support Agreement**") with

Lifespace and holders owning approximately 63% of the outstanding principal amount of the

2007 Bonds.

18.     Based upon the terms set forth in the Plan Support Agreement, the Debtor

prepared a Disclosure Statement for Solicitation of Acceptances of a Prepackaged Plan of

Reorganization for Deerfield Retirement Community, Inc. (including any supplements and

annexes thereto, the "**Disclosure Statement**") and a Prepackaged Plan of Reorganization of

Deerfield Retirement Community, Inc. dated November 18, 2013 (the "**Plan**").  On November

18, 2013, the Disclosure Statement, Plan and related documents were distributed to the holders

of the 2007 Bonds and to Lifespace for voting (all other creditors of the Debtor did not have their rights altered and were therefor unimpaired under the Plan).

19.     A voting deadline of January 6, 2014 was established to cast votes on the Plan. The Debtor obtained by such deadline the following votes:

| Voting Class | Acceptance | | Rejection | |
|---|---|---|---|---|
| | Percentage of Dollars Voting | Percentage of Total Vote | Percentage of Dollars Voting | Percentage of Total Vote |
| Class 1 Claims | 98.10% | 90.48% | 1.90% | 9.52% |
| Class 2 Claims | 100% | 100% | 0% | 0% |
| Class 5 Claims | 100% | 100% | 0% | 0% |

## SUMMARY OF FIRST DAY MOTIONS

20.     The Debtor filed the First Day Motions concurrently with the filing of its Chapter 11 petition.  The Debtor requests that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition in and through Chapter 11.

21.     For a more detailed description of the First Day Motions than set forth below, the Debtor respectfully refers the Court to the respective First Day Motions.  To the extent that this declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.  Capitalized terms that are used in this section but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

A.  *Application to Employ Dorsey & Whitney*

22.      The Debtor seeks to retain Dorsey & Whitney LLP ("**Dorsey**") as its attorneys because Dorsey has extensive experience and knowledge in the field of debtors' and creditors' rights, business reorganization under Chapter 11 and practicing before bankruptcy courts.

23.      I am aware that Dorsey has been actively involved in major Chapter 11 cases. Additionally, Dorsey represented the Debtor prior to the Petition Date and, therefore, will be able to quickly respond to any and all issues that may arise during this Chapter 11 case.  During its prior representation of the Debtor and in preparation for this Chapter 11 case, Dorsey has become familiar with the Debtor's business and affairs and many of the potential legal issues that may arise in the context of this Chapter 11 Case.  Accordingly, I believe that Dorsey is both well-qualified and uniquely able to represent the Debtor in this Chapter 11 case in an efficient and timely manner.

B.  *Application to Employ North Shores*

24.      The Debtor seeks to retain North Shores Consulting Inc. ("**North Shores**") as its financial advisor because North Shores has extensive experience and knowledge in the healthcare and life care fields, debtors' and creditors' rights, and debt restructuring.  In addition, North Shores has become familiar with the Debtor's operations and business through the services it provided to the Debtor prior to the commencement of this Chapter 11 case.  Accordingly, I believe that North Shores is well qualified to provide the Debtor financial advisor services in this Chapter 11 case.

25.      Moreover, I believe that if the Debtor is required to retain financial advisors other than North Shores, the Debtor would needlessly incur additional expenses and delays associated with familiarizing such new advisor with the intricacies of its financial affairs and business operations; especially as the Debtor with North Shores' assistance has already prepared and

8

solicited votes on a plan of reorganization.  Thus, North Shores' retention in this Chapter 11 case
will be efficient and cost effective for the estate.

C.  *Cash Collateral Motion*

26.     The Debtor seeks entry of an order authorizing the Debtor to (a) continue use of
its existing bank accounts, rather than open new debtor-in-possession accounts including a new
segregated account for the payment of taxes, (b) continue its use of its existing cash management
system, and (c) continue its use of its correspondence and business forms substantially in the
form existing immediately before the Petition Date, without reference to its status as debtor-in-
possession.

(i)     **Description of the Debtor's Cash Management System**

27.     In the ordinary course of business, the Debtor utilizes a cash management system
that provides established processes for the collection, management, transferring and
disbursement of funds generated and used in its operations (the "**Cash Management System**")
The bank accounts used in connection with the Cash Management System are as follows
(collectively, the "**Bank Accounts**"):

| Type of Account | Account Designation Used by Debtor | Bank Name | Contact Name at Bank | Typical Balance |
|---|---|---|---|---|
| Checking | Revenue Account | Bankers Trust Company | Mark Phillips (515) 245-5276 | $200,000 - $500,000 |
| Checking | Payroll Account | Bankers Trust Company | Mark Phillips (515) 245-5276 | $0 – funds are deposited and then paid out to employees |
| Checking | Disbursement Account | Bankers Trust Company | Mark Phillips (515) 245-5276 | $0 – funds are deposited as checks are cut |

| Checking | Cafeteria Account | Bankers Trust Company | Mark Phillips (515) 245-5276 | $2,000 – funds associated with the café at the Facility |
| Checking | Insurance Reserve Account | Bankers Trust Company | Minda Barr (515) 246-5283 | $89,000 – funds on reserve for self-insurance purposes |
| Savings | Operating Saving Account | Bankers Trust Company | Minda Barr (515) 246-5283 | $1,000 |
| Checking | Health Center Refund | Bankers Trust Company | Minda Barr (515) 246-5283 | $15,000 as of November 30, 2013 |
| Escrow | Admission Deposits | Bankers Trust Company | Minda Barr (515) 246-5283 | $4,000 as of November 30, 2013 |

28.     The Debtor's Cash Management System consists of eight (8) bank accounts held by the Debtor with Bankers Trust Company as follows: (i) a checking account that serves as the Debtor's main operating account into which all revenue is deposited and held pending disbursement (the "**Revenue Account**"); (ii) a payroll account (the "**Payroll Account**") that is a zero-balance account used to fund payroll  and the payment of employment taxes; (iii) a disbursement account (the "**Disbursement Account**") that is a zero-balance account used to fund non-payroll, account payables; (iv) an account which holds a nominal amount of funds related to the Facility's café operation; (v) an insurance reserve account which holds funds designated for the Debtor's self-insurance program; (vi) a savings account designed to hold excess funds for investment purposes (which the Debtor is not currently using); (vii) a health center reimbursement account that is used to hold funds for health center residents for reimbursement purposes; and (viii) an escrow account used to hold admission deposits.

29.     The Revenue Account is funded by payments from residents which are received by ACH, wire or check payment.  The Revenue Account is used to receive incoming payments,

deposit checks and make disbursements to other accounts for the Debtor's operational expenses, including payroll and accounts payable obligations, in the ordinary course of the Debtor's business.

30.     The Debtor maintains detailed and accurate records of all disbursements and transfers flowing within the Cash Management System, including all checks that are written on its accounts.  The Debtor's bank allows the Debtor to easily monitor its Bank Account balances and activity, generate reports, hold and release checks, stop payments, transfer funds and send wires.

**(ii)     The Debtor's Business Forms**

31.     In the ordinary course of business, the Debtor uses several varieties of business forms.  To minimize the expense to the estate and to avoid any confusion with customers, employees, and third parties, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all business forms, including without limitation, checks, letterhead, customer forms, purchase orders, contracts, and invoices (collectively, the "**Business Forms**"), as such forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as debtor-in-possession.

**(iii)     Benefits of the Existing Cash Management System**

32.     The Debtor's Cash Management System is a significant aspect of the Debtor's ordinary course of business practices.  The Debtor's Bank Accounts are part of the Cash Management System that ensures the Debtor's ability to monitor and control all of its cash receipts and disbursements efficiently.  During the pendency of this Chapter 11 case, the Debtor intends to fund operations from existing cash and post-petition payments, all of which will run through the Cash Management System.  I believe that if the Debtor is required to close all existing Bank Accounts and terminate the Cash Management System immediately, the Debtor

would need to expend resources and time to establish the requisite number of new bank accounts in an expedient manner and to establish a new cash management system to fulfill its business requirements.  I believe that this disruption to the Debtor's ordinary financial affairs would be prejudicial to the Debtor's estate.

33.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

### D. *Employee Wages Motion*

34.     The Debtor seeks entry of an order (i) authorizing, but not requiring, the Debtor to reimburse prepetition expenses and to pay prepetition claims for, among other items, ordinary and customary wages and salaries, federal and state withholding taxes, payroll taxes, and all other employee benefits the Debtor pays in the ordinary course of its business (collectively, the "**Wage Obligations**"), (ii) authorizing, but not requiring, the Debtor to continue its employee benefits programs (collectively, the "**Employee Benefits**" and together with the Wage Obligations, the "**Employee Obligations**"), including making any payments required thereunder and honoring accrued Personal Time Off ("**PTO**") and to allow its Employees to use prepetition accrued PTO in the ordinary course; and (iii) to the extent that certain banks and other financial institutions are required to receive, process, honor, and pay checks presented for payment by its employees, directing such banks and financial institutions to honor all funds transfer requests made by the Debtor relating thereto.

35.     The Debtor's workforce is currently approximately 165 employees (collectively, the "**Employees**") performing a variety of functions ranging from full nursing care to housekeeping and maintenance to dining room staff and office administration.  As of the Petition

Date, the Debtor had no employment agreements with any personnel, and all employment is "at

will" employment.

36.    The Debtor's workforce is critical to its business operations.  Each of the Debtor's

employees is essential not only to the continued, uninterrupted operation of the Debtor's

business, but to effectuating the orderly administration of this Chapter 11 case.  The Debtor's

employees have distinct experience and expertise that are vital to the Debtor's operations.

Among other things, the Debtor requires its employees to provide a wide variety of specialized

services associated with its unique senior living services.  Failure to provide essential services, to

develop relationships and to maintain the residential campus will cause both current and

prospective residents to seek out competitors.  As a result, the Debtor's business will not only

lose its going concern value, and its assets, but its relations with residents and the community

will also be harmed.  More importantly, the loss of employees will at minimum diminish the

amount and quality of vital services provided to current residents who rely on the Debtor's

employees for their well-being and could cause harm to the health of residents.  I believe that this

ramification not only is unacceptable to the Debtor but is contrary to public policy, and

demonstrates why the Debtor's workforce is critical.

### (i)    The Debtor's Prepetition Wage Obligations

#### (a)    Wages

37.    The Debtor pays its Employees every two weeks on a Thursday.  Each two week

payroll for the Employees, including wages, salaries and employer related taxes, is estimated to

be approximately $175,000  (the "**Wages**").  Payroll payments are made via direct deposit

through electronic transfer of funds directly to the Employees.  Currently no employees receive

payment via check.

38.     The Debtor relies on Lifespace to calculate the payroll obligations that are due. Upon receipt of the calculations, on Wednesday of every other week the Debtor transfers funds from its Revenue Account into its Payroll Account.  From the Payroll Account, electronic transfer of funds are made to the employees and, on a regular basis, transfers of tax obligations are made to the applicable governmental authorities.

39.     On January 9, 2014, the Debtor paid the Employees their prepetition Wages for the period from December 22, 2013 to January 4, 2014.  The Employees have continued to accrue Wages since that date.  As of the Petition Date, the aggregate amount of accrued Wages through Petition Date that remain unpaid to the Employees (the "**Unpaid Wages**") is approximately $63,500.

40.     If the Debtor's Employee Wages Motion is granted, the Debtor will not pay any Employee more than the $12,475 limit permitted under Bankruptcy Code § 507(a)(4).  All post-petition Employee wages will be paid in the ordinary course of business.

### (b)     Reimbursement of Prepetition Employee Business Expenses

41.     Prior to the Petition Date, and in the ordinary course of its business, the Debtor directly or indirectly reimburses Employees for certain expenses incurred on behalf of the Debtor in the scope of their employment  ("**Reimbursable Expenses**").  Most expenses incurred by Employees are paid for by a corporate credit card in the name of the Debtor and there is not a need to reimburse the Employees as the Debtor directly pays such credit card charges.  However, certain expenses such as for mileage are not capable of being paid through the use of a credit card.  In such cases, the Debtor reimburses Employees for such expenses by including additional amounts on the Employee's paycheck in response to a reimbursement request.

42.     Because Employees do not always submit claim forms for reimbursement promptly, it is difficult for the Debtor to determine the exact amount of outstanding

Reimbursable Expenses at any particular time or the total amount that may be owed as of the

Petition Date.  I believe, however, that the Reimbursable Expenses for the prepetition period will

likely total no greater than $1,000.  All post-petition employee expenses shall be reimbursed in

the ordinary course of business.

(c)      <b>Prepetition Withholdings and Deductions</b>

43.      The Debtor withholds from each Employee, wage amounts related to, among

other things, federal, state and local income taxes, social security and Medicare taxes

(collectively, the "<b><u>Withheld Amounts</u></b>")  for remittance to the appropriate federal, state, or local

taxing authorities.  The Debtor then matches from its own funds social security and Medicare

taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal

unemployment insurance (the "<b><u>Employer  Payroll Taxes</u></b>," and together with the Withheld

Amounts, the "<b><u>Payroll Taxes</u></b>").

44.      The Payroll Taxes are held in the Debtor's Payroll Account pending their delivery

to the appropriate federal, state, or local taxing authorities.  As of the Petition Date, I believe that

all Payroll Taxes then due have been remitted to the appropriate taxing authorities.  However,

out of an abundance of caution, the Debtor seeks authority, but not direction, to honor and

process its prepetition obligations with respect to the Payroll Taxes, including forwarding any

unremitted Withheld Amounts to the appropriate taxing authorities.

45.      During each applicable pay period, the Debtor routinely deducts certain amounts

from Employees'  paychecks, including, without limitation, (a) garnishments, child support, and

similar legally ordered deductions and (b) other pre-tax and after-tax deductions payable

pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share

of health care benefits, insurance premiums,  flexible and/or health savings account

contributions,  403(b) plan contributions, 457(b) plan contributions, legally ordered deductions

15

and other miscellaneous deductions) (collectively, the "**Deductions**") and forwards those amounts to the applicable parties or sponsors of the Debtor's benefit plans.  As of the Petition Date, I believe that only nominal Deductions have not been forwarded to the appropriate third-party recipients.  However, to the extent any such amounts are outstanding, the Debtor seeks authority to forward these pre-petition Deductions to the applicable third party recipients.

### (ii)   Employee Benefits

46.     In the ordinary course of its business, the Debtor provides its Employees with certain employee benefits, including, but not limited to: (a) PTO, (b) a 403(b) savings plan, (c) 457(b) plan, (d) medical and health care programs, and (e) certain insurance and other specific employee benefits, described in greater detail below (collectively, the "**Employee Benefits**").

47.     If the Employee Wages Motion is granted, the Debtor will not pay any Employee more than the limit permitted under Bankruptcy Code § 507(a)(5) with respect to any Employee Benefit contribution.

### (a)   Paid Time Off

48.     In the ordinary course of business, the Debtor provides allotted PTO to its employees.  The Debtor requests that the Court authorize, but not require, the Debtor to (a) "cash out" pre-petition PTO of its Employees and (b) to honor PTO earned by current employees and to allow such employees to use pre-petition accrued PTO in the ordinary course of business. Accrued PTO which remains unused, expires.  Through the Petition Date, the Debtor's employees have accrued PTO which in aggregate amounts to approximately $210,000 in value.

49.     I do not believe that any current employee has accrued PTO within 180 days of the bankruptcy filing which exceeds in amount the $12,475 limit established by Bankruptcy Code § 507(a)(4).

(b)     **403(b) and 457(b) Plans**

50.     In the ordinary course of business, the Debtor maintains (i) a 403(b) savings plan and (ii) a 457(b) saving plan (collectively the "**Retirement Plans**") for the benefit of its Employees.  The 403(b) plan is administered by Principal Financial Group and the 457(b) plan is administered by Lifespace.  Each of the Employees, upon meeting certain guidelines regarding length of employment and full time status, is eligible to participate in the Retirement Plans.  The Debtor provides certain contributions to the 403(b) plan.  Employee contributions and the Debtor's contributions to the Retirement Plans are transferred to the applicable administrators approximately one week after each payroll.

(c)     **Health Benefit Plans**

51.     Wellmark is the sponsor of the Debtor's health plan (the "**Health Benefit Plan**").  The Debtor pays 77% of premiums for medical, 77% of premiums for dental, and 77% of premiums for vision coverage of each Employee.  An optional pre-tax flexible spending account is also available to Employees, at their expense, for eligible out-of-pocket health care and dependent expenses.

52.     As of the Petition Date, I believe that the amount of accrued and outstanding prepetition obligations respect to the Health Benefit Plans to be $55,000.

(d)     **Insurance**

53.     The Debtor offers Employees basic life insurance and Accidental Death and Dismemberment ("**ADD**") insurance.  In addition, the Debtor maintains workers' compensation policies to provide its Employees with compensation for injuries arising from or related to their employment with the Debtor.  The Debtor pays for basic life and ADD insurance coverage valued as follows: hourly employees receive one times annual compensation up to $50,000; full time salary employees receive two times annual compensation up to $50,000; Department Heads

17

and the Executive Director receive two times annual compensation up to $100,000.  In addition,

the Debtor provides long-term disability insurance for qualifying disabilities, up to a maximum

of $10,000 per month and provides short-term disability, up to a maximum of $1,000 per month.

Employees also are provided the option to elect supplemental life, ADD, and disability

insurance.  As of the Petition Date, I believe that the amount of accrued and outstanding

prepetition obligations with respect to insurance described herein to be approximately $3,600,

which is the Debtor's company and employee portion (not claims outstanding).

(e)    **Additional Benefits.**

54.    The Debtor offers additional benefit programs (the "**Additional Benefit
Programs**") to the Employees, including bonus and incentive programs, perks programs (which

provides discounts for various retailers, restaurants, hotels, car rentals, and other services), an

employee assistance program and tuition assistance.

(f)    **Payment to Third Parties Incident to Payments and Contributions.**

55.    I believe that the aggregate amount of all costs incident to, inter alia, the Unpaid

Wages, Payroll Taxes, Deductions, and Employee Benefits, including processing costs or

administration costs ("**Pre-petition Processing Costs**") accrued but unpaid as of the Petition

Date is nominal.  I believe that payment of the Prepetition Processing Costs is necessary to

ensure that third party providers continue to provide services with respect to the Debtor's

prepetition employee related obligations.

(g)    **Banks to Honor and/or Reissue Checks**

56.    I also believe that it is necessary for all applicable banks and other financial

institutions be authorized to receive, process, honor and pay any and all checks and transfers

drawn on the Debtor's Payroll Account or Disbursement Account, whether such checks were

presented before, or are presented after the Petition Date.

18

### E. *Cash Collateral Motion*

57.    The Debtor seeks entry of an interim order granting the following relief: (i) authorizing the interim use of cash collateral pursuant to Bankruptcy Code §§ 105, 361, 362 and 363, (ii) granting adequate protection to the Trustee pursuant to Bankruptcy Code §§ 361, 362 and 363, and (iii) scheduling a final hearing.

58.    I believe that the Debtor's cash on hand on the Petition Date securing the obligations under the Loan Agreement and Indenture  (the "**Cash Collateral**") constitutes "cash collateral" within the meaning of Bankruptcy Code § 363.  Without access to the Cash Collateral, the Debtor would not have sufficient available cash to continue the operation of the Facility during this Chapter 11 case.  The Cash Collateral will be used to fund the Debtor's various operating expenses and professional fees as well as insurance, taxes, Chapter 11 fees and other costs.

### F. *HIPAA Motion*

59.    The Debtor seeks entry of an order authorizing the Debtor to file (i) to file a separate creditor matrix containing resident information (the "**Patient Matrix**"), (ii) to file a separate Schedule F concerning residents as such identification may reveal protected patient information and other proprietary information (the "**Patient Schedule F**") under seal, and (iii) a separate Schedule G concerning residents as such identification may reveal protected patient information and other proprietary information (the "**Patient Schedule G**") under seal, for the purposes of protecting the privacy rights of its residents, complying with its requirements under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and keeping commercially valuable information confidential.

60.     I believe that the Debtor should be allowed to file information concerning its

residents under seal because (i) HIPAA regulations prohibit a party from disclosing patients'

names and addresses or other records relating to payment for medical services since it could be

considered "protected health information" under 45 C.F.R. §§ 160.103 and 160.104, *et seq*, (ii)

identifying the contingent amount of an entrance fee a particular resident may be due will reveal

confidential information that may be of an advantage to the Debtor's competitors and (iii)

disclosure of the contingent amount of an entrance fee a particular resident may be due could

result in residents comparing the deals each received when they executed their respective

Continuing Care Contracts resulting in dissatisfaction among the residents that would negatively

impact the Debtor's business.

61.     The Debtor's business model has each resident enter into a continuing care

contract (a "**Continuing Care Contract**").  The Continuing Care Contracts require a resident to

pay an entrance fee which varies upon the size and type of the Living Unit initially occupied by

the resident.  Historically, these entrances fees have ranged from $129,000 to $636,000.   In

addition to the entrance fee, residents are required to pay a monthly service fee.

62.     In exchange for the entrance fee and the monthly service fee, the Debtor under a

Continuing Care Contract agrees to provide the resident with a Living Unit and if a transfer is

necessary to the Residential Care Facility or the Health Center, then such costs of care shall be

set according to a formula, with certain additional costs for additional meals, medical and

personal supplies, drugs and therapy.

63.     Upon a resident's death or termination of the Continuing Care Contract, a resident

is entitled to a refund of a portion of their entrance fee when their particular Living Unit is re-

endowed to a new resident.

64.     The Facility also accepts a limited number of residents who directly enter the Residential Care Units or the Health Center who do not enter into Continuing Care Contracts for Living Units.  These individuals pay certain monthly and per diem fees for the services received.

65.     I believe that attempting to divide residents into those receiving health care services (and thereby entitled to HIPPA protection) and those not receiving health care services is difficult.  Residents from time to time may move from the living units into either the residential care units or the health center.  Residents in the living units also may be receiving certain health care services.  Finally, the omission of a resident from a list of all residents that are not receiving health care services is in fact a disclosure through omission that such individual is in fact receiving health care services.  Therefore, I believe that in order to protect the residents entitled to protection under HIPPA, the identity of all residents must be kept confidential.

    *G. Ombudsman Motion*

66.     The Debtor seeks entry of an order that no patient care ombudsman be appointed in this case because, among other reasons; (i) it is unclear whether the Debtor even qualifies as a "health care business" since only a portion of its activities relate to the actual provision of health care services rather than such activities being the "primary" engagement of the Debtor; (ii) Lifespace, which is financially strong non-debtor, provides management services at the Debtor's Facility and will ensure that the proper level of patient care is maintained; (iii) the Debtor has historically and is currently providing a high quality of care and such operations will continue during the continuance of this Chapter 11 case; (iv) the Debtor will, subject to the granting of the Cash Collateral Motion, have cash sufficient to ensure that patient care is not effected; (v) the Debtor is already subject to review and oversight by the Iowa Department of Elder Affairs and the Iowa Department of Inspection and Appeals; and (vi) the Debtor's case has been filed as a

21

prepackaged Chapter 11 case with substantially more than the requisite votes approving the solicited plan of reorganization, and therefore I believe that the Debtor's exit from Chapter 11 will be swift.

67.     Moreover, the continuing care retirement community industry is heavily regulated by state and federal authorities.  The Debtor, as owner of such a facility, is required to satisfy these regulations.

68.     The Debtor is subject to Iowa Code Chapter 523D (the "**<u>Retirement Facilities Act</u>**") (which regulates continuing care retirement communities and senior adult congregate living facilities).  The Debtor is required to amend its annual disclosure statement when there are material changes in applicable information, and the Debtor has materially satisfied all currently applicable requirements of the Retirement Facilities Act.

69.     The Debtor is subject to Iowa Code Chapter 231C (which regulates Assisted Living Programs, facilities providing housing and other health-related or personal services).  The Debtor is in compliance with the provisions of Chapter 231C in all material respects and is certified by the Iowa Department of Elder Affairs.

70.     The Debtor is subject to Iowa Code Chapter 135C (which regulates health centers and requires that health centers be licensed by the Department of Inspections and Appeals).  Chapter 135C, and the administrative rules implementing it, mandate the provision of certain services and provide for the establishment of a resident advocate committee and impose various restrictions upon the types of individuals admitted as residents, among other requirements.  The Facility is subject to annual and unscheduled inspections by the Iowa Department of Inspections and Appeals.  The Debtor is in compliance with the provisions of Chapter 135C in all material respects, and is licensed by the Iowa Department of Inspection and Appeals.

71.     In the case of the Debtor, the need for bankruptcy is driven by considerations

unrelated to patient care.  As further set forth in the Disclosure Statement, the occupancy at the

Residential Care Facility and Health Care Facility are strong at 90.4% and 88.6%.  The Debtor's

main problem is the level of occupancy in its living units (which does not involve the delivery of

health care services) is only at 68.0%.  As the largest component of the Facility, the low

occupancy in the living units was one of the primary drivers in the need to restructure the

Debtor's long term bond obligations.

72.     As outlined above, the Debtor is subject to a variety of licensing regimes in the

State of Iowa.  I believe these regulatory authorities and the Debtor's historic good standing with

these licensing agencies should provide sufficient protection to the patients.

73.     The Facility is managed by financially sound Lifespace who manages a number of

other continuing care retirement communities and provides those patients adequate care.

Moreover, Lifespace has an "A" rating and therefore has sufficient financial wherewithal to

maintain a high level of patient care.

74.     In this case, I do not believe that there should be any tension between the patients

and the Debtor.  This case was filed as a prepackaged Chapter 11 where the patients' and

residents' rights will be unaltered.  The resident's executory contracts will be assumed under the

Plan.

75.     I believe that an ombudsman would serve little purpose in this case.  The Debtor

hopes to have its prepackaged plan approved as soon as possible and to exit bankruptcy in less

than two months.  I believe an ombudsman would only result in additional costs without

providing a benefit and therefore believe that these facts demonstrate that appropriate safeguards

23

are already in place to ensure that patients will receive the appropriate level of care, and the

appointment of an ombudsman would only be financially burdensome and redundant.

   H.  *Disclosure Statement Approval/Plan Confirmation Motion*

76.   The Debtor seeks entry of an order scheduling a combined hearing on adequacy

of the Disclosure Statement and confirmation of the Plan and approving the form and manner of

notice thereof; (ii) setting the deadline to object to the adequacy of the Disclosure Statement and

confirmation of the Plan; and (iii) approving solicitation procedures with respect to the Plan.

77.   As part of its calculus in analyzing how best to restructure its debt obligations, the

Debtor determined that a lengthy chapter 11 proceeding would harm its ongoing business

operations and decrease its going concern value.  As the Debtor's main business obstacle has

been obtaining and maintaining the necessary occupancy levels to generate sufficient revenues to

service its debt, a lengthy stay in bankruptcy would only exacerbate this problem.  Potential new

residents at the Facility would likely be wary of making a significant financial commitment to an

entity that is the subject of a Chapter 11 proceeding.  By using the prepackage reorganization

structure, the Debtor and the Consenting Bondholders hoped to minimize the negative impacts

from the Debtor's Chapter 11 proceeding by making the stay in bankruptcy short.  Permitting a

combined hearing on the Plan and Disclosure Statement would promote judicial economy,

expedite the Debtor's successful reorganization and emergence from bankruptcy, minimize the

negative effects of the bankruptcy filing on the Debtor's business, mitigate the unnecessary cost

and disruption of the bankruptcy proceedings, and provide creditors and interest holders with the

greatest opportunity to maximize their recovery and distributions.

78.   In connection with the solicitation of votes on the Plan, the Debtor employed

Globic Advisors as its voting agent (the "**Voting Agent**") to disseminate the Disclosure

Statement, Plan, Ballots and related documents to the parties entitled to vote.  The Voting Agent also tabulated the Ballots returned by the parties entitled to vote.

79.     The Debtor believes that the Solicitation Procedures employed by the Voting Agent were adequate to provide all holders of the 2007 Bonds and Lifespace a meaningful opportunity to review the solicitation materials and cast a vote on the Plan.

80.     In addition to the distribution made by the Voting Agent, the Bond Trustee also distributed a notice to the holders of the 2007 Bonds notifying them of the commencement of the solicitation process.

81.     The establishment of November 15, 2013 as the record date for determining who is entitled to vote on the Plan was logical as it was the last business day prior to the date the solicitation packages were disseminated.

82.     The voting deadline of January 6, 2014 was selected by the Debtor so as to provide sufficient time in light of the holidays for the holders of the 2007 Bonds and Lifespace to review the solicitation materials and cast their ballots.  These creditors were given a period of 49 calendar days in which to review the materials and cast their ballots.

## CONCLUSION

83.     To minimize any loss of value to its business, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 case with as little interruption to the Debtor's operations as possible.  If this Court grants the relief requested in the above discussed First Day Motions, the prospect of achieving these objectives – to the maximum benefit of creditors, parties in interest, and the Debtor's estate – will be substantially enhanced.

[Signature on Following Page]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 10, 2014

By: _____
Name:   Scott M. Harrison
Title:    President and Chief Executive Officer
          of the Debtor