# DISCLOSURE STATEMENT FOR SOLICITATION OF ACCEPTANCES OF A PREPACKAGED PLAN OF REORGANIZATION FOR DEERFIELD RETIREMENT COMMUNITY, INC.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING EASTERN TIME) ON JANUARY 6, 2014 UNLESS EXTENDED BY DEERFIELD (THE "**VOTING DEADLINE**").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A PREPACKAGED PLAN OF REORGANIZATION PRIOR TO THE FILING OF A VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  <u>NO CHAPTER 11 CASE HAS YET BEEN COMMENCED</u>.  AS NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF BANKRUPTCY CODE § 1125(a).   IF A VOLUNTARY REORGANIZATION CASE IS FILED, IMMEDIATELY FOLLOWING SUCH FILING, DEERFIELD RETIREMENT COMMUNITY, INC., AS THE DEBTOR, EXPECTS TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND THE SOLICITATION OF VOTES FOR AND CONFIRMING, THE PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN.

Deerfield Retirement Community, Inc. ("**<u>Deerfield</u>**," or after commencement of the Chapter 11 Case, the "**<u>Debtor</u>**") hereby transmits this disclosure statement (as may be amended, supplemented or otherwise modified from time to time, the "**<u>Disclosure Statement</u>**") pursuant to Section 1126(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**<u>Bankruptcy Code</u>**"), in connection with Deerfield's solicitation of votes (the "**<u>Solicitation</u>**") to confirm the Prepackaged Plan of Reorganization for Deerfield Retirement Community, Inc. dated November 18, 2013 (as may be amended, supplemented or otherwise modified from time to time, the "**<u>Plan</u>**").  All capitalized terms in this Disclosure Statement not otherwise defined herein shall have the meanings given to them in the Plan attached hereto as <u>Exhibit 1</u>.  The purpose of this Disclosure Statement is to provide holders of Claims that are entitled to vote on the Plan (holders of First Lien Bond Claims, First Lien Lifespace Claims and Lifespace Unsecured Claims) (the "**<u>Voting Classes</u>**") with sufficient information to allow them to make an informed decision on whether to accept or reject the Plan.

The overall purpose of the Plan is to enable Deerfield to reduce its debt leverage and better position Deerfield to compete and fulfill its charitable mission.  Generally, the Plan provides that:

- Each holder of the Senior Living Facility Revenue Refunding Bonds (Deerfield Retirement Community, Inc.) Series 2007A and Series 2007B Extendable Rate Adjustable Securities (collectively, the "**Series 2007 Bonds**") issued by the Iowa Finance Authority shall receive its pro rata share of (i) $23,736,500 of Senior Living Facility Revenue Bonds (Deerfield Retirement Community, Inc.) Series 2014A issued by the Iowa Finance Authority ($580 in principal amount of Series 2014A Bonds per $1,000 in Series 2007 Bonds held) and (ii) $4,452,640 of Senior Living Facility Subordinate Revenue Bonds (Deerfield Retirement Community, Inc.) Series 2014B issued by the Iowa Finance Authority ($108.80 in principal amount of Series 2014B Subordinate Bonds per $1,000 in Series 2007 Bonds held);

- Lifespace Communities, Inc. ("**Lifespace**") will receive $1,000 of the Series 2014C Bonds in exchange for each $1,000 of principal amount First Lien Lifespace Claims held by Lifespace;

- Lifespace, in exchange for the cancellation of approximately $18,500,000 in unsecured obligations owing by Deerfield, will (i) have the existing management agreement assumed as modified, (ii) retain its approximately $300,000 claim to a resident refund and (iii)  retain its "member" status in Deerfield; and

- **All Allowed Claims of other creditors, including unsecured creditors and the residents, will be paid in full in accordance with their normal terms and such claim holders shall otherwise retain all of their rights against Deerfield.**

THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.   THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR WILL THERE BE ANY DISTRIBUTION OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PLAN.

DEERFIELD HAS ENTERED INTO A PLAN SUPPORT AGREEMENT WITH LIFESPACE AND CERTAIN BENEFICIAL HOLDERS OF THE SERIES 2007 BONDS HOLDING APPROXIMATELY 63% OF THE PRINCIPAL AMOUNT OF THE SERIES 2007 BONDS (SUCH PARTIES, THE "**PLAN SUPPORT PARTIES**").   PURSUANT TO THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT PARTIES, AS APPLICABLE, HAVE AGREED TO, AMONG OTHER THINGS, VOTE ALL OF THEIR CLAIMS IN FAVOR OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.   THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST DEERFIELD ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST DEERFIELD (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NONE OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), ANY OTHER SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY OR ANY COURT HAS APPROVED OR DISAPPROVED THE PLAN, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE PLAN OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY DEERFIELD AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY DEERFIELD IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY DEERFIELD.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING.  THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS.   ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN

DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING DEERFIELD OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON DEERFIELD OR HOLDERS OF CLAIMS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.   EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS.**

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO RISKS AND UNCERTAINTIES.   FORWARD-LOOKING STATEMENTS GIVE DEERFIELD'S CURRENT EXPECTATIONS RELATING TO ITS FINANCIAL CONDITION, RESULTS OF OPERATIONS, PLANS, OBJECTIVES, FUTURE PERFORMANCE AND BUSINESS.   THESE STATEMENTS MAY INCLUDE WORDS SUCH AS "ANTICIPATE," "ESTIMATE," "EXPECT," "PLAN," "INTEND," "BELIEVE" AND OTHER WORDS AND TERMS OF SIMILAR MEANING IN CONNECTION WITH ANY DISCUSSION OF THE TIMING OR NATURE OF FUTURE OPERATING OR FINANCIAL PERFORMANCE OR OTHER EVENTS.   THESE FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT DEERFIELD HAS MADE IN LIGHT OF ITS EXPERIENCE IN THE INDUSTRY IN WHICH IT OPERATES, AS WELL AS ITS PERCEPTIONS OF HISTORICAL TRENDS, CURRENT CONDITIONS, EXPECTED FUTURE DEVELOPMENTS AND OTHER FACTORS IT BELIEVES ARE APPROPRIATE UNDER THE CIRCUMSTANCES.   ALTHOUGH DEERFIELD BELIEVES THAT THESE FORWARD-LOOKING STATEMENTS ARE BASED ON REASONABLE ASSUMPTIONS, YOU SHOULD BE AWARE THAT MANY FACTORS COULD AFFECT DEERFIELD'S ACTUAL FINANCIAL CONDITION OR RESULTS OF OPERATIONS AND CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE FORWARD-LOOKING STATEMENTS.   THESE FACTORS INCLUDE, AMONG OTHER THINGS, THOSE DISCUSSED IN ARTICLE X OF THIS DISCLOSURE STATEMENT TITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

**DEERFIELD SUPPORTS CONFIRMATION OF THE PLAN.  DEERFIELD URGES ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

**IF THE CHAPTER 11 CASE IS FILED, DEERFIELD INTENDS TO CONTINUE OPERATING ITS BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE AND TO OBTAIN THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO PAY ITS EMPLOYEES, AGENTS, TRADE AND CERTAIN OTHER CREDITORS IN FULL AND ON TIME IN ACCORDANCE WITH EXISTING BUSINESS TERMS. DEERFIELD AND THE PLAN SUPPORT PARTIES BELIEVE THAT IT IS IN THE BEST INTERESTS OF DEERFIELD TO CONTINUE TO PAY SUCH CREDITORS IN FULL AND ON TIME, BECAUSE: (I) DOING SO WILL MINIMIZE THE RISK OF DISRUPTION TO DEERFIELD'S BUSINESS; (II) THE PLAN PROVIDES FOR THE UNIMPAIRMENT OF RESIDENT UNSECURED CLAIMS AND GENERAL UNSECURED CLAIMS; AND (III) THE CHAPTER 11 CASE IS EXPECTED TO BE BRIEF IN DURATION DUE TO ITS PREPACKAGED NATURE.**

## QUESTIONS AND ANSWERS ABOUT THE RESTRUCTURING THROUGH A PREPACKAGED PLAN OF REORGANIZATION

*The following are some questions and answers regarding the Prepackaged Plan of Reorganization.  It does not contain all of the information that may be important to you.  You should carefully read this Disclosure Statement to fully understand the terms of the Plan, as well the Plan itself, in making your investment decision.  You should pay special attention to Article X regarding "Certain Risk Factors to be Considered."  Capitalized terms used in this Disclosure Statement but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan, a copy of which is attached hereto as Exhibit 1.*

**General**

**Q:    What is the purpose of the Restructuring Transaction?**

A:    Deerfield believes that a financial restructuring is necessary to provide it with a tenable long-term capital structure and sufficient liquidity to conduct its operations.  Overall, the purpose of the Restructuring Transaction is to reduce Deerfield's debt leverage and better position it to compete in the market.

The Restructuring Transaction is expected to be accomplished through a plan of reorganization after the filing of a bankruptcy petition under Chapter 11 of the Bankruptcy Code.  If the Plan is approved by the Bankruptcy Court and consummated, the following transactions will occur (the "**Restructuring Transaction**"):

- The existing $40,925,000 of Series 2007 Bonds will be cancelled in exchange for (i) $23,736,500 of Series 2014A Bonds and (ii) $4,452,640 of Series 2014B Subordinate Bonds, with the obligations on the Series 2014 Bonds being secured by the same collateral as secures the Series 2007 Bonds (but with the Series 2014B Subordinate Bonds secured on a subordinated basis).

- Bridge financing in the approximate amount of $2,500,000 issued by Lifespace and a portion of the deferred management fees owing to Lifespace will be converted into the Series 2014C Bonds, with such obligations secured on a pari passu basis with the collateral that secures the other Series 2014A Bonds.

- Unsecured advances totaling $18,500,000 made by Lifespace to Deerfield will be cancelled, but Lifespace will retain its right to an approximately $300,000 resident refund, will have its management agreement assumed, as modified, and will retain its "member" status in Deerfield as reorganized.

- **All other holders of Claims other than the holders of the Series 2007 Bonds, the 2007 Bond Trustee and Lifespace will retain all of their**

**rights against Deerfield as reorganized and will have the right to be paid the full amount owed to them.**

**Q:    What is Chapter 11 bankruptcy?**

A:    Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  It allows a company to continue to manage and operate its business while restructuring its debt, without the need to liquidate and go out of business.  In Chapter 11 bankruptcies, the "debtor" formulates a plan of reorganization which includes the company's proposed new debt and capital structure.  The Chapter 11 plan is then voted on by the company's creditors, and will be approved by the bankruptcy court if it meets certain criteria under the Bankruptcy Code.  Once the Chapter 11 plan is approved, and the conditions to consummating the Chapter 11 plan are met, the company can exit bankruptcy with the new capital structure that was approved as part of its Chapter 11 plan.

**Q:    What is the Plan?**

A:    The Plan attached to this Disclosure Statement as <u>Exhibit 1</u> is Deerfield's means for implementing the Restructuring Transaction described above.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cramdown" provisions of Bankruptcy Code § 1129(b), each class of Claims that is impaired must vote to accept the Plan.  An impaired class of claims is deemed to accept a plan of reorganization if (i) the holders of at least two-thirds in dollar amount and (ii) more than one-half in number of holders of the claims in such class who actually cast ballots vote to accept the plan.

**Q:    Why does Deerfield need to file bankruptcy in order to restructure?**

A:    The 2007 Bond Indenture that governs the Series 2007 Bonds requires unanimous consent from all holders of Series 2007 Bonds in order to complete the Restructuring Transaction outside of bankruptcy.  Since there are numerous holders of the Series 2007 Bonds, Deerfield would not likely receive responses from all such holders giving unanimous consent for the Restructuring Transaction.  However, Chapter 11 of the Bankruptcy Code allows Deerfield to complete the Restructuring Transaction with less than unanimous participation and consent.  To confirm the Plan, Deerfield needs the votes of at least one impaired class of claims who accepts the Plan by favorable votes of (i) the holders of at least two-thirds in dollar amount and (ii) more than one-half in number of holders of the claims in such class who actually cast ballots.  If the Plan is confirmed by the Bankruptcy Court, it will bind all holders of Claims against Deerfield regardless of whether they voted for, against, or did not vote at all on, the Plan.

Therefore, assuming that the Plan satisfies the other requirements of the Bankruptcy Code, a smaller number of claim holders can bind other claim holders to the terms of the Plan to accomplish the Restructuring Transaction than would be required outside of a bankruptcy proceeding.  The confirmation and effectiveness of the Plan are subject to certain conditions that may not be satisfied.  As further discussed in Section 10.1 of this Disclosure Statement, Deerfield cannot assure you that all requirements for confirmation

and effectiveness of the Plan will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan have been met.

**Q:    What impact does the Plan have on trade creditors or residents of the Deerfield Facility?**

A:    Deerfield is committed to preserving its relationships with its trade creditors and the residents at the Facility.  The Plan provides that the rights of trade creditors and the residents of the Facility will be unaltered.  Thus, obligations owing from Deerfield to trade creditors or residents before the filing of the Chapter 11 Case will continue to be owing after confirmation and consummation of the Plan.  Such obligations will not be discharged or impaired.

**Q:    What are the expected results of the Restructuring Transaction?**

A:    Deerfield expects that the Restructuring Transaction, if successful, will reduce its debt leverage and better position it to compete in the marketplace.  Specifically, upon the completion of the Restructuring Transaction, Deerfield expects that its long term indebtedness, including accrued and unpaid interest, will be reduced from an estimated $61 million to an amount of not more than $39.5 million at the closing of the Restructuring Transaction (assuming the full draw of $5 million under the Series 2014C Bonds, and a full draw on the Series 2014D Bonds).  Deerfield will also obtain additional liquidity from Lifespace and will have the proceeds available from the Series 2014D Bonds available to make capital improvements at the Facility.

Assuming that Deerfield is able to complete the Restructuring Transaction, it expects that, for the foreseeable future, cash generated from operations as well as advances made by Lifespace in connection with the Series 2014C Bonds will be sufficient to fund operations and to increase working capital as necessary to support Deerfield's long-term business plan, though there can be no assurance that such cash generated will be sufficient for such purposes.

**Q:    What is the Plan Support Agreement?**

A:    The Plan Support Agreement is a contract that Deerfield entered into with several of its largest stakeholders, including Lifespace and beneficial holders of approximately 63% of the outstanding principal amount of the Series 2007 Bonds, whereby the parties agreed to support the Plan on the terms described therein.  These supporting creditors have agreed to, among other things, vote all of their Claims in favor of the Plan, to support the Restructuring Transaction and to take all reasonable actions necessary and appropriate to consummate the Plan in a timely manner, so long as certain restructuring milestones set forth in the Plan Support Agreement are met.  Such milestones include a deadline for consummation of the Plan by March 31, 2014, as may be further extended with the consent of the Plan Support Parties.  The Plan Support Agreement is attached to this Disclosure Statement as <u>Exhibit 2</u>, which also includes a term sheet for the Restructuring Transaction.  Other parties have the ability to sign the Plan Support Agreement in accordance with its terms.

Because of the commitments made by the Plan Support Parties to vote in favor of the Plan, Deerfield believes that it will receive sufficient votes to confirm the Plan, even if other creditors vote to reject the Plan.

**Q:     Why is it important that I vote to accept the Plan?**

A:     It is important that you vote to accept the Plan to ensure that sufficient votes are received to confirm the Plan and complete the Restructuring Transaction.

**Q:     What happens if sufficient votes are not received?**

A:     If Deerfield fails to obtain sufficient votes to confirm the Plan and implement the Restructuring Transaction, Deerfield has several options available to it, <u>which in Deerfield's opinion will result in worse outcomes for all of Deerfield's creditors and stakeholders</u>.  Since Deerfield cannot meet its obligations under the Series 2007 Bonds as they become due, Deerfield may elect to (i) **do nothing in which case the Holders of the Series 2007 Bonds may seek to foreclose on the Facility**, (ii) commence a bankruptcy case with the goal of selling the Facility, or (iii) commence a bankruptcy case and propose a plan with terms different from the Plan.  Please see Article VII of this Disclosure Statement titled "Alternatives to Confirmation and Consummation of the Plan" for an extended discussion of these possible negative alternatives.

Under any of these alternative scenarios, the potential outcome and recoveries for Deerfield's creditors and stakeholders is likely to be substantially worse than the outcome and recoveries contemplated under the Restructuring Transaction.  Among other things, absent such restructuring, Deerfield will not have sufficient funds available from the operation of the Facility, the debt service reserve funds or other sources of revenue to pay the debt service on the Series 2007 Bonds or the First Lien Lifespace Claims.  A forced sale or liquidation of the Facility and/or Deerfield's other assets would likely generate proceeds far below the expected value and recoveries provided under the Restructuring Transaction.

**Accordingly, Deerfield believes that it is important that you vote to accept the Plan in order to avoid the adverse consequences described above.**

**Q:     What risks should I consider in deciding whether or not to vote in favor of the Plan?**

A:     In deciding whether to vote in favor of the Plan, you should carefully consider the discussion of risks and uncertainties affecting Deerfield, the Plan, and the Series 2014 Bonds described in Article X of this Disclosure Statement titled "Certain Risk Factors to be Considered," which represent certain of the risks that Deerfield faces.  Additional risks and uncertainties not currently known to Deerfield, or that Deerfield currently deems immaterial, may also affect your investment decision and/or impair Deerfield's business operations.  You should carefully consider the other information and data included in this Disclosure Statement and the Exhibits attached hereto for other risks that may affect you.

**Q:      Has the board of directors adopted a position on the Plan?**

A:      Yes.  Deerfield's board of directors has voted in favor of pursuing the Restructuring Transaction through the Plan.

**The Solicitation of the Plan**

**Q:      Who is soliciting votes on the Plan?**

A:      Deerfield is soliciting votes on the Plan.

**Q:      Who is eligible to vote for the Plan?**

A:      Generally, holders of claims in classes that are impaired are eligible to vote on the Plan.  As more fully explained in this Disclosure Statement, a claim is impaired, generally speaking, if its treatment under a plan of reorganization alters the terms of, or rights associated with, that claim.

For the purposes of the Plan, Deerfield has organized the Claims against it into different classes.  Holders of claims impaired by the Plan that are entitled to vote on the Plan will vote on the Plan by class.  Under the Plan, members of the same class are treated the same.  The Plan categorizes the following parties into separate classes of claims: (i) holders of First Lien Bond Claims into Class 1 – these are holders of the Series 2007 Bonds; (ii) the holder of First Lien Lifespace Claims into Class 2; (iii) holders of Other Secured Claims into Class 3; (iv) holders of Priority Claims into Class 4; (v) the holder of Lifespace Unsecured Claims into Class 5; (vi) holders of Resident Unsecured Claims into Class 6; (vii) holders of General Unsecured Claims into Class 7; and (viii) holders of Interests in Deerfield into Class 8.

The holders of Class 1 Claims, Class 2 Claims and Class 5 Claims are impaired and are eligible to vote on the Plan.  The holders of all other claims and interests are unimpaired and conclusively presumed to accept the Plan under Bankruptcy Code § 1126(f) and, thus, are not entitled to vote on the Plan.

**Q:      What will I receive under the Plan if it is confirmed and consummated?**

A:      Each holder of Series 2007 Bonds shall receive its pro rata share of (i) the Series 2014A Bonds and (ii) the Series 2014B Subordinate Bonds.

The holder of the First Lien Lifespace Claims will receive for each principal dollar owed as part of such Claim one dollar of the Series 2014C Bonds.

The holder of the Lifespace Unsecured Claims will retain its right to an approximately $300,000 resident refund, will have its management agreement modified and assumed and will retain its "member" status in Deerfield as reorganized.

Holders of all other Allowed Claims will be paid in full.

**Q:     What vote is needed to confirm the Plan?**

A:     The Bankruptcy Code provides that only holders of claims entitled to vote and who actually cast a ballot will be counted for purposes of determining whether acceptances from a sufficient number of holders of impaired claims in an impaired class have been received to allow the Plan to be confirmed.  If a holder eligible to vote does not deliver an original, duly completed and signed Ballot, such holder's preference on the Plan will not be counted in determining acceptance or rejection of the Plan.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cramdown" provisions of Bankruptcy Code § 1129(b), each class of claims or interests that is impaired must vote to accept the Plan.  An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in dollar amount and more than one-half in number of holders of the claims in such class who actually cast ballots vote to accept the plan.   Under the Plan, holders of the Series 2007 Bonds, the First Lien Lifespace Claims and the Lifespace Unsecured Claims constitute separate impaired classes who are receiving a distribution and therefore are entitled to vote on the Plan. Holders of all other Claims will be unimpaired and conclusively are presumed to accept the Plan.

The Bankruptcy Court may disagree with Deerfield's classification of claims and interests and any party-in-interest may challenge the classification of claims.  If the Bankruptcy Court concludes that the classification of claims under the Plan does not comply with the requirements of the Bankruptcy Code, the Plan may not be confirmed. See Article X for a discussion of certain risk factors to be considered.

If the Plan is confirmed by the Bankruptcy Court, it will bind all holders of claims against Deerfield regardless of whether they voted for, against, or did not vote at all on, the Plan. Therefore, assuming that the Plan satisfies the other requirements of the Bankruptcy Code, a smaller number of holders of claims can bind other holders to the terms of the Plan than would be required to effect the Restructuring Transaction outside of bankruptcy.  Additionally, since claims are grouped in classes for the purpose of voting on the Plan, holders of claims may be bound by the decisions of other claim holders in a way that they otherwise would not be bound outside of bankruptcy.

Due to the commitments made by the Plan Support Parties under the Plan Support Agreement, Deerfield believes that the Plan will receive enough votes from holders of all impaired classes to confirm the Plan.  However, if Deerfield does not receive acceptances from a sufficient number of holders of Series 2007 Bonds to allow the Plan to be confirmed under the Bankruptcy Code, the Plan will not be confirmed or become effective.

**Q:     When is the deadline for submitting Ballots?**

A:     The Ballots must be received by the Voting Agent by **5:00 p.m. (Eastern Prevailing Time) on January 6, 2014**, unless Deerfield extends the date until which Ballots will be accepted.   Except to the extent Deerfield so determines in its sole discretion or as

permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by Deerfield in connection with its request for confirmation of the Plan (or any permitted modification thereof).

Ballots must be sent by mail, hand delivery, overnight courier, facsimile or electronic mail to the Voting Agent, at its address on the Ballot and in this Disclosure Statement. For holders of Series 2007 Bonds voting through a nominee, Beneficial Holder Ballots must be submitted to the nominee with sufficient time for the nominee to submit the Master Ballots to the Voting Agent by the Voting Deadline.  See Article VIII of this Disclosure Statement titled "Summary of Voting Procedures" for additional information regarding the voting process.

**Q:**   **How do I vote on the Plan?**

Please follow the procedures for voting on the Plan described in Article VIII of this Disclosure Statement and on the Ballots you receive.  For further information, contact the Voting Agent at the following address:

**Globic Advisors**
**One Liberty Plaza, 23rd Floor**
**New York, NY 10006**
**Attn: Robert Stevens**
**E-mail: rstevens@globic.com**
**Telephone: 1-800-974-5771**
**Facsimile:  (212) 271-3252**

You may also consult your broker, dealer, commercial bank, trust company or other nominee for assistance.

**Q:**   **Can I revoke my vote?**

A:   Any party that has previously submitted a properly completed Ballot to the Voting Agent before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent, before the Voting Deadline, a subsequent properly completed Ballot for acceptance or rejection of the Plan.  However, Plan Support Parties are restricted in their ability to revoke their vote pursuant to the terms of the Plan Support Agreement.

**Q:**   **Whom do I call if I have any questions about how to submit Ballots or any other questions relating to the Plan?**

A:   Questions and requests for assistance with respect to the procedures for voting on the Plan, as well as requests for additional copies of this Disclosure Statement and the Ballot, may be directed to the Voting Agent at its address and telephone number set forth in this Disclosure Statement.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ...................................................................................................1

    1.1    General. ..................................................................................................................1
    1.2    The Confirmation Hearing. ....................................................................................2
    1.3    Classification of Claims and Interests. ..................................................................2
    1.4    Voting; Holders of Claims Entitled to Vote. .........................................................3
    1.5    Important Matters. .................................................................................................5

ARTICLE II. SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
    OF CLAIMS AND INTERESTS THEREUNDER ............................................................5

ARTICLE III. BUSINESS DESCRIPTION ...............................................................................10

    3.1    General. ................................................................................................................10
    3.2    Capital Structure .................................................................................................10
    3.3    Management of the Facility. ................................................................................12
    3.4    Residents at the Facility. .....................................................................................12
    3.5    Employees. ...........................................................................................................12
    3.6    Regulation. ...........................................................................................................12

ARTICLE IV. EVENTS LEADING TO THE SOLICITATION .................................................13

    4.1    Events Leading to the Solicitation. .....................................................................13
    4.2    The Plan Support Agreement. ..............................................................................14

ARTICLE V. THE CHAPTER 11 CASE AND PLAN .............................................................14

    5.1    Chapter 11 Cases Generally. ...............................................................................14
    5.2    Summary of Distributions under the Plan. ...........................................................15
    5.3    Means for Implementation. ..................................................................................23
    5.4    Discharge. ............................................................................................................29
    5.5    Vesting and Retention of Causes of Action. ........................................................30
    5.6    Survival of Certain Indemnification Obligations. ...............................................30
    5.7    Release, Injunction and Related Provisions. ........................................................31
    5.8    Objections to Claims. ..........................................................................................34
    5.9    Executory Contracts. ...........................................................................................34
    5.10  Conditions Precedent to Confirmation and Consummation of the Plan. ...............35
    5.11  Retention of Jurisdiction. ....................................................................................37
    5.12  Amendments. .......................................................................................................37

ARTICLE VI. CONFIRMATION OF THE PLAN ....................................................................38

    6.1    Confirmation Hearing. .........................................................................................38
    6.2    Confirmation. .......................................................................................................38

6.3     Classification of Claims and Interests....................................................................42

6.4     Consummation. .....................................................................................................43

ARTICLE VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ...................................................................................................................43

7.1     Alternative Plan(s) of Reorganization. ..................................................................43

7.2     Liquidation Under the Bankruptcy Code................................................................44

7.3     Inaction/Maintenance of Status Quo......................................................................44

ARTICLE VIII. SUMMARY OF VOTING PROCEDURES.........................................................44

8.1     The Solicitation Package.......................................................................................44

8.2     Voting Deadline. ...................................................................................................45

8.3     Voting and Revocation Instructions.......................................................................45

8.4     Note to Holders of Claims in the Voting Classes. .................................................48

8.5     Voting Tabulation. ................................................................................................48

ARTICLE IX. THE CHAPTER 11 CASE ANTICIPATED EVENTS .........................................49

9.1     Continuation of Business After the Petition Date...................................................49

9.2     First Day Relief.....................................................................................................49

9.3     Case Administration..............................................................................................50

ARTICLE X. CERTAIN RISK FACTORS TO BE CONSIDERED ..........................................51

10.1    Certain Bankruptcy Considerations. .....................................................................51

10.2    General Business Risks.........................................................................................57

10.3    Risks Specific to the Series 2014 Bonds...............................................................66

ARTICLE XI. SECURITIES LAW MATTERS ........................................................................72

11.1    General..................................................................................................................72

11.2    Issuance of the Series 2014 Bonds Under the Plan.................................................72

11.3    Where You Can Find More Information. ...............................................................73

ARTICLE XII. UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .................73

ARTICLE XIII. CONCLUSION ................................................................................................75

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- Plan (<u>Exhibit 1</u>);

- Plan Support Agreement (<u>Exhibit 2</u>);

- Exchange Disclosure Document (<u>Exhibit 3</u>);

- Audited Financial Statements for Deerfield for the fiscal year ended December 31, 2012 (<u>Exhibit 4</u>);

- Liquidation Analysis (<u>Exhibit 5</u>); and

- Reorganized Company's Projected Financial Information (<u>Exhibit 6</u>).

## ARTICLE I.
## INTRODUCTION

**1.1**   *General.*

Deerfield hereby transmits this Disclosure Statement pursuant to Bankruptcy Code § 1126(b), in connection with the solicitation of votes with respect to the Plan. All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Plan attached hereto as Exhibit 1.

The purpose of this Disclosure Statement is to provide holders of Claims that are entitled to vote on the Plan (*i.e.*, holders of Series 2007 Bonds, First Lien Lifespace Claims and Lifespace Unsecured Claims) with sufficient information to allow them to make an informed decision on whether to accept or reject the Plan. The overall purpose of the Plan is to reduce Deerfield's debt leverage and better position Deerfield to compete in the marketplace. If Deerfield obtains the requisite votes accepting the Plan, Deerfield anticipates commencing the Chapter 11 Case and promptly thereafter seeking approval of this Disclosure Statement and the Plan from the Bankruptcy Court.

**Deerfield has not commenced a case under Chapter 11 of the Bankruptcy Code at this time.**

Deerfield has fixed **5:00 P.M. (prevailing Eastern Time) on November 15, 2013** as the voting record date (the "**Voting Record Date**"). Accordingly, only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot with this Disclosure Statement and may vote on the Plan. If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Voting Agent: **Globic Advisors** at 1-800-974-5771, via e-mail to rstevens@globic.com or send your written inquiry to:

**Globic Advisors**
**One Liberty Plaza, 23rd Floor**
**New York, NY 10006**
**Attn: Robert Stevens**
**Facsimile (212) 271-3252**

**Although the solicitation of votes on the Plan relates to a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, no filing has yet occurred. Deerfield expressly reserves the right to extend the Voting Deadline by oral or written notice to the Voting Agent.**

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement and the Exhibits hereto, including the Plan, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and Bankruptcy Code § 1126(b). In voting on the Plan, holders of Claims entitled to vote should not

rely on any information relating to Deerfield and its business other than the information contained in this Disclosure Statement, the Plan and all Exhibits hereto and thereto.

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made to the Voting Agent.

## 1.2    *The Confirmation Hearing.*

If Deerfield receives the requisite votes in favor of the Plan, then it intends to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Upon the commencement of the Chapter 11 Case, Deerfield intends to request that the Bankruptcy Court schedule, as promptly as practicable, a hearing to (i) approve this Disclosure Statement as containing adequate information within the meaning of Bankruptcy Code § 1125(a), (ii) approve the solicitation of votes on the Plan as being in compliance with Bankruptcy Code § 1126(b), and (iii) confirm the Plan.  Even if Deerfield does not receive the requisite votes in favor of the Plan prior to filing its petitions, Deerfield may decide to file for Chapter 11 relief and seek confirmation of the Plan or a modified plan.

Bankruptcy Code § 1128(a) requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan.  Bankruptcy Code § 1128(b) provides that a party-in-interest may object to confirmation of a plan.  Objections to confirmation must be filed with the Bankruptcy Court and served on the Debtor as well as the other parties set forth in the notice of the Confirmation Hearing (the "**Notice of Confirmation Hearing**") by the objection deadline, as will be set forth therein.  The Notice of Confirmation Hearing shall be provided, among others, to holders of Claims entitled to vote on the Plan, or their representatives.  At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Plan was in compliance with Bankruptcy Code § 1126;

- determine whether the Plan has been accepted by a sufficient number and amount of Class 1 Claims, Class 2 Claims and Class 5 Claims;

- determine whether this Disclosure Statement contains adequate information within the meaning of Bankruptcy Code § 1125(a);

- hear and determine objections, if any, to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

## 1.3    *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in Deerfield, and specifies which Classes are (a) impaired or unimpaired by the Plan, (b) entitled to vote to

-2-

accept or reject the Plan in accordance with Bankruptcy Code § 1126, and (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | First Lien Bond Claims | Yes | Yes |
| Class 2 | First Lien Lifespace Claims | Yes | Yes |
| Class 3 | Other Secured Claims | No | No (Deemed to accept) |
| Class 4 | Priority Claims | No | No (Deemed to accept) |
| Class 5 | Lifespace Unsecured Claims | Yes | Yes |
| Class 6 | Resident Unsecured Claims | No | No (Deemed to accept) |
| Class 7 | General Unsecured Claims | No | No (Deemed to accept) |
| Class 8 | Interests in Deerfield | No | No (Deemed to accept) |

**1.4**   *Voting; Holders of Claims Entitled to Vote.*

Under the Bankruptcy Code, only holders of allowed claims or interests in classes of claims or interests that are impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject a proposed plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or interests under a Chapter 11 plan in which the holders of claims or interests are unimpaired are conclusively presumed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.

In connection with the Plan:

- Claims in **Classes 1, 2 and 5** are impaired and the holders of such Claims will receive distributions under the Plan.  As a result, holders of Claims in **Classes 1, 2 and 5** are entitled to vote to accept or reject the Plan;

- Claims in **Classes 3, 4, 6 and 7** are unimpaired.  As a result, holders of Claims in those Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan;

- Interests in **Class 8** are unimpaired.  Deerfield is a non-profit corporation and as such does not have any shareholders.  However, under Deerfield's organizational documents, Lifespace is designated as a "member" and holds certain non-economic rights with respect to Deerfield's governance.  To the extent this status is considered an "interest" it has been placed in Class 8 and is unimpaired.  As a result, the holder of such Interest is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under a plan vote to accept such plan, unless the provisions of Bankruptcy Code § 1129(b) are met.  For a class of impaired claims to accept the Plan, Bankruptcy Code § 1126 requires acceptance by (i) holders

of at least two-thirds in dollar amount and (ii) more than one-half in number of holders of claims of such class who cast ballots to vote on the Plan.

If a Class of Claims entitled to vote on the Plan rejects the Plan, Deerfield reserves the right to amend the Plan

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Plan and their respective exhibits and related documents are the only materials Deerfield is providing to creditors for their use in determining whether to vote to accept or reject the Plan. Such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

If you are the holder of a Series 2007 Bond, a First Lien Lifespace Claim or a Lifespace Unsecured Claim, please complete, execute and return your Ballot(s) in accordance with the instructions contained therewith on or before the Voting Deadline. All correspondence in connection with voting on the Plan should be directed to the Voting Agent at the following address:

**Globic Advisors**
**One Liberty Plaza, 23rd Floor**
**New York, NY 10006**
**Attn: Robert Stevens**

TO BE COUNTED, AN ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **5:00 P.M., PREVAILING EASTERN TIME, ON JANUARY 6, 2014** UNLESS EXTENDED BY DEERFIELD. ACCORDINGLY, EACH BENEFICIAL HOLDER VOTING THROUGH ITS NOMINEE SHOULD RETURN ITS BENEFICIAL HOLDER BALLOT TO ITS NOMINEE *WELL BEFORE* JANUARY 6, 2014 IN ORDER TO ALLOW SUFFICIENT TIME TO PERMIT SUCH NOMINEE TO DELIVER A MASTER BALLOT, INCLUDING SUCH BENEFICIAL HOLDER VOTE, BEFORE THE VOTING DEADLINE. MASTER BALLOTS MAY BE SENT TO THE VOTING AGENT VIA MAIL, OVERNIGHT COURIER, MESSENGER, FACSIMILE OR ELECTRONIC MAIL. ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Voting Agent. Only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to or on the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims has accepted the Plan. If a Chapter 11 Case is commenced, the Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

**1.5**    *Important Matters.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements.  The projected financial information contained herein and in the Exhibits annexed hereto is, therefore, not necessarily indicative of the future financial condition or results of operations of Deerfield, which in each case may vary significantly from those set forth in such projected financial information.  Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by Deerfield, its advisors, or any other person that the projected financial conditions or results of operations can or will be achieved.

## ARTICLE II.
## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.  The summaries in this table are qualified in their entirety by the description of the treatment of such Claims in Article III of the Plan.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims, Professional Fee Claims and Priority Tax Claims have not been classified.

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 1 | First Lien Bond Claims | Each Holder of a Series 2007 Bond shall receive the following consideration for each $1,000 of principal amount of such Series 2007 Bond held:<br><br>• $580 in principal amount of Series 2014A Bonds.<br><br>• $108.80 in principal amount of Series 2014B | Impaired | Entitled to Vote | $40,925,000 | 69% |

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| | | Subordinate Bonds. | | | | |
| | | For the avoidance of doubt, no distributions will be made under the Plan to Holders of Series 2007 Bonds for accrued and unpaid interest or with respect to any other amounts besides outstanding principal amounts due; but the 2007 Bond Trustee may make distributions from amounts held under the 2007 Bond Indenture to pay such amounts. | | | | |
| | | The 2007 Bond Trustee shall receive payment of all its unpaid reasonable fees and expenses due under the 2007 Bond Indenture through the Effective Date in Cash. | | | | |
| Class 2 | First Lien Lifespace Claims | In satisfaction of each Allowed First Lien Lifespace Claim, the holder of the Allowed First Lien Lifespace Claim shall receive in respect of each $1,000 of principal amount of its First Lien Lifespace Claim $1,000 of the Series 2014C Bonds. | Impaired | Entitled to Vote | $2,755,372 million | 95% |
| | | For the avoidance of doubt, no distributions will be made to the | | | | |

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| | | Holder of the Allowed First Lien Lifespace Claim on account of accrued and unpaid interest or with respect to any other amounts besides outstanding principal amounts due (which shall include deferred management fees due under the Management Agreement for the period from July 1, 2013 through the Petition Date at the reduced rate of 50%). | | | | |
| Class 3 | Other Secured Claims | Subject to the provisions of Bankruptcy Code §§ 502(b)(3) and 506(d), each holder of an Allowed Other Secured Claim shall have its Claim Reinstated. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $0 | 100% |
| Class 4 | Priority Claims | In satisfaction of each Allowed Priority Claim, each holder thereof shall receive (i) to the extent such Claim is due and owing on the Effective Date, payment in full, in Cash, on the Distribution Date; (ii) to the extent such Claim is not due and owing on the Effective Date, payment in full, in Cash, in accordance with the | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $174,000[1] | 100% |

---

[1]    This amount assumes a full week of payroll will be due in addition to $5,000 of sales and use taxes. Since the Petition Date is not yet determined, this amount may change based upon the actual amounts outstanding as of the Petition Date.

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|-------|----------------------|-----------|--------|---------------|--------------------------|--------------------|
| | | terms of any agreement between such Holder and the Reorganized Debtor, or when such Claim otherwise becomes due and owing under (a) applicable non-bankruptcy law, or (b) in the ordinary course of business; or (iii) such other treatment as may be agreed to by such Holder and the Reorganized Debtor. | | | | |
| Class 5 | Lifespace Unsecured Claims | On the Effective Date, the holder of the Allowed Lifespace Unsecured Claim shall receive, in full and final satisfaction of its Allowed Lifespace Unsecured Claim, (i) the Reinstatement of the Lifespace Resident Refund Assignment, (ii) assumption of the Management Agreement (as modified as described in Section 4.07 of the Plan); provided however, the deferred management fee due for the period of July 1, 2013 through the Petition Date (at the reduced rate of 50%) shall be treated as part of the First Lien Lifespace Claim. (iii) retention of its "member" status with Deerfield as reorganized.<br><br>No other distributions shall be made (other than | Impaired | Entitled to Vote | $18,800,000 million | 1.5% |

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| | | the retention of its Interests in the Reorganized Debtor) in connection with the discharge of the Claims arising under or related to the Subordinated Loan Documents, the Support Agreement Documents and the Lifespace Extraordinary Advances. | | | | |
| Class 6 | Resident Unsecured Claims | On the Effective Date, all Resident Unsecured Claims shall be Reinstated. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $30,000[2] | 100% |
| Class 7 | General Unsecured Claims | On the Effective Date, all General Unsecured Claims shall be Reinstated. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $282,000[3] | 100% |
| Class 8 | Interests in Deerfield | On the Effective Date, all Interests in Deerfield shall be Reinstated. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | N/A | 100% |

The recoveries set forth above are estimates and are contingent upon approval of the Plan as proposed.

---

[2] This amount is an estimate of advance deposits placed and other amounts due to residents. It does not include the estimated $6,451,804 which is contingently due to residents who no longer reside at the Facility that becomes payable when their units are resold. Since the Petition Date is not yet determined, this amount may change based upon the actual amounts outstanding as of the Petition Date.

[3] This amount is based upon historical accounts payable amounts. Since the Petition Date is not yet determined, this amount may change based upon the actual amounts outstanding as of the Petition Date.

## ARTICLE III.
## BUSINESS DESCRIPTION

### 3.1    *General.*

Deerfield Retirement Community, Inc. was formed as an nonprofit corporation in Iowa in 2000 for the purpose of owning and operating a life care retirement community known as "**Deerfield Retirement Community**" located at 13731 Hickman Road, Urbandale, Iowa (the "**Facility**").  The Facility is a life care retirement community designed to accommodate persons 62 years of age or older.

Deerfield's core business is owning and operating the Facility, although certain services related to the Facility are provided by Lifespace pursuant to a Management Agreement.  The Facility offers seniors a continuum of care in a 46 acre campus-style setting, providing living accommodations and related healthcare and support services to a target market of upper-middle class-income seniors.  The Facility enables seniors to remain at the same location while adapting to changing needs for healthcare services by providing various levels of support and care.

The Facility is comprised of 32 townhomes and 138 independent living apartments (together, the "**Living Units**"), common areas, a residential care facility with 24 residential care living units, and a health center with 30 skilled nursing care beds.  The common areas include a multi-purpose room, a formal dining room, a private dining room, guest suites, a billiards/cards room, a library, a lounge, an arts and crafts studio, an exercise room, a beauty-barber shop and a bank office.  The on-site residential care facility has its own common areas.  The on-site health center provides private rooms, a physical therapy room, arts and crafts therapy area, dining rooms and lounges.

For the twelve months ending September 30, 2013, Deerfield recorded gross revenue of approximately $7,267,000 and incurred net losses of approximately $4,393,000.  A copy of Deerfield's audited financial statements for 2012 are attached hereto as Exhibit 4.

### 3.2    *Capital Structure*

#### (a)    **Series 2007 Bonds.**

To finance the construction and development of the Facility, Deerfield had the Iowa Finance Authority issue its Revenue Bonds (Deerfield Retirement Community, Inc. Project) Series 2003A and Series 2003B (the "**Series 2003 Bonds**").

In 2007, Deerfield repaid the Series 2003 Bonds through the issuance by the Iowa Finance Authority of its (i) Senior Living Facility Revenue Refunding Bonds (Deerfield Retirement Community, Inc.) Series 2007A in the original principal amount of $40,955,000 and (ii) Senior Living Facility Revenue Refunding Bonds (Deerfield Retirement Community, Inc.) Series 2007B Extendable Rate Adjustable Securities in the original principal amount of $3,210,000, pursuant to an Indenture of Trust dated as of May 1, 2007 (the "**2007 Bond Indenture**") between the Iowa Finance Authority and Bankers Trust Company, N.A. as trustee. Under that certain Loan Agreement dated as of May 1, 2007 (the "**2007 Loan Agreement**") between Deerfield and the Iowa Finance Authority, Deerfield became obligated to make

payments sufficient to discharge the Series 2007 Bonds as they became due.  Today, the Series 2007A Bonds are outstanding in an aggregate principal amount of $37,715,000 and the Series 2007B Bonds are outstanding in an aggregate principal amount of $3,210,000.

Pursuant to the 2007 Loan Agreement, Deerfield granted a security interest in all income, revenues, receipts and other moneys received by or on behalf of Deerfield from the Facility or its operations and all rights to receive the same, with certain exceptions (the "**Pledged Facility Receivables**").

Pursuant to a Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Financing Statement, dated as of May 1, 2007 (the "**2007 Mortgage**"), Deerfield granted (i) a mortgage lien on the real property associated with the Facility, subject to Permitted Liens (as defined therein), and (ii) a security interest in the personal property and fixtures included in the Facility, subject to Permitted Liens, to the 2007 Bond Trustee to secure Deerfield's obligations under the 2007 Loan Agreement, including its obligation to make payments sufficient to discharge the Series 2007 Bonds and certain Parity Debt (as defined in the 2007 Loan Agreement).

The Series 2007 Bonds are also secured by certain funds held by the 2007 Bond Trustee under the 2007 Bond Indenture.  Included among these funds are funds held in the Debt Service Reserve Fund (the "**Debt Service Reserve Fund**").

(b)      **Lifespace Secured Loans.**

As Deerfield's financial difficulties increased and while it was working on formulating the Restructuring Transaction with the holders of the Series 2007 Bonds, commencing in June 2013, Deerfield obtained $2,500,000 in loans from Lifespace as Parity Debt under the 2007 Loan Agreement.  Under the terms of the 2007 Loan Agreement, Parity Debt is secured by the Pledged Facility Receivables and the 2007 Mortgage on a parity basis with the Series 2007 Bonds.  Additionally, Lifespace agreed to defer Deerfield's payment of its fees due to Lifespace under the Management Agreement, which as of the Petition Date will be in the approximate aggregate deferred amount of $255,372.

(c)      **Lifespace Unsecured Loans.**

To provide support to Deerfield, its member, Lifespace entered into (i) that certain Subordinated Loan Agreement dated as of May 15, 2007 (the "**Subordinated Loan Agreement**") between Lifespace, Deerfield and the 2007 Bond Trustee pursuant to which Lifespace provided $4,300,000 of subordinated loans to Deerfield and (ii) that certain Support Agreement dated as of May 1, 2007 (the "**Support Agreement**") among Deerfield, Lifespace and the 2007 Bond Trustee pursuant to which Lifespace provided $3,000,000 of advances to Deerfield.  As of the date of this Disclosure Statement, Deerfield owes Lifespace an approximate amount of (i) $6,600,000 in principal and interest under the Subordinated Loan Agreement, (ii) $3,000,000 under the Support Agreement and (iii) $8,900,000 in respect of other additional advances made by Lifespace to Deerfield from time to time.

      **(d)**    **Interests.**

      As a 501(c)(3) nonprofit corporation, Deerfield does not have shareholders. However, its by-laws identify Lifespace as its sole "member" with certain rights related to Deerfield's governance.

**3.3**    *Management of the Facility.*

      Lifespace currently provides management services to Deerfield at the Facility pursuant to that certain Administrative Services Agreement dated as of April 13, 2002 (the "**Management Agreement**"). Lifespace presently provides management services to 11 other continuing care retirement communities in six other states. In total Lifespace provides management services to over 5,000 residents. Under the terms of the Management Agreement, Lifespace is paid a monthly management fee equal to 5% of Deerfield's revenues.

**3.4**    *Residents at the Facility.*

      As of September 30, 2013, the Facility's occupancy rates were as follows:

| | |
|---|---|
| Living Units | 68.0% |
| Residential Care Facility | 90.4% |
| Health Center | 88.6% |

      Deerfield currently offers Residency Agreements in four different formats. The different forms of Residency Agreements provide for essentially identical services to the residents and have essentially identical terms except for the terms regarding fees and refunds. A detailed description of the Residency Agreements can be found under the heading "Continuing Care Contracts" in Appendix A to the Exchange Disclosure attached as Exhibit 3 hereto. In addition to the residents, Deerfield accepts a limited number of individuals who directly enter the residential care facility or the health center and who do not enter into Residency Agreements for Living Units. A description of the terms of these Care Agreements can be found under the heading "Continuing Care Contracts" in Appendix A to the Exchange Disclosure attached as Exhibit 3 hereto.

**3.5**    *Employees.*

      Deerfield has more than 200 employees working at the Facility. Deerfield endeavors to provide a comprehensive wage and benefit package that is competitive with other comparable organizations in its industry. Deerfield's employee benefit package includes employer-sponsored health insurance, defined contribution retirement plans, paid time off and long-term disability insurance. Employees of Deerfield are not represented by a union and Deerfield management is not aware of any present organizational efforts by any union.

**3.6**    *Regulation.*

      As a life care retirement community, the Facility is subject to numerous regulations, which are administered by state government agencies. Iowa Code Chapter 523D (the "**Retirement Facilities Act**") governs continuing care retirement communities and senior adult

congregate living facilities, facilities that provide housing and other services to residents in consideration of an entrance fee.  The Retirement Facilities Act regulates the provisions of residency agreements and mandates an annual filing certifying compliance with its provisions. Deerfield believes it has satisfied all currently applicable requirements of the Retirement Facilities Act, including entering into an escrow agreement for the entrance fees.  Down payments made by prospective residents and interest earnings are held in an escrow account at Bankers Trust Company N.A.

Iowa Code Chapter 135C regulates Assisted Living Programs, facilities providing housing and other health-related or personal services, and requires that such facilities either be certified by the Department of Elder Affairs or voluntarily accredited.  Deerfield believes it is in compliance with the provisions of Chapter 135C in all material respects.

Iowa Code Chapter 135C regulates health centers and requires that health centers be licensed by the Department of Inspections and Appeals.  Deerfield believes it is in compliance with the provisions of Chapter 135C in all material respects.

A further description of the regulations and licensure requirements with respect to the Facility can be found under the heading "Regulation and Licensure" in Appendix A to the Exchange Disclosure attached as <u>Exhibit 3</u> hereto.  Deerfield believes it has complied with the requirements imposed by Iowa Code Chapter 523D and the residential care facility and the health center are licensed by the  Iowa Department of Inspection and Appeals, in accordance with Iowa Code Chapter 135C.

## ARTICLE IV.
## EVENTS LEADING TO THE SOLICITATION

**4.1**   *Events Leading to the Solicitation.*

The recent economic downturn has had a significant adverse impact on Deerfield.  Many factors, including the steep decline in the residential real estate market, which has impaired the ability of some potential residents to sell their houses and then move into the Facility, and increased competition, have resulted in Deerfield's failure to attract residents as quickly as was forecasted.  This slower occupancy and the resulting utilization of working capital to fund debt service has meant less revenue and cash available for Deerfield to pay operating expenses.

In late 2012, Deerfield commenced discussions with certain holders of the Series 2007 Bonds regarding a restructuring of the bond debt.  These discussions accelerated in June 2013 when Deerfield failed to make its monthly payments to the 2007 Bond Trustee under the 2007 Loan Agreement, which is an event of default under the 2007 Bond Indenture and the Series 2007 Bonds.  After good-faith, arm's-length negotiations, in late August 2013, Deerfield reached an agreement in principle with Lifespace and certain majority holders of the Series 2007 Bondholders on the Restructuring Transaction, which was memorialized in a Term Sheet. Effective as of October 31, 2013, Deerfield, Lifespace and certain holders of the Series 2007 Bonds entered into the Plan Support Agreement (as may be amended or modified, the "**Plan Support Agreement**").

**4.2**      *The Plan Support Agreement.*

Pursuant to the Plan Support Agreement, the Plan Support Parties have agreed to, among other things, vote all of their Claims against Deerfield in favor of the Plan, to support the terms of the Restructuring Transaction and to take all reasonable actions necessary and appropriate to consummate the Plan in a timely manner, so long as certain restructuring milestones set forth in the Plan Support Agreement are met.  Such milestones include a deadline for consummation of the Plan by March 31, 2014, as may be extended with the consent of the Plan Support Parties.

Each of the parties to the Plan Support Agreement has agreed that, unless the Plan Support Agreement is terminated in accordance with the terms thereof, it will not take any action that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Plan, and not directly or indirectly propose, support, solicit, encourage or participate in the formulation of any restructuring for Deerfield other than the Plan.

Nothing in the Plan Support Agreement shall require Deerfield or its board of directors to breach any fiduciary obligations it has under applicable law.

**ARTICLE V.**
**THE CHAPTER 11 CASE AND PLAN**

**5.1**      *Chapter 11 Cases Generally.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor may remain in possession of its assets, continue to manage its business and attempt to reorganize its business for the benefit of the debtor, its creditors and other parties-in-interest.  The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in its property as of the date the petition is filed. Bankruptcy Code §§ 1107 and 1108 provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee.  The commencement of a Chapter 11 case also triggers the automatic stay provisions of Bankruptcy Code § 362.  Bankruptcy Code § 362 provides, among other things, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until confirmation of a plan of reorganization.

Pursuant to Bankruptcy Code § 1102, upon the commencement of a Chapter 11 case, the Office of the United States Trustee (the "**U.S. Trustee**") is required to appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors as the U.S. Trustee deems appropriate.  However, it is not uncommon for the U.S. Trustee to not appoint a creditors' committee in cases where solicitation of a Plan has been conducted before the petition date and holders of unsecured claims are unimpaired.

Pursuant to Bankruptcy Code § 1103, a committee appointed under Bankruptcy Code § 1102 may:

- consult with the trustee or debtor-in-possession concerning the administration of the Chapter 11 case;

- investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business and any other matter relevant to the case or to the formulation of a plan;

- participate in the formulation of a plan and advise those represented by such committee of such committee's determinations as to any plan formulated;

- request the appointment of a trustee or examiner under Bankruptcy Code § 1104; and

- perform such other services as are in the interest of those represented by the committee.

Furthermore, pursuant to Bankruptcy Code § 1109(b), upon the commencement of the Chapter 11 case, any party-in-interest, including the debtor, a creditors' committee, or any indenture trustee may raise and may appear and be heard on any issue in the Chapter 11 case.

**5.2    *Summary of Distributions under the Plan.***

If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim in a particular Class will receive the same treatment as the other holders in the same Class of Claims, whether or not such holder voted to accept the Plan, unless such holder agrees to accept less favorable treatment by settlement or otherwise. Moreover, upon Confirmation, the Plan will be binding on all of Deerfield's creditors regardless of whether such creditors voted to accept the Plan. Such treatment will be in full satisfaction, release and discharge of and in exchange for such holder's Claims against Deerfield, except as otherwise provided in the Plan.

(a)    **Treatment of Unclassified Claims.**

The Bankruptcy Code does not require classification of certain priority claims against a debtor. In this case, these unclassified claims include Administrative Claims, Priority Tax Claims and Professional Fee Claims as set forth below.

(1)    **Administrative Claims.**

Under the Plan, Administrative Claims include any claim for costs and expenses of administration pursuant to Bankruptcy Code §§ 503(b), 507(a)(2), 507(b), or 1114(e)(2) including: the actual and necessary costs and expenses of preserving the Estate and operating the business of the Debtor (such as wages, salaries, or commissions for services, and payments for goods and other services) incurred from the Petition Date and all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930 to the Effective Date, but specifically excludes Priority Tax Claims, Priority Claims, and Professional Fee Claims. Each holder of an Allowed Administrative Claim shall be paid 100% of the unpaid Allowed amount of such Claim in Cash

on the Distribution Date.   Notwithstanding the immediately preceding sentence, Allowed Administrative Claims incurred in the ordinary course of business and on ordinary business terms unrelated to the administration of the Chapter 11 Case (such as Allowed trade and vendor Claims) shall be paid, at the Debtor's or Reorganized Debtor's option, in accordance with ordinary business terms for payment of such Claims.   Notwithstanding the foregoing, the holder of an Allowed Administrative Claim may receive such other, less favorable treatment as may be agreed upon by the claimant and the Debtor or Reorganized Debtor.

### (2)      Priority Tax Claims.

Under the Plan, Priority Tax Claims include any Claim by a governmental unit of the kind specified in Bankruptcy Code § 507(a)(8).   Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall at the election of the Reorganized Debtor either (i) be treated in accordance with the terms set forth in Bankruptcy Code § 1129(a)(9)(C) or (ii) shall be paid in Cash in full on the Distribution Date.

### (3)      Professional Fee Claims.

Under the Plan, Professional Fee Claims include any Claim by a Professional Person (other than an ordinary course professional retained pursuant to an order of the Bankruptcy Court) for compensation or reimbursement pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 503(b) or 1103(a) in connection with the Chapter 11 Case, and a claim by a member of a Committee, if any, arising under Bankruptcy Code § 503(b)(3)(F).   Each Allowed Professional Fee Claim shall be paid in full by the Disbursing Agent in such amounts as are Allowed by the Bankruptcy Court (i) upon the date upon which the order relating to any such Professional Fee Claim is entered and becomes a Final Order, or (ii) upon such other terms as may be mutually agreed upon by and between the Holder of such a Professional Fee Claim and the Debtor (or the Reorganized Debtor as the case may be).

### (b)      Treatment of Classified Claims.

The following describes the Plan's classification of the Claims and Interests that are required to be classified under the Bankruptcy Code and the treatment each holder of Allowed Claims or Allowed Interests will receive for such Claims or Interests:

### (1)      Class 1—First Lien Bond Claims.

The Claims in Class 1 consist of any Claim derived from or based upon the 2007 Indenture Documents and the Series 2007 Bonds, including without limitation, all principal and accrued and unpaid interest owing on the Series 2007 Bonds and all unpaid reasonable fees and expenses of the 2007 Bond Trustee.   The First Lien Bond Claims shall be deemed to be Allowed Claims (i) in the amount of $40,925,000 representing unpaid principal and (ii) all unpaid reasonable expenses due to the 2007 Bond Trustee under the 2007 Bond Indenture.

Treatment:  To the extent not previously paid, on, or as soon as reasonably practicable after, the Effective Date, the Holders of Allowed First Lien Bond Claims shall receive, in full satisfaction of such Claims, the following:

- Each Holder of a Series 2007 Bond shall receive the following consideration for each $1,000 of principal amount of such Series 2007 Bond held:

  o $580 in principal amount of Series 2014A Bonds.

  o $108.80 in principal amount of Series 2014B Subordinate Bonds.

  o For the avoidance of doubt, no distributions will be made under the Plan to Holders of Series 2007 Bonds for accrued and unpaid interest or with respect to any other amounts besides outstanding principal amounts due; but the 2007 Bond Trustee may make distributions from amounts held under the 2007 Bond Indenture to pay such amounts.

  o In addition to exchanging the Series 2007 Bonds for the Series 2014A Bonds and Series 2014B Subordinate Bonds, the holders of the Series 2007 Bonds shall be deemed to have directed the 2007 Bond Trustee to transfer $1,633,164 from the various funds held under the 2007 Bond Indenture to be held in the Debt Service Reserve Fund under the 2014 Bond Indenture solely for the benefit of the Series 2014A Bonds.

- The 2007 Bond Trustee shall receive payment of all its unpaid reasonable fees and expenses due under the 2007 Bond Indenture through the Effective Date in Cash.

Under the terms of the Plan, the Holders of the Series 2007 Bonds will be directed to exchange their holdings in the Series 2007 Bonds for the Series 2014A Bonds and Series 2014B Subordinate Bonds issued by the Iowa Finance Authority as described in more detail below. Deerfield's obligations under the 2007 Loan Agreement will be terminated and the 2007 Mortgage will be released. Deerfield will enter into the 2014 Loan Agreement and 2014 Mortgage as security for repayment of the Series 2014 Bonds. A description of the 2014 Loan Agreement and 2014 Mortgage can be found in the Exchange Disclosure Document attached hereto as Exhibit 3 (the "**Exchange Disclosure**") and the form of such documents are attached as Appendix E and F to the Exchange Disclosure.

The terms of the Series 2014A Bonds and Series 2014B Subordinate Bonds are described in more detail in the Exchange Disclosure and a copy of the 2014 Bond Indenture and forms of the Series 2014A Bonds and Series 2014B Subordinate Bonds are attached as Appendix D to the Exchange Disclosure. In brief, the terms of the Series 2014A Bonds and Series 2014B Subordinate Bonds are as follows:

*Series 2014A Bonds*

| | |
|---|---|
| Principal Amount: | $23,736,500 |
| Interest Rate: | 2.70% until November 15, 2016, then 5.40% thereafter |
| Interest Payment Dates: | May 15 and November 15 |

| Mandatory Redemption Payment Dates: | November 15, 2017 and each November 15th thereafter until maturity |
| Maturity Date: | November 15, 2046 |
| Security: | Secured on a senior basis by the 2014 Loan Agreement and 2014 Mortgage |
| Other Significant Terms: | The Series 2014A Bonds are subject to optional redemption at any time on or after November 15, 2024. |

### Series 2014B Subordinate Bonds

| Principal Amount: | $4,452,640 |
| Interest Rate: | 2.0% but increasing to 3.0% per annum after Deerfield has maintained at least 90% occupancy in the Living Units for three consecutive months and increasing to 4.0% per annum after Deerfield has achieved audited 150 Days Cash on Hand ("**DCOH**") as of the end of a fiscal year |
| Interest Payment Dates: | May 15 with payments being made entirely in kind accreting to the principal balance; provided that payments will be made in Cash (i) for any payment date occurring on or after May 15, 2051 and (ii) on a particular payment date occurring after the earlier of May 15, 2018 and the achievement of Stable Occupancy if the audited DCOH as of the end of the preceding year exceeds 150 days, which Cash payment shall be in an amount equal to 33% of the Excess Cash (as defined in the 2014 Bond Indenture) above the 150 DCOH (with any shortfall on such payment date being paid in kind) |
| Mandatory Redemption Payment Dates | May 15 as described in the other significant terms below |
| Maturity Date: | May 15, 2056 |
| Security: | Secured on a subordinated basis by the 2014 Loan Agreement and 2014 Mortgage (subordinated to the Series 2014A Bonds, Series 2014C Bonds and Series 2014D Bonds) |
| Other Significant Terms: | The Series 2014B Subordinate Bonds are subject to mandatory redemption on May 15, 2051 and |

each May 15th thereafter until maturity.  The Series 2014B Subordinate Bonds are also subject to mandatory redemption on any May 15th commencing the earlier of May 15, 2018 and the achievement of Stable Occupancy if (i) the audited DCOH as of the end of the preceding year exceeds 150 days, and (ii) after payment of interest due on such payment date on the Series 2014B Subordinate Bonds from the 33% of the Excess Cash above the 150 DCOH, which mandatory redemption amount shall be any amount available from the 33% of Excess Cash after payment of such interest.

All First Lien Bond Claims, including those for accrued and unpaid interest, will be discharged and shall not be included in any other Class.

Voting:  Class 1 is Impaired.  Therefore, holders of Class 1 First Lien Bond Claims are entitled to vote to accept or reject the Plan.

### (2)    Class 2—First Lien Lifespace Claims.

The Claims in Class 2 consist of any Claim derived from or based upon (i) that certain Second Amended and Restated Secured Promissory Note dated as of November 8, 2013 in the principal amount of $2,500,000 made by Deerfield in favor of Lifespace and (ii) for deferred management fees due under the Management Agreement for the period from July 1, 2013 through December 31, 2013 of $255,372.  The First Lien Lifespace Claims shall be deemed to be Allowed Claims in the approximate amount of $2,627,686 (the principal amount owing under the Promissory Note and 50% of the deferred management fees owing under the Management Agreement for the period of July 1, 2013 through the Petition Date).

Treatment:  To the extent not previously paid, on, or as soon as reasonably practicable after, the Effective Date, the Holder of Allowed First Lien Lifespace Claims shall receive, in full satisfaction of such Claims, the following:

- The Holder of an Allowed First Lien Lifespace Claim shall receive in respect of each $1,000 of principal amount of its First Lien Lifespace Claim, $1,000 of the Series 2014C Bonds.

- For the avoidance of doubt, no distributions will be made to the Holder of the Allowed First Lien Lifespace Claim on account of accrued and unpaid interest or with respect to any other amounts besides outstanding principal amounts due (which shall include deferred management fees due under the Management Agreement for the period from July 1, 2013 through the Petition Date at the reduced rate of 50%).

The Series 2014C Bonds issued on the Distribution Date with respect to the Allowed First Lien Lifespace Claims have the following attributes:

| | |
|---|---|
| Principal Amount: | $2,627,686 |
| Interest Rate: | 2.70% until November 15, 2016, then 5.40% thereafter |
| Interest Payment Dates: | May 15 and November 15 |
| Mandatory Redemption Payment Dates: | November 15, 2017 and each November 15th thereafter until maturity |
| Maturity Date: | November 15, 2046 |
| Security: | Secured on a senior basis by the 2014 Loan Agreement and 2014 Mortgage |
| Other Significant Terms: | The Series 201C Bonds are subject to optional redemption at any time to the extent the Reorganized Debtor has greater than 120 DCOH for two consecutive quarterly measurement dates and can maintain 120 DCOH after the redemption |

Voting:  Class 2 is Impaired.  Therefore, the holder of Class 2 First Lien Lifespace Claims is entitled to vote to accept or reject the Plan.

### (3)     Class 3—Other Secured Claims.

The Claims in Class 3 consist of any Secured Claim, if any, other than the First Lien Bond Claims and the First Lien Lifespace Claims.

Each Allowed Other Secured Claim in Class 3 shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate Class for purposes of the Plan.  Deerfield does not believe that there are any Claims that will fall into this Class.

Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, and to the extent not previously paid, each Allowed Other Secured Claim shall be Reinstated on the Effective Date.

Voting:  Class 3 is not Impaired by the Plan and each holder of a Class 3 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).  Therefore, holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

-20-

**(4)        Class 4—Priority Claims.**

The Claims in Class 4 consist of any Claim entitled to priority pursuant to Bankruptcy Code § 507(a), other than: (i) an Administrative Claim; (ii) a Priority Tax Claim; and (iii) a Professional Fee Claim.

Treatment:   Except to the extent that a Holder of an Allowed Priority Claim agrees to less favorable treatment, and to the extent not previously paid, Holders of Allowed Priority Claims shall receive, in full satisfaction of such Claims, either (i) to the extent such Claim is due and owing on the Effective Date, payment in full, in Cash, on the Distribution Date; (ii) to the extent such Claim is not due and owing on the Effective Date, payment in full, in Cash, in accordance with the terms of any agreement between such Holder and the Reorganized Debtor, or when such Claim otherwise becomes due and owing under (a) applicable non-bankruptcy law, or (b) in the ordinary course of business; or (iii) such other treatment as may be agreed to by such Holder and the Reorganized Debtor.

Voting:   Class 4 is not Impaired by the Plan and each holder of a Class 4 Priority Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).   Therefore, holders of Class 4 Priority Claims are not entitled to vote to accept or reject the Plan.

**(5)        Class 5—Lifespace Unsecured Claims.**

Allowance:   The Claims in Class 5 consist of any Claim derived from or based upon the Claims of Lifespace against Deerfield arising from or under (a) the Subordinated Loan Documents, (b) the Support Agreement Documents, (c) the Lifespace Extraordinary Advances, and (d) the Lifespace Resident Refund Assignment but shall not include any First Lien Lifespace Claims or any claims under the Management Agreement.   The Lifespace Unsecured Claims shall be deemed to be Allowed Claims in the approximate amount of $18,800,000.

Treatment:   On the Effective Date, the holder of the Allowed Lifespace Unsecured Claims shall receive, in full and final satisfaction of its Allowed Lifespace Unsecured Claims, (i) the Reinstatement of the Lifespace Resident Refund Assignment and (ii) assumption of the Management Agreement (as modified and as described in the Plan); provided, however, the management fees due for the period of July 1, 2013 through December 31, 2013 shall be treated as part of the First Lien Lifespace Claims.   No other distributions shall be made (other than the retention of its Interests in the Reorganized Debtor) in connection with the discharge of the Claims arising under or related to the Subordinated Loan Documents, the Support Agreement Documents and the Lifespace Extraordinary Advances.

Voting:   Class 5 is Impaired.   Therefore, the holder of the Class 5 Lifespace Unsecured Claims is entitled to vote to accept or reject the Plan.

**(6)        Class 6—Resident Unsecured Claims.**

The Claims in Class 6 consist of all the Claims arising under (i) those certain Residency Agreements entered into by and between existing or former residents of the Facility and Deerfield which have not been terminated and any additional documents related thereto and

(ii) those certain Care Agreements entered into by and between Deerfield and individuals residing in the residential care facility or the health center who did not have Residency Agreements.

        Treatment:  Except to the extent that a Holder of an Allowed Resident Unsecured Claim agrees to less favorable treatment, and to the extent not previously paid, each Allowed Resident Unsecured Claim shall be Reinstated on the Effective Date and any executory contract or unexpired lease between a Holder of an Allowed Resident Unsecured Claim and Deerfield shall be deemed assumed.

        Voting:   Class 6 is not Impaired by the Plan and each Holder of a Class 6 Resident Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).  Therefore, Holders of Class 6 Resident Unsecured Claims are not entitled to vote to accept or reject the Plan.

### (7)      Class 7—General Unsecured Claims.

        The Claims in Class 7 consist of any prepetition Unsecured Claim against Deerfield that is not an Administrative Claim, Priority Tax Claim, Professional Fee Claim, First Lien Bond Claim, First Lien Lifespace Claim, Resident Unsecured Claim, Priority Claim, Other Secured Claim, or Lifespace Unsecured Claim.

        Treatment:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, or as provided otherwise in the Plan, and to the extent not previously paid, each Allowed General Unsecured Claim shall be Reinstated on the Effective Date.

        Voting:  Class 7 is not Impaired by the Plan and each Holder of a Class 7 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).  Therefore, Holders of Class 7 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

### (8)      Class 8—Interests in Deerfield.

        Class 8 consists of all contractual and other rights of Lifespace as the designated "member" of Deerfield.

        Treatment:   On the Effective Date, all Interests in Deerfield, if any, shall be Reinstated.

        Voting:  Class 8 is not Impaired by the Plan and the Holder of the Class 8 Interest is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f). Therefore, the Holder of Class 8 Interests is not entitled to vote to accept or reject the Plan.

**5.3**      *Means for Implementation.*

  (a) **Restructuring Transaction.**

    On or as of the Effective Date, the Distributions provided for under the Plan shall be effectuated pursuant to the following transactions (collectively, the "**Restructuring Transaction**"): (i) pursuant to Bankruptcy Code §§ 1141(b) and (c), and except as otherwise provided in the Plan, the property of the Estate shall vest in the Reorganized Debtor, free and clear of all Claims, liens, encumbrances, charges, and other Interests, except as provided in the Plan, the 2014 Indenture Documents or the Confirmation Order and the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein; (ii) the 2014 Indenture Documents will be executed and the 2014 Bonds will be issued as described below; (iii) although Deerfield is a non-profit and does not have equity owners, Lifespace will continue to be identified as the "member" of the Reorganized Debtor and shall have the rights associated with such designation; (iv) Deerfield shall consummate the Plan by (1) facilitating the exchange of the Series 2007 Bonds for the Series 2014A Bonds and Series 2014B Subordinate Bonds, (2) directing the issuance of the Series 2014C Bonds to Lifespace in satisfaction of the First Lien Lifespace Claims and to the extent Lifespace makes an advance of its Exit Commitments (described in Section 5.3(d) below), (3) making Distributions of Cash to holders of Allowed Claims entitled to payment on the Distribution Date, and (4) issuing the Series 2014D Bonds as described in Section 5.3(e) below; and (v) the releases provided for herein, which are an essential element of the Restructuring Transaction, shall become effective.

  (b) **Corporate Action.**

    Deerfield shall continue to exist as the Reorganized Debtor on and after the Effective Date, with all of the powers of a non-profit corporation under Iowa law.  The certificate of incorporation of the Reorganized Debtor shall continue to prohibit the issuance of nonvoting stock to the extent required by Bankruptcy Code § 1123(a)(6).  The adoption of any new or amended and restated certificate of incorporation and by-laws of the Reorganized Debtor and the other matters provided for under the Plan involving the corporate or entity structure of Deerfield or the Reorganized Debtor, or corporate action to be taken by or required of Deerfield or the Reorganized Debtor, shall be deemed to have occurred and be effective as provided herein and shall be authorized and approved in all respects, without any requirement of further action by member or directors of Deerfield or the Reorganized Debtor, as the case may be.  The Confirmation Order shall provide that it establishes conclusive corporate or other authority, and evidence of such corporate or other authority, required for the Debtor and the Reorganized Debtor to undertake any and all acts and actions required to implement or contemplated by the Plan, and no board or member vote shall be required with respect thereto.

  (c) **Execution of the 2014 Indenture Documents.**

    On the Effective Date, the Reorganized Debtor shall take or cause to be taken the following actions simultaneously:

- The Authority and the 2014 Bond Trustee shall execute the 2014 Bond Indenture;

- The Authority shall issue the Series 2014 Bonds;

- The 2014 Bond Trustee shall deliver the Series 2014A Bonds and Series 2014B Subordinate Bonds in exchange for the surrender of the Series 2007 Bonds at the rate of $580 of Series 2014A Bonds and $108.80 of Series 2014B Subordinate Bonds for each $1,000 of Series 2007 Bonds surrendered;

- The 2014 Bond Trustee shall deliver the surrendered Series 2007 Bonds to the 2007 Bond Trustee who shall cancel such Series 2007 Bonds;

- The 2014 Bond Trustee shall deliver to Lifespace $2,627,686 of Series 2014C Bonds and shall deliver such additional series 2014C Bonds as is necessary on the Distribution Date as described in the following paragraph entitled "Lifespace Advances for Series 2014C Bonds;"

- The Reorganized Debtor, Lifespace and the 2014 Bond Trustee shall execute the 2014 Loan Agreement;

- The Reorganized Debtor shall execute and file the 2014 Mortgage and obtain a title insurance policy in connection therewith;

- The 2007 Loan Agreement shall be terminated and the 2007 Mortgage shall be released;

- Lifespace shall execute an amendment to the Management Agreement reducing by 50% its management fees for the period of January 1, 2014 through December 31, 2016; and

- The 2007 Bond Trustee shall transfer to the 2014 Bond Trustee an amount of not less than $1,633,164 from the Debt Service Reserve Fund under the 2007 Bond Indenture to be held by the 2014 Bond Trustee in the Debt Service Reserve Fund under the 2014 Bond Indenture.

**(d)    Lifespace Advances for Series 2014C Bonds.**

On the Distribution Date, Lifespace shall advance funds to the Reorganized Debtor in exchange for the issuance to it of a like amount of Series 2014C Bonds, to the extent funds are needed to maintain a minimum level of thirty (30) days cash on hand. Thereafter, Lifespace shall advance funds to the Reorganized Debtor in exchange for the issuance to it of a like amount of Series 2014C Bonds to maintain a minimum level of thirty (30) days cash on hand through December 31, 2016; provided, however, advances made by Lifespace shall not result in the aggregate amount of Series 2014C Bonds issued to exceed $5,000,000 (subject to the following proviso); provided further that Lifespace may (but shall not be obligated to) make

additional advances of funds to the Reorganized Debtor to satisfy refunds due to residents at the Facility upon their death or withdrawal from the Facility, up to an aggregate amount of $1,500,000 in exchange for the issuance to it of a like amount of Series 2014C Bonds. As a result, at no time will the aggregate principal amount of the Series 2014C Bonds be in excess of $6,500,000.

(e)    **Series 2014D Bond Commitment.**

As part of its agreed treatment as a holder of the Lifespace First Lien Claims, Lifespace agrees that it will acquire from the Reorganized Debtor up to $6,000,000 of Series 2014D Bonds. The Reorganized Debtor may issue the Series 2014D Bonds solely in conjunction with capital projects, including the construction of an auditorium.

At this time Deerfield has not determined the full scope of the capital improvement projects that it desires to undertake. As such, the full $6,000,000 of Series 2014D Bonds may not be issued. Any decisions regarding the capital improvement projects that will be undertaken by the Reorganized Debtor and any related issuance of the Series 2014D Bonds must occur within one year after the Effective Date. The terms of the Series 2014D Bonds are as follows:

*Series 2014D Bonds*

| | |
|---|---|
| Principal Amount: | Up to $6,000,000 |
| Interest Rate: | 2.70% until November 15, 2016, then 5.40% thereafter |
| Interest Payment Dates: | May 15 and November 15 |
| Mandatory Principal Redemption Dates: | November 15, 2047 and each November 15th thereafter until maturity |
| Maturity Date: | November 15, 2050 |
| Security: | Secured on a senior basis by the 2014 Loan Agreement and 2014 Mortgage |
| Other Significant Terms: | The Series 2014D Bonds are subject to optional redemption at any time after the earlier of May 15, 2018 and the achievement of Stable Occupancy if the audited DCOH as of the end of the preceding year exceeds 150 days, which optional redemption amount shall be limited to 33% of the Excess Cash (as defined in the 2014 Bond Indenture) above the 150 DCOH. |

In addition to the scheduled level mandatory principal redemption payments occurring between 2047 and 2050, the Reorganized Debtor will be required to redeem Series 2014D Bonds if, as of any May 15th occurring after the earlier of May 15, 2018 and the achievement of Stable Occupancy, the audited DCOH as of the end of the preceding year exceeds 150 days, in an amount equal to 33% of the Excess Cash above the 150 DCOH.

(f)    **Retention of Marketing Consultant.**

Deerfield engaged Greystone Development Company II, LP ("**Greystone**") on April 1, 2013 to assist with the marketing at the Facility in an effort in increase occupancy. The services that Greystone provides include preparing, updating and coordinating the implementation of a new independent living unit marketing plan, which includes their review and recommendation for changes to resident contracts regarding entrance fees and refund plans, deferred entrance fee plans, monthly service fees and sale and move-in incentives. Deerfield will assume its contract with Greystone and certain of its recommendations will be implemented by the Reorganized Debtor. The Greystone contract will conclude upon the earlier of (i) achieving ninety percent occupancy of the independent living units or (ii) forty-eight months from the commencement of marketing services.

(g)    **Effectuating Documents and Further Transactions.**

The Debtor and the Reorganized Debtor shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, so long as such documents, contracts, instruments and other agreements are consistent with the Plan and the Plan Support Agreement.

(h)    **Managers and Officers of the Reorganized Debtor.**

As of the Effective Date, employees of Deerfield will remain employed by the Reorganized Debtor on the same terms and conditions as existed on the Effective Date, to assist the Reorganized Debtor with the administration of the Estate and business of the Reorganized Debtor. Notwithstanding the foregoing, and for the avoidance of doubt, all employment agreements, if any, governing the employment of such parties with the Debtor shall be deemed assumed as of the Effective Date in accordance with Section 6.01 of the Plan.

(i)    **Directors of the Reorganized Debtor.**

As of the Effective Date, the Reorganized Debtor's board of directors shall consist of those certain individuals, the names of which are set forth in Appendix A attached to the Exchange Disclosure, which are the same members of the board of directors as of the Petition Date. Following the occurrence of the Effective Date, the board of directors of the Reorganized Debtor may be replaced by such individuals as are selected in accordance with the organizational documents of the Reorganized Debtor.

(j)    **General Distribution Mechanics.**

Notwithstanding anything herein to the contrary, no Distribution shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim. Except with respect to Claims which are Reinstated, no claimant shall have recourse to the Reorganized Debtor (or any property thereof), other than with regard to the enforcement of rights or Distributions under the Plan.

Any Cash payment to be made pursuant to the Plan will be in U.S. dollars and may be made by draft, check, or wire transfer, in the sole discretion of the Debtor or the Reorganized Debtor, or as otherwise required or provided in any relevant agreement or applicable law.  Any payment or Distribution due on a day other than a Business Day may be made, without interest, on the next Business Day.

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Reorganized Debtor may, in lieu of making such Distribution to such Person, make such Distribution into a segregated account until the disposition thereof shall be determined by Court order or by written agreement among the interested parties.

Unless otherwise provided herein, on or immediately after the Effective Date, the Reorganized Debtor or the Distribution Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Distribution, and subject to Bankruptcy Rule 9010, unless otherwise provided herein, make all distributions to any holder of an Allowed Claim at (a) the address of such holder on the books and records of the Debtor or its agents, (b) at the address in any written notice of address change delivered to the Debtor or the Distribution Agent, or (c) in the case of a holder of a First Lien Bond Claim, at the address either on record with the DTC or in the 2007 Bond Trustee's official records.  In the event that any distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Distribution Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such Distribution shall be made to such Holder without interest, provided, however, such Distributions shall be deemed unclaimed property under Bankruptcy Code § 347(b) at the expiration of one year from the relevant Distribution Date.

The Reorganized Debtor or applicable Distribution Agent shall hold all unclaimed property (and all interest, dividends, and other distributions thereon), for the benefit of the Holders of Claims entitled thereto under the terms of the Plan.  At the end of one (1) year following the relevant Distribution Date of particular Cash or Series 2014 Bonds, the Holders of Allowed Claims theretofore entitled to unclaimed property shall be deemed to have forfeited such property, whereupon all right, title and interest in and to such property shall immediately and irrevocably revest in the Reorganized Debtor, such Holders shall cease to be entitled thereto and: (a) any such unclaimed property that is Cash (including Cash interest, maturities, dividends and the like) shall be property of the Reorganized Debtor free of any restrictions thereon; and (b) any Series 2014 Bonds that are unclaimed property shall be canceled.  The Reorganized Debtor or the applicable Distribution Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtor's books and records or relevant registers maintained for such Claims.

Notwithstanding any other provision of the Plan, only Series 2014 Bonds in denominations of round dollars shall be issued.  When any Distribution on account of an Allowed Claim would otherwise result in the issuance of a number of Series 2014 Bonds that is not a round dollar, the actual Distribution of such Series 2014 Bonds shall be rounded to the next higher or lower number as follows:  (a) fractions equal to or greater than ½ shall be rounded up

to the next higher whole dollar; and (b) fractions less than ½ shall be rounded down to the next lower whole dollar.

### (k)     Withholding Taxes.

Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions under the Plan. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.  Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that is to receive a Distribution of Cash and/or Series 2014 Bonds pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution.

### (l)     Exemption from Certain Transfer Taxes.

To the fullest extent permitted by applicable law, (a) all sale transactions consummated by the Debtor and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtor of any owned property pursuant to Bankruptcy Code §§ 363(b) or 1123(b)(4), any assumption, assignment, and/or sale by the Debtor of its interests in unexpired leases of non-residential real property or executory contracts pursuant to Bankruptcy Code § 365(a), and (b) the creation, modification, consolidation or recording of any mortgage pursuant to the terms of the Plan, the 2014 Indenture Documents or ancillary documents, shall constitute a "transfer under a plan" within the purview of Bankruptcy Code § 1146, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### (m)     Exemptions from Securities Laws.

The issuance of the Series 2014 Bonds pursuant to the Plan shall be exempt from any securities laws registration requirements to the fullest extent permitted by Bankruptcy Code § 1145.

### (n)     Setoffs and Recoupments.

The Reorganized Debtor, or its designee as instructed by such Reorganized Debtor, may, pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights and causes of action that the Reorganized Debtor may hold against the holder of such Allowed Claim after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by the Reorganized Debtor of any and all claims, rights and causes of action that the Reorganized Debtor may possess against such holder.

(o)      **Insurance Preservation and Proceeds.**

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover claims against the Debtor or any other Person.

**5.4    *Discharge.***

(a)      **Scope.**

Except as otherwise provided in the Plan or Confirmation Order, in accordance with Bankruptcy Code § 1141(d)(1), entry of the Confirmation Order acts as a discharge, effective as of the Effective Date, of all debts of, Claims against, and liens on, the Debtor, its assets or properties, which debts, Claims, and liens arose at any time before the entry of the Confirmation Order.  The discharge of the Debtor shall be effective as to each Claim, whether the Claim is an Allowed Claim or whether the holder thereof votes to accept the Plan.  On the Effective Date, as to every discharged Claim, any holder of such Claim shall be precluded from asserting against the Debtor, the Reorganized Debtor or its assets or properties, any other or further Claim based upon any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date.

(b)      **Injunction.**

In accordance with Bankruptcy Code § 524, the discharge provided by this Section 10.06 of the Plan and Bankruptcy Code § 1141, *inter alia*, acts as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims, and liens discharged by the Plan.

(c)      **Releases of Liens.**

Unless a particular Claim is Reinstated: (i) each holder of a First Lien Bond Claim and First Lien Lifespace Claim shall, on or immediately before the Effective Date and as a condition to receiving any Distribution under the Plan:  (A) turn over and release to the Debtor, or the Reorganized Debtor, as applicable, any and all property of the Debtor or the Estate that secures or purportedly secures such Claim; and (B) execute such documents and instruments as the Debtor or the Reorganized Debtor require to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, right, title and interest in such property shall revert to the Reorganized Debtor free and clear of all Claims, including (without limitation) liens, charges, pledges, encumbrances and/or security interests of any kind subject to the Liens created upon Consummation of the Plan.  All liens of the holders of such Claims in property of the Debtor, the Estate, and/or the Reorganized Debtor shall be deemed to be canceled and released as of the Effective Date.  To the extent any holder of a Claim described in the first sentence of this subsection fails to release the relevant liens as described above, the Reorganized Debtor may act as attorney-in-fact, on behalf of the holders of such liens, to provide any releases as may be required.

(d)      **Cancellation of Stock/Instruments.**

The Series 2007 Bonds (including all other 2007 Indenture Documents) and any other note, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor under the First Lien Lifespace Claims or the Lifespace Unsecured Claims that is not Reinstated, and any rights of any holder in respect thereof, shall be deemed cancelled on the Effective Date, provided, however, the 2007 Bond Indenture shall continue in effect solely for purposes of allowing the 2007 Bond Trustee to make the Distributions to be made on account of the Series 2007 Bonds.

## 5.5    *Vesting and Retention of Causes of Action.*

Except as otherwise provided in the Plan (including, but not limited to, Section 4.09 of the Plan), on the Effective Date all property comprising the Estate (including, subject to any release provided for herein, any claim, right or cause of action which may be asserted by or on behalf of the Debtor, shall be vested in the Reorganized Debtor free and clear of all Claims, liens, charges, encumbrances and interests of creditors, except for the rights to Distribution afforded to holders of Allowed Claims under the Plan.  After the Effective Date, the Reorganized Debtor shall have no liability to holders of Claims other than as provided for in the Plan.  As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire and settle and compromise claims or interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement entered into in connection with the Plan or by order of the Bankruptcy Court, in accordance with Bankruptcy Code § 1123(b), the Reorganized Debtor shall retain and may enforce any claims, rights and causes of action that the Debtor or the Estate may hold.  The Reorganized Debtor may pursue those claims, rights and causes of action in accordance with what is in its best interests and in accordance with its fiduciary duties.

## 5.6    *Survival of Certain Indemnification Obligations.*

The obligations of the Debtor to indemnify individuals who serve or served on or after the Petition Date as their respective directors, officers, agents, employees, representatives, and Professional Persons retained by the Debtor pursuant to the Debtor's certificate of incorporation, by-laws, applicable statutes and preconfirmation agreements in respect of all present and future actions, suits and proceedings against any of such officers, directors, agents, employees, representatives, and Professional Persons retained by the Debtor, based upon any act or omission related to service with, for, or on behalf of the Debtor on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be expanded, discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the reorganization contemplated by the Plan and shall be performed and honored by the Reorganized Debtor regardless of such confirmation, consummation and reorganization, and regardless of whether the underlying claims for which indemnification is sought are released pursuant to the Plan.

5.7     *Release, Injunction and Related Provisions.*

(a)     **Releases by the Debtor and its Estate**

Except as otherwise expressly provided in the Plan or the Confirmation Order, and subject to the terms of any prior Bankruptcy Court orders, pursuant to Bankruptcy Code § 1123(b), for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of restructuring contemplated by the Plan, on the Effective Date, the Released Parties shall be deemed released and discharged by the Debtor, the Reorganized Debtor, and the Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of the Debtor, the Reorganized Debtor, the Estate, or their affiliates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the 2007 Indenture Documents, the Subordinated Loan Documents, the Support Agreement Documents, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the receipt of any payment or advance prior to the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, this Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, including but not limited to the 2014 Indenture Documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing release (i) will have no effect on the liability of any Released Party arising from an act, omission, transaction, agreement, event or other occurrence determined by a Final Order issued by a court of competent jurisdiction to constitute fraud, willful misconduct, or gross negligence; and (ii) will not constitute a release or waiver of any defense available to the Debtor, the Reorganized Debtor, or the Estate in connection with any Disputed Claim asserted against the Debtor, the Reorganized Debtor, or the Estate by any Released Party.  The releases described herein shall be binding upon all Persons.  Notwithstanding the foregoing, nothing in this Section 5.7 shall be deemed to assert or imply any admission of liability on the part of any of the parties released hereby.

(b)     **Exculpation and Limitation of Liability.**

Except as otherwise specifically and expressly provided in the Plan, none of the Released Parties, shall have or incur, and each such party is hereby exculpated from, any liability (whether arising under contract, tort, or federal or state securities laws, whether known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise) to, or be subject to any right of action by, any Holder of a Claim or Interest or any other party in interest, or (with respect to such Claims or Interests) any of their respective agents, Affiliates, or any of their successors or assigns, for any prepetition or postpetition act or omission taken or not taken (as the case may be) or any other transaction, event, or occurrence in any way connected

-31-

with, relating to, or arising out of, (i) Debtor's out-of-court restructuring efforts; (ii) the Debtor's Chapter 11 Case and the commencement and administration thereof; (iii) this Disclosure Statement, the Plan, the Plan Supplement, any agreement, instrument, or other document related thereto (including the 2014 Indenture Documents), and all transactions contemplated thereby; (iv) the pursuit of Confirmation and the approval of this Disclosure Statement (including, without limitation, the formulation, negotiation, preparation, dissemination, implementation, or administration of any of the foregoing documents, or the solicitation of votes in connection therewith), or any orders of the Bankruptcy Court related thereto; (v) the administration and Consummation of the Plan and the occurrence of the Effective Date; (vi) the property to be distributed in the manner contemplated by, the Plan or any other Final Order; (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; or (viii) any other act taken or omitted to be taken in connection with, or in contemplation of, any of the restructuring or other transactions contemplated by the Plan or any document related thereto, in each instance, except any act, omission, transaction, agreement, event or other occurrence determined by a Final Order to constitute fraud, willful misconduct, or gross negligence (the "**Precluded Claims**"), and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(c)       **Releases by Holders of Impaired Claims.**

As of the Effective Date, except as otherwise provided for in the Plan, to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each Person or Entity which has held, holds, or may hold a Claim in Classes 1, 2 and 5, solely in its capacity as the Holder of such Claim, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtor, the Reorganized Debtor, the Released Parties, and the Estate from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of any such Holder, Person, or Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Holder, Person, or Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the 2007 Indenture Documents, the Subordinated Loan Documents, the Support Agreement Documents, the subject matter of, or the transactions or events giving rise to, any Claim in such Classes that is treated in the Plan, the restructuring of Claims related to such Classes prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, this Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, including but not limited to the 2014 Indenture Documents (including, without limitation, the Precluded Claims); provided, however, that the foregoing release (i) will have no effect on the liability of the Debtor, the Reorganized Debtor, or the Estate arising from an act, omission, transaction, agreement, event or other occurrence determined by a Final Order issued by a court of competent jurisdiction to constitute fraud, willful misconduct, or gross negligence of the Debtor or Reorganized Debtor; and (ii) will not constitute a release or waiver of any Claim available to the Holder of a Disputed Claim in connection with such Disputed Claim asserted against the Debtor, the Reorganized Debtor, or the Estate.

      **(d)**      **Permanent Injunction.**

EXCEPT AS SPECIFICALLY AND EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE CONFIRMATION DATE, ANY PERSON (OTHER THAN THE DEBTOR, OR THE REORGANIZED DEBTOR) WHO HAS HELD, HOLDS, OR MAY HOLD A CLAIM IN CLASSES 1, 2 OR 5 AGAINST THE DEBTOR, THE ESTATE, OR THE REORGANIZED DEBTOR, OR ANY CLAIM CLASSIFIED IN CLASSES 1, 2 OR 5 AGAINST ANY PERSON (INCLUDING THE DEBTOR) FOR WHICH THE DEBTOR OR THE REORGANIZED DEBTOR IS OR MAY BE DIRECTLY LIABLE OR INDIRECTLY LIABLE BY WAY OF CONTRIBUTION, INDEMNITY (INCLUDING AN OBLIGATION TO PAY DEFENSE COSTS UNDER THE PLAN OR OTHERWISE) OR OTHERWISE IS, WITH RESPECT TO ANY SUCH CLAIM, PERMANENTLY ENJOINED FROM AND AFTER THE EFFECTIVE DATE FROM TAKING ANY OF THE FOLLOWING ACTIONS (I) ASSERTING, COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING ANY OF THE DEBTOR, THE ESTATE, OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM FOR WHICH THE DEBTOR OR REORGANIZED DEBTOR IS DIRECTLY OR INDIRECTLY LIABLE BY WAY OF CONTRIBUTION, INDEMNITY OR OTHERWISE, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY OF THE DEBTOR, THE ESTATE, OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM FOR WHICH THE DEBTOR OR REORGANIZED DEBTOR IS DIRECTLY OR INDIRECTLY LIABLE BY WAY OF CONTRIBUTION, INDEMNITY OR OTHERWISE; (III) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN OF ANY KIND AGAINST THE DEBTOR, THE ESTATE, OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM FOR WHICH ANY OF THE DEBTOR OR REORGANIZED DEBTOR ARE OR MAY BE DIRECTLY OR INDIRECTLY LIABLE BY WAY OF CONTRIBUTION, INDEMNITY OR OTHERWISE; (IV) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE TO ANY OF THE DEBTOR, THE ESTATE, OR THE REORGANIZED DEBTOR, ON ACCOUNT OF ANY SUCH CLAIMS FOR WHICH ANY OF THE DEBTOR OR REORGANIZED DEBTOR ARE OR MAY BE DIRECTLY OR INDIRECTLY LIABLE BY WAY OF CONTRIBUTION, INDEMNITY OR OTHERWISE; (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN; AND (VI) PROSECUTING, COMMENCING, CONTINUING OR OTHERWISE ASSERTING ANY RIGHT, CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE PLAN OR THAT IS OTHERWISE INCONSISTENT WITH THE PROVISIONS OF THE PLAN. ANY PERSON INJURED BY ANY WILLFUL VIOLATION OF SUCH INJUNCTION SHALL RECOVER ACTUAL DAMAGES, INCLUDING COSTS AND ATTORNEYS' FEES, AND, IN APPROPRIATE CIRCUMSTANCES, MAY RECOVER PUNITIVE DAMAGES, FROM THE WILLFUL VIOLATOR(S).

(e)      **Exclusive Jurisdiction.**

The Bankruptcy Court (and the United States District Court for the Southern District of Iowa) shall retain exclusive jurisdiction to adjudicate any and all claims or causes of action released pursuant to Article X of the Plan (i) against any Released Party, (ii) relating to the Debtor, the Plan, the Distributions, the Chapter 11 Case, the Restructuring Transaction, or any contract, instrument, release, agreement or document executed and delivered in connection with the Plan and the Restructuring Transaction, and (iii) brought by the Debtor (or any successor thereto) or any holder of a Claim.

**5.8      *Objections to Claims.***

From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without Court approval.

Any objections or disputes with respect to any Claims (other than Claims in Classes 1, 2 and 5) made prior to the Effective Date will continue to exist on and after the Effective Date and such objections or disputes will not be adjudicated in the Chapter 11 Case, but shall be addressed by the Reorganized Debtor in the ordinary course of business.

**5.9      *Executory Contracts.***

(a)      **Executory Contracts and Unexpired Leases.**

On the Effective Date, all executory contracts and unexpired leases of Deerfield and/or the Estate shall be assumed by Deerfield and assigned to the Reorganized Debtor pursuant to the provisions of Bankruptcy Code §§ 365 and 1123, except:  any executory contracts that give rise to the First Lien Bond Claims, First Lien Lifespace Claims or the Lifespace Unsecured Claims (other than the Management Agreement), if any, each of which shall be deemed rejected.

**For the avoidance of doubt, each Residency Agreement and Care Agreement, and all obligations arising thereunder, including the repayment of any entrance fees, will be assumed by the Reorganized Debtor as of the Effective Date pursuant to the Plan.**

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of executory contracts and unexpired leases, the assumption or rejection of which is provided for in Section 6.01 of the Plan pursuant to Bankruptcy Code §§ 365 and 1123 and such assumption or rejection shall be deemed effective as of the Effective Date.

(b)      **Cure.**

Except as otherwise provided under the Plan, any Cure Payment shall be effected or otherwise satisfied by prompt payment of such monetary amount as contemplated by Bankruptcy Code § 365(b)(1)(A) or as otherwise agreed to by the parties.  If there is a dispute regarding (a) the timing of any Cure Payment required in order to meet the promptness requirement of Bankruptcy Code § 365(b)(1), (b) the nature, extent or amount of any cure requirement, (c) the Reorganized Debtor's ability to provide "adequate assurance of future

performance" (within the meaning of Bankruptcy Code § 365) under the contract or lease to be assumed, or (d) any other matter pertaining to assumption, subject to the provisions of the Plan, the Cure Payment will occur as soon as practicable following the entry of a Final Order or other settlement resolving the dispute.

To the extent it is impossible for the Reorganized Debtor to cure a default arising from any failure to perform a non-monetary obligation, such default shall be cured by performance by the Reorganized Debtor at or after assumption in accordance with the terms of the applicable unexpired lease or executory contract, with the applicable executory contract or unexpired lease remaining in effect for the benefit of the Reorganized Debtor.

**5.10**   *Conditions Precedent to Confirmation and Consummation of the Plan.*

**(a)**      **Conditions Precedent to Confirmation.**

Confirmation will not occur unless and until:

(1)      The Plan Support Agreement shall be in effect in accordance with its terms on the date of the Confirmation Hearing and no breach or default has occurred and is continuing thereunder;

(2)      The Bankruptcy Court has entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under Bankruptcy Code § 1144, in form and substance reasonably acceptable to the Debtor, determining that this Disclosure Statement and pre-petition solicitation of votes on the Plan complied with Bankruptcy Code § 1125(g);

(3)      The Bankruptcy Court has entered the Confirmation Order, which shall not be subject to any stay or subject to an unresolved request for revocation under Bankruptcy Code § 1144, in form and substance reasonably acceptable to the Debtor, Lifespace and the 2007 Bond Trustee, that shall include a finding of fact and conclusion of law that the Debtor, the 2007 Bond Trustee, the 2014 Bond Trustee, the Plan Support Parties and any other applicable party, and their respective present and former members, officers, directors, managers, employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in Bankruptcy Code § 1125(e) and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions; and

(4)The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein or attached to the Plan or this Disclosure Statement have been filed in form and substance reasonably acceptable to the Debtor, Lifespace and the 2007 Bond Trustee.

**(b)**      **Conditions to the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 7.04 of the Plan:

(1)     The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtor, Lifespace and the 2007 Bond Trustee, and has become a Final Order;

(2)     The Plan, and all related documents requiring execution in accordance with the Plan including, without limitation, the 2014 Indenture Documents, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtor that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(3)     The transactions described in Article IV of the Plan, including, without limitation, the issuance of and exchange for the Series 2014 Bonds shall have been substantially consummated prior to or contemporaneously with the occurrence of the Effective Date;

(4)     All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

(5)     Any material alteration to, or interpretation of, any term or provision of the Plan by the Bankruptcy Court shall have been acceptable to the Debtor and the majority of the Plan Support Parties, each in their sole discretion;

(6)     The 2014 Bond Trustee shall have received an opinion, in form and substance reasonably acceptable to the 2014 Bond Trustee, of a nationally recognized bond counsel acceptable to the 2014 Bond Trustee that interest on the Series 2014A Bonds and the Series 2014B Subordinate Bonds will not be included in the gross income of the Holders thereof for purposes of federal income taxation;

(7)     There shall not be in effect on the Effective Date any (i) order entered by a court or (ii) any order, opinion, ruling or other decision entered by any other court or governmental entity or (iii) any applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan; and

(8)     No request for revocation of the Confirmation Order under Bankruptcy Code § 1144 shall remain pending.

**(c)     Waiver of Conditions Precedent.**

Each of the conditions precedent to the Effective Date of the Plan set forth in Section 7.02 of the Plan may be waived in whole or in part with the written consent of the Reorganized Debtor, Lifespace and the 2007 Bond Trustee, whose consents shall not be unreasonably withheld, and without any notice to other parties in interest or the Bankruptcy Court and without a hearing, except that with respect to the bond counsel opinion referred to in Section 7.02(f) of the Plan, only the consent of the 2007 Bond Trustee is required to waive such requirement and the 2007 Bond Trustee may only do so in writing.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Reorganized Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtor or Reorganized Debtor).  The failure of the Reorganized Debtor

to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

### (d)    Revocation, Withdrawal or Non-Consummation.

Subject to the terms of the Plan Support Agreement, the Debtor under the Plan reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, unless otherwise agreed to by the Debtor and any counterparty to such settlement or compromise, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan or this Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, the Reorganized Debtor, or any other Person, (ii) prejudice in any manner the rights of the Debtor, Reorganized Debtor, or any Person in any further proceedings involving the Debtor or Reorganized Debtor, or (iii) constitute an admission of any sort by the Debtor, Reorganized Debtor, or any other Person.  Notwithstanding the above, revocation, withdrawal or failure to consummate the Plan shall not affect any settlement previously approved by the Bankruptcy Court, and such settlements (once effective by their terms) are and remain fully enforceable.

## 5.11    *Retention of Jurisdiction.*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Bankruptcy Code §§ 105(a) and 1142, as set forth in Article IX of the Plan.

## 5.12    *Amendments.*

Subject to the terms of the Plan Support Agreement, the Debtor reserves the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to Bankruptcy Code § 1127 and Bankruptcy Rule 3019, the Debtor or the Reorganized Debtor, as applicable, may alter, amend or modify the Plan at any time prior to or after the Confirmation Date but prior to the Effective Date.  The Debtor reserves the right to include any amended exhibits or schedules in the Plan Supplement.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

Notwithstanding the foregoing, the Debtor may not, without the consent of each of the Plan Support Parties, alter, amend, or modify the Plan, in any manner that (a) materially alters or materially affects the rights or interests of the 2007 Bond Trustee or the Holders of the Series 2007 Bonds, (b) materially alters or materially affects the treatment of the First Lien Bond Claims under the Plan, (c) materially alters or materially affects the terms or characteristics of

the Series 2014 Bonds as set forth in the Plan, or (d) is inconsistent with the terms of the Plan Support Agreement.

## ARTICLE VI.
## CONFIRMATION OF THE PLAN

**6.1**   *Confirmation Hearing.*

Bankruptcy Code § 1128(a) requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  The Debtor will promptly after commencement of the Chapter 11 Case request that the Bankruptcy Court hold a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), including a determination that the Plan solicitation was in compliance with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure or, if there is not any such law, rule or regulation, was made after disclosure of adequate information as defined in the Bankruptcy Code, upon such notice to parties-in-interest as is required by the Bankruptcy Code and the Bankruptcy Court.  Bankruptcy Rule 2002(b) requires no less than 28 days' notice by mail of the time for filing objections to confirmation of the Plan and of the time and place of the confirmation hearing, unless the Bankruptcy Court shortens or lengthens this period.  Holders of impaired Claims, among others, will be provided notice by mail, or by publication if required by the Bankruptcy Court, of the date and time fixed by the Bankruptcy Court for the Confirmation Hearing.

Bankruptcy Code § 1128(b) provides that any party-in-interest may object to confirmation of the Plan.  The Bankruptcy Court will also establish procedures for the filing and service of objections to confirmation of the Plan.  Such procedures will be described in the notice informing parties-in-interest of the time for filing objections to confirmation of the Plan.

**ANY OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY RULES AND ANY PROCEDURES ESTABLISHED BY THE BANKRUPTCY COURT.**

**6.2**   *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Bankruptcy Code § 1129(a) have been satisfied with respect to the Plan.

**(a)**   **Confirmation Requirements.**

Confirmation of a plan under Bankruptcy Code § 1129(a) requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the Chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date;

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtor believes that:

- the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code;

-39-

- the Debtor has complied or will have complied with all of the requirements of Chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of the relevant statutory confirmation requirements.

### (1)    Acceptance.

Classes 1, 2 and 5 are impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 3, 4, 6, 7 and 8 are unimpaired and, therefore, are conclusively presumed to accept the Plan pursuant to Bankruptcy Code § 1126(f).

The Debtor will also seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of Bankruptcy Code § 1129(a).

### (2)    Feasibility; Financial Projections; Valuation.

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, Deerfield has analyzed its ability to meet its obligations under the Plan. As part of this analysis, Deerfield has prepared projections of the financial performance of the Reorganized Debtor for each of the five fiscal years from 2014 through 2018 (the "**Financial Projections**"). The Financial Projections, and the assumptions on which they are based, are set forth in the Projected Financial Information contained in Exhibit 6 hereto.

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur by no later than March 31, 2014.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. THE PROJECTIONS WERE PREPARED DURING 2013. WHILE DEERFIELD BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. DEERFIELD MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS, AND DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE THE FINANCIAL PROJECTIONS TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW.

Deerfield and its advisors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in Exhibit 6. The Financial Projections have not been

examined or compiled by independent accountants. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of Deerfield and its management, and are subject to significant incremental uncertainty as a result of the scope and potential duration of the current economic environment in the United States. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the Reorganized Debtor's actual financial results. Therefore, the actual results achieved throughout the five-year period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

(b)     **Best Interests Test.**

With respect to each impaired Class of Claims, confirmation of the Plan requires that each holder of a Claim either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if Deerfield were liquidated under Chapter 7 of the Bankruptcy Code. To determine what holders of Claims in each impaired Class would receive if Deerfield were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of Deerfield's assets and properties in the context of liquidation under Chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the assets and properties of Deerfield, augmented by the Cash held by Deerfield at the time of the commencement of the liquidation case. Such Cash amount would be (i) first, reduced by the amount of the Allowed Secured Claims, (ii) second, reduced by the costs and expenses of liquidation and such additional administrative claims that might result from the termination of Deerfield's business and the use of Chapter 7 for the purposes of liquidation, and (iii) third, reduced by Deerfield's costs of liquidation under Chapter 7, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of leases and executory contracts (including vendor, agent and customer contracts) assumed or entered into by Deerfield prior to the filing of the Chapter 7 case.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of Deerfield's assets and properties, after subtracting the amounts attributable to the foregoing claims, must be compared with the value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, Deerfield and its advisors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of Deerfield under Chapter 7.

Moreover, Deerfield believes that the value of any distributions to each Class of Allowed Claims in a Chapter 7 case would be less than the value of distributions under the Plan.

Any distribution in a Chapter 7 case would not occur for a substantial period of time.  It is likely that distribution of the proceeds of the liquidation to holders of unsecured claims could be delayed for up to 18 months after the completion of such liquidation in order to resolve claims and prepare for distributions.  In the event litigation is necessary to resolve claims asserted in the Chapter 7 case, the delay could be prolonged.

Deerfield prepared a liquidation analysis which is annexed hereto as Exhibit 5 (the "**Liquidation Analysis**").  The information set forth in Exhibit 5 provides (i) a summary of the liquidation value of Deerfield as a going concern, assuming a Chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's estate (or abandon such assets to allow the secured creditor to conduct such liquidation) and (ii) the expected recoveries of Deerfield's creditors under the Plan.  Deerfield believes that the sale price in a going concern liquidation for the Facility would be no more than between $14 million and $16 million.  A liquidation of the Facility wherein the facility is shut down and then sold would result in even lower recoveries.  The Liquidation Analysis indicates that holders of First Lien Bond Claims would, after payment of liquidation costs and expenses, receive a 39% recovery on their Claims in a going concern liquidation scenario.  In contrast, holders of First Lien Bond Claims would receive a 69% recovery under the Plan.  Further, holders of First Lien Lifespace Claims would receive a 39% recovery in a going concern liquidation and a 95% recovery under the Plan.  Holders of Lifespace Unsecured Claims would receive a zero percent (0%) recovery in a going concern liquidation and a 1.5% recovery under the Plan.  As reflected in Exhibit 5, Classes 5, 6 and 7 would likely have a zero percent (0%) recovery on their Claims in a going concern liquidation scenario.  In contrast, the holders of Allowed Resident Unsecured Claims and Allowed General Unsecured Claims would have a 100% recovery on their Claims under the Plan.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by Deerfield's management and its advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of Deerfield and its management.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of Deerfield and its management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of Deerfield.  Accordingly, the values reflected might not be realized if Deerfield were, in fact, to be liquidated.  The Chapter 7 liquidation period is assumed to last six months following the appointment of a Chapter 7 trustee, allowing for, among other things, the proper marketing and sale of the Facility as a going concern.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

**6.3**    *Classification of Claims and Interests.*

Bankruptcy Code § 1123 provides that a plan of reorganization must classify claims against, and interests in, a debtor.  Under Bankruptcy Code § 1122, a plan of reorganization may classify claims and interests only into classes containing claims and interests which are substantially similar to the other claims or interests in the same class.  The Plan designates seven

classes of claims and one class of interests.  Deerfield believes that it has classified all claims and interests in compliance with the provisions of Bankruptcy Code § 1122.  However, should Deerfield commence the Chapter 11 Case, a holder of a Claim or Interest could challenge Deerfield's classification of Claims and Interests, and the Bankruptcy Court could determine that a different classification is required for the Plan to be confirmed.  In such event, it is Deerfield's intention to seek to modify the Plan to provide for whatever classification might be required by the Bankruptcy Court and to use the acceptances received, to the extent permitted by the Bankruptcy Court, the Bankruptcy Code and the Bankruptcy Rules to demonstrate the acceptance of the Class or Classes which are affected.  Any such reclassification could affect a Class's acceptance of the Plan by changing the composition of such Class and the required vote for acceptance of the Plan and could potentially require a resolicitation of votes on the Plan. Deerfield believes that the Plan meets the classification requirements of the Bankruptcy Code.

**6.4**   *Consummation.*

The Plan will be consummated on the Effective Date.  The Effective Date will occur on a Business Day selected by the Debtor on which the conditions precedent to the effectiveness of the Plan, as set forth in the Plan, have been satisfied or waived pursuant to the Plan.  For a more detailed discussion of such conditions precedent and the consequences of the failure to meet such conditions, see Article X herein.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

**ARTICLE VII.**
**ALTERNATIVES TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN**

**DEERFIELD BELIEVES THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.**

If the Plan is not consummated, Deerfield will remain unable to service its debt obligations, including repayment of the Series 2007 Bonds.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

**7.1**   *Alternative Plan(s) of Reorganization.*

In formulating and developing the Plan, Deerfield considered various alternatives and engaged in an extensive negotiating process with the Plan Support Parties.  Deerfield believes that the Plan fairly adjusts the rights of various Impaired Classes of Claims, and also provides superior recoveries to all Classes over any alternative capable of rational consideration (such as a Chapter 7 liquidation), thus enabling stakeholders to maximize their returns.  If sufficient votes in favor of the Plan are not received, Deerfield could nevertheless commence a Chapter 11 Case

and seek to have an alternate Plan approved.  In such a situation, the probable recoveries to all Holders of Claims would be substantially worse than the treatment accorded under the Plan.

If Deerfield is forced to file for bankruptcy protection without a consensual deal with the holders of the Series 2007 Bonds because such bondholders commence the exercise of remedies, the bankruptcy case could be time-consuming and much more costly than the currently contemplated restructuring.  Deerfield believes that these actions could hinder its ability to obtain financing and make it difficult to restructure its debt obligations.

### 7.2   *Liquidation Under the Bankruptcy Code.*

Deerfield could be liquidated under Chapter 7 of the Bankruptcy Code.  Deerfield believes that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Exhibit 5 attached to this Disclosure Statement.

Further, Deerfield could liquidate by selling all or substantially all of Deerfield's assets pursuant to a sale conducted through either Bankruptcy Code § 363 or through a Chapter 11 plan.  Deerfield considered such options, but believes that at this time neither approach would likely increase the value of the recovery by Deerfield's stakeholders and would likely result in lower aggregate distributions being made to creditors than those provided for in the Plan.

### 7.3   *Inaction/Maintenance of Status Quo.*

If sufficient votes are not received to confirm the Plan, Deerfield could elect to not file bankruptcy.  However, defaults under the 2007 Bond Indenture will continue and the Holders of the Series 2007 Bonds may elect to exercise foreclosure remedies available to them under the 2007 Indenture Documents.  The result to all stakeholders in such a situation is materially worse than the treatment provided in the Plan.

### ARTICLE VIII.
### SUMMARY OF VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan.  Holders of Impaired Claims entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### 8.1   *The Solicitation Package.*

The following materials constitute the solicitation package (collectively, the "**Solicitation Package**"):

- the applicable Ballots and applicable voting instructions;

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits, including the Plan and any other supplements or amendments to these documents.

The Voting Classes shall be sent paper copies of the appropriate Ballots and applicable voting instructions and copies of this Disclosure Statement with all exhibits, including the Plan. Any party who desires paper copies of these documents may request copies by writing to Globic Advisors, One Liberty Plaza, 23rd Floor, New York, NY 10006, Attn: Robert Stevens.

**8.2**    *Voting Deadline.*

The period during which Ballots with respect to the Plan will be accepted by the Voting Agent will terminate on the Voting Deadline, set as 5:00 p.m. (Eastern Prevailing Time) on January 6, 2014, unless Deerfield extends the date until which Ballots will be accepted.  Except to the extent Deerfield so determines in its sole discretion or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by Deerfield in connection with Deerfield's request for confirmation of the Plan (or any permitted modification thereof).

Deerfield reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances has been received.  Deerfield will give notice of any such extension in a manner deemed reasonable to Deerfield in its discretion.

**8.3**    *Voting and Revocation Instructions.*

Only the Voting Classes are entitled to vote to accept or reject the Plan, and they may do so by following the instructions below and the voting instructions attached to the Ballot.  The failure of a holder of a Claim in the Voting Classes to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.

Deerfield is providing the Solicitation Package to holders of Claims in the Voting Classes whose names (or the names of their nominees) appear as of the Voting Record Date, which was November 15, 2013, in the records maintained by Deerfield or the DTC, as applicable.

**(a)    Instructions for Nominees of Holders of Series 2007 Bonds.**

If you are a broker, dealer, commercial bank, trust company or other nominee that is the registered holder of securities, please forward a copy of this Disclosure Statement, the appropriate Beneficial Holder Ballot, and any other enclosed materials to each beneficial owner as of the Voting Record Date and arrange for beneficial owners to vote in accordance with the voting procedures described herein.

As nominee, you may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Beneficial Holder Ballots, together with this Disclosure Statement, a return envelope provided by, and addressed to, you as the nominee, and other materials requested to be forwarded.  Each such beneficial owner may vote on the Plan by completing the information requested on the Beneficial Holder Ballot, indicating its vote on the Beneficial Holder Ballot, and returning the completed original Beneficial Holder Ballot to you, as nominee.  After collecting the Beneficial Holder Ballots, you, as nominee, should, in turn,

complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots received, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline.  All Beneficial Holder Ballots returned by beneficial owners should either be forwarded to the Voting Agent (along with the Master Ballot) or be retained by nominees for inspection for at least <u>one year</u> from the Voting Deadline.

**Each nominee should advise its beneficial owners to return their Beneficial Holder Ballots to the nominee by a date calculated by the nominee to allow it to prepare and return the Master Ballot to the Voting Agent so that it is actually received by the Voting Agent on or before the Voting Deadline**.

Deerfield expects that DTC as a nominee holder of the Series 2007 Bonds, will arrange for its participants to vote by executing a letter of authorization in favor of such participants.  As a result of such letter, each such participant will be authorized to vote its Voting Record Date positions held in the name of such securities clearing agencies, by executing a Master Ballot.  Deerfield shall, in any event, rely on the listing of participants provided by DTC as of the Voting Record Date.

(b)      **Instructions for Beneficial Owners of Series 2007 Bonds.**

If you are a beneficial owner holding securities as a record holder in your own name you should complete the information requested on the Master Ballot, indicate your vote on the Master Ballot, and return the completed original Master Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

If you are a beneficial owner holding securities through a broker, dealer, commercial bank, trust company or other nominee, you or your "nominee" can vote on the Plan by completing the information requested on the Beneficial Holder Ballot, indicating your vote on the Beneficial Holder Ballot, and returning the completed original Beneficial Holder Ballot to your nominee in sufficient time for your nominee then to process the Beneficial Holder Ballot and complete and return the Master Ballot to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline.  If no pre-addressed, postage pre-paid envelope was enclosed for this purpose, your nominee should be contacted for instructions.

Any Beneficial Holder Ballot returned to a nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Voting Agent a Master Ballot that reflects the vote of such beneficial owner.

(c)      **Voting in General.**

Any holder of a Claim in the Voting Classes that has not received the appropriate Ballot should contact its nominee or the Voting Agent at its address and telephone number listed in this Disclosure Statement.

Deerfield has engaged the Voting Agent as the noticing, claims and balloting agent to assist in the balloting and tabulation process.  The Voting Agent will process and tabulate Ballots for each class entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable on or after the Petition Date.

**Any Ballot that is properly executed by the holder of a Claim, but that does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted, provided, however, Master Ballots may reflect the votes of multiple beneficial owners that may be inconsistent as long as each beneficial owner votes its entire claim either in favor of or against the Plan.**

Each holder of a Claim in the Voting Classes must vote all of its Claims within a particular class either to accept or reject the Plan and may not split its votes.

(d)    <b>Withdrawal or Revocation of a Ballot.</b>

Acceptances or rejections of the Plan may be withdrawn or revoked at any time before the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Beneficial Holder Ballot, acting through the nominee who completed the Master Ballot in such beneficial owner's name, as the case may be.  However, after commencement of a reorganization case in connection with the Plan, withdrawal or revocation of votes accepting or rejecting the Plan may be effected only with the approval of the Bankruptcy Court.

Acceptances or rejections in regard to the Plan may be withdrawn or revoked before commencement of a reorganization case in connection with the Plan by complying with the following procedures: (1) a record holder of a Claim in the Voting Classes should deliver a written notice of withdrawal or revocation to the record holder for endorsement and delivery to the Voting Agent and (2) a record holder of a Claim in the Voting Classes who voted securities held for its own account should deliver a written notice of withdrawal or revocation to the Voting Agent.

To be effective, a notice of revocation and withdrawal must:

- be received prior to the Voting Deadline by the Voting Agent at its address;

- specify the name and/or customer account number of the beneficial owner whose vote on the Plan is being withdrawn or revoked;

- contain the description of the Claim as to which a vote on the Plan is withdrawn or revoked; and

- be signed by the beneficial owner of the Claim who executed the Beneficial Holder Ballot reflecting the vote being withdrawn or revoked, or by the nominee who executed the Master Ballot reflecting the vote being withdrawn or revoked, as applicable, in each case in the same manner as the original signature on the Beneficial Holder Ballot or Master Ballot, as the case may be.

-47-

**8.4**    *Note to Holders of Claims in the Voting Classes.*

By signing and returning a Ballot, each holder of a Claim in the Voting Classes will be certifying to the Bankruptcy Court and Deerfield that, among other things:

- the holder has received and reviewed a copy of this Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has cast the same vote with respect to all Claims in the same respective class; and

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claims, then any such Ballots are thereby revoked.

**8.5**    *Voting Tabulation.*

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a claim.

Unless Deerfield decides otherwise, Ballots received after the Voting Deadline may not be counted.  The method of delivery of the Ballots to be sent to the Voting Agent is at the election and risk of each holder of a Claim in the Voting Classes.  Except as otherwise provided herein, a Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot.  **No Ballot should be sent to Deerfield, Deerfield's agents (other than the Voting Agent), or Deerfield's financial or legal advisors.**

Deerfield reserves the right to use the acceptances to seek confirmation of any permitted amendment or modification of the Plan, provided that Deerfield may not make any amendment or modification to the Plan prohibited by the Bankruptcy Code, the Bankruptcy Rules or in violation of the Plan Support Agreement.

The Bankruptcy Court may require Deerfield to disseminate additional solicitation materials if Deerfield makes material changes to the terms of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same holder with respect to the same Claim in the respective Voting Class, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Holders of a Claim in the Voting Classes must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted, provided, however, Master Ballots may reflect the votes of multiple beneficial owners that may be inconsistent as long as each beneficial owner votes its entire claim either in favor of or against the Plan.

In the event a designation of a vote with respect to a Claim on the basis of a lack of good faith is requested by a party-in-interest under Bankruptcy Code § 1126(e), the Bankruptcy Court

will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Deerfield will file with the Bankruptcy Court on the Petition Date, or as soon as practicable thereafter, the voting report prepared by the Voting Agent. The voting report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or e-mail or damaged. The voting report also shall indicate Deerfield's intentions with regard to such irregular Ballots. Neither Deerfield nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the voting report, nor will any of them incur any liability for failure to provide such notification.

## ARTICLE IX.
## THE CHAPTER 11 CASE ANTICIPATED EVENTS

**9.1**   *Continuation of Business After the Petition Date.*

Following the Petition Date, the Debtor intends to operate its business in the ordinary course as debtor-in-possession under Bankruptcy Code §§ 1107 and 1108.

**9.2**   *First Day Relief.*

The Debtor expects that the Chapter 11 Case will be of a short duration, and expects to request that the Bankruptcy Court schedule a confirmation hearing within 30 to 45 days of the Petition Date. To expedite its emergence from Chapter 11, the Debtor intends to seek, among other things, the relief detailed below from the Bankruptcy Court on the Petition Date. If granted, this relief will facilitate the administration of the Chapter 11 Case. There can be no assurances, however, that the Bankruptcy Court will grant the requested relief. Bankruptcy courts customarily provide various forms of administrative and other relief in the early stages of Chapter 11 cases. The Debtor intends to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate its reorganization goals, including the matters described below.

Together with its petition for relief, the Debtor anticipates filing a number of "first day" motions on the Petition Date. The Debtor's first day motions may include, among other things, motions for:

- an order authorizing the Debtor to obtain use of cash claimed as collateral;

- an order authorizing the Debtor (i) to continue the Debtor's current cash management system, (ii) to maintain prepetition bank accounts, (iii) to continue use of existing business forms and existing books and records and (iv) authorizing the Debtor to continue its current investment guidelines and invest its available cash in the customary manner and consistent with past practices;

- an order authorizing the Debtor to pay (i) prepetition employee wages, salaries and other compensation, (ii) prepetition employee business expenses, and (iii) other miscellaneous employee expenses and employee benefits;

- an order authorizing the Debtor to retain certain Professionals, including its legal counsel and financial advisor; and

- such other orders as are typical in reorganization cases or that may be necessary for the preservation of the Debtor's assets or for confirmation of the Plan.

Additionally, Deerfield intends to seek Bankruptcy Court approval shortly after the commencement of the Chapter 11 Case to pay certain of the General Unsecured Claims in the ordinary course of business, including prepetition amounts outstanding to utility companies as adequate assurance, and accrued taxes and regulatory fees to the applicable taxing authorities, among other payments of prepetition amounts typically granted as "first day" relief. The Plan proposes to assume substantially all of Deerfield's executory contracts and unexpired leases, which requires Deerfield to pay such claims in full.

The orders will be sought pursuant to accompanying motions and, if appropriate, memoranda of law. The foregoing list is subject to change depending upon the Debtor's needs in connection with its operations during the Chapter 11 Case. Failure of the Bankruptcy Court to enter certain of these orders, or a delay in doing so, could result in the Chapter 11 Case becoming protracted and could delay, perhaps materially, the hearing on, and the ultimate confirmation of, the Plan.

**9.3**    *Case Administration.*

(a)    **Scheduling of Combined Disclosure Statement and Confirmation Hearing and Approval of Prepetition Solicitation Procedures.**

The Debtor intends to seek an order scheduling a combined Confirmation Hearing and hearing on this Disclosure Statement at which time the Debtor will seek approval of this Disclosure Statement and confirmation of the Plan pursuant to Bankruptcy Code §§ 1125, 1128 and 1129. The Debtor will request this hearing be held no later than forty-five (45) days after the Petition Date. Additionally, the Debtor will seek approval of the prepetition solicitation procedures of acceptances of the Plan from holders of Claims in Voting Classes.

(b)    **Schedules and Statement of Financial Affairs.**

The Debtor does not believe that detailed schedules of assets and liabilities ("**Schedules**") and statements of financial affairs ("**SOFAs**"), which otherwise must be filed in bankruptcy cases, should be required in its proposed prepackaged Chapter 11 Case. In light of the expense to be incurred in connection with preparation of such documents, the lack of impairment of all Classes except Classes 1, 2 and 5 (which Classes shall vote on the Plan) and the confidential nature of the names of the residents at the Facility, the Debtor believes the filing

of such detailed Schedules and SOFAs is unnecessary and will seek a waiver of the requirement to file such documents, or alternatively, if such relief is not granted, an extension of time to file its Schedules and SOFAs.

      (c)      **Retention of Professionals.**

Upon the commencement of the Chapter 11 Case, the Debtor intends to file certain applications to retain professionals who will assist the Debtor in the administration of the Chapter 11 Case.  Among other professionals, the Debtor intends to retain Dorsey & Whitney LLP as restructuring counsel, North Shores Consulting Inc. as financial advisor, and Globic Advisors, as noticing agent.

**ARTICLE X.**
**CERTAIN RISK FACTORS TO BE CONSIDERED**

**10.1**   *Certain Bankruptcy Considerations.*

      (a)      **General.**

While Deerfield believes that the Chapter 11 Case, commenced in order to implement an agreed-upon restructuring, will be of short duration and will not be materially disruptive to it business, Deerfield cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that Deerfield may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, the Chapter 11 Case could have an adverse effect on Deerfield's business.  Among other things, it is possible that bankruptcy proceedings could adversely affect Deerfield's relationships with its key vendors and suppliers, residents, employees and agents.  Bankruptcy proceedings also will involve additional expenses and may divert some of the attention of Deerfield's management away from the operation of the business.

The extent to which bankruptcy proceedings disrupt Deerfield's business will likely be directly related to the length of time it takes to complete the proceedings.  If Deerfield is unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, it may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that can be confirmed.  Such delay would increase both the probability and the magnitude of the potentially adverse effects described herein.

      (b)      **Improper Solicitation of Acceptances.**

Usually, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a Chapter 11 case.  Nevertheless, a debtor may solicit votes before the commencement of a Chapter 11 case in accordance with Bankruptcy Code § 1126(b) and Bankruptcy Rule 3018(b).  Bankruptcy Code § 1126(b) and Bankruptcy Rule 3018(b) require that:

-51-

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of adequate information.

With regard to solicitation of votes before the commencement of a bankruptcy case, if the Bankruptcy Court concludes that the requirements of Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, whereupon the Plan could not be confirmed without a resolicitation of votes to accept or reject the Plan.  While Deerfield believes that the requirements of Bankruptcy Code § 1126(b) and Bankruptcy Rule 3018 will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Bankruptcy Code § 1125(a)(1) describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims to make an informed judgment about the Plan.

If the Bankruptcy Court determines that the disclosures made herein were inadequate, the votes in favor of the Plan will not count.  Deerfield would then have to commence the solicitation process again, which would include re-filing a plan of reorganization and disclosure statement.  Typically, this process involves a 90-day or longer period and includes a court hearing for the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by another solicitation of votes for the plan of reorganization, followed by a confirmation hearing where the Bankruptcy Court determines whether the requirements for confirmation have been satisfied, including the requisite claim holder acceptances.

(c)    **Failure to Confirm the Plan.**

Classes 1, 2 and 5 are the only Classes that are entitled to vote to accept or reject the Plan.  Deerfield believes it will receive the requisite amount of votes in favor of the Plan, in light of the fact that the Plan Support Parties have agreed to vote for, support and not object to the Plan.  Deerfield will thus receive votes from holders of close to two-thirds in amount of holders of First Lien Bond Claims (Class 1) and will receive votes from the holder of 100% of the Lifespace First Lien Claims and the Lifespace Unsecured Claims.  However, it is unknown whether Deerfield will receive the requisite number of accepting votes from Class 1 to meet the Bankruptcy Code requirement to have a majority of those voting in such Class to accept the Plan.

Even if the requisite votes for Classes 1, 2 and 5 are received, the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may decide not to confirm the Plan.  Bankruptcy Code § 1129 requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of Deerfield, and that the value of distributions to dissenting holders of Claims may not be less than

the value such holders would receive if Deerfield was liquidated under Chapter 7 of the Bankruptcy Code. Although Deerfield believes that the Plan meets such test, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

There can be no assurance that modifications to the Plan would not be required for confirmation, or that such modifications would not require a resolicitation of votes on the Plan. Deerfield believes that the Plan would not be followed by a liquidation or an immediate need for further financial reorganization and that holders of claims would receive or retain value that is not less than the value such holders would receive or retain if Deerfield was liquidated under Chapter 7 of the Bankruptcy Code.

If no plan of reorganization can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate Deerfield's assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of claims are set forth in Exhibit 5. Deerfield believes that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that Deerfield's assets would have to be sold or otherwise disposed of over a short period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of Deerfield's operation.

(d)     **Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan.**

The Plan constitutes a settlement, compromise and release of all rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan, taking into account and conforming to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination or Bankruptcy Code §§ 510(b) and (c). This settlement, compromise and release require approval by the Bankruptcy Court in the form of a confirmation order. Deerfield cannot ensure that the Bankruptcy Court will approve of the settlement contemplated in the Plan.

(e)     **Alternative Plans of Reorganization May Be Proposed.**

Once the Chapter 11 Case has commenced, other parties-in-interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. Were such an order to be entered, other parties-in-interest would then have the opportunity to propose alternative plans of reorganization.

If other parties-in-interest were to propose an alternative plan following expiration or termination of Deerfield's exclusivity period, such a plan may be less favorable to, among others, the existing holders of First Lien Bond Claims, First Lien Lifespace Claims, Lifespace Unsecured Claims, Resident Unsecured Claims and General Unsecured Claims. Alternative plans of reorganization also may treat less favorably the claims of a number of other constituencies, including Deerfield's employees, agents, vendors and residents. Deerfield considers maintaining relationships with its employees, agents, residents and vendors as critical to maintaining the value of its business as it restructures, and has sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share Deerfield's assessment and seek to impair the claims of such constituencies. If there are competing plans of reorganization, the Chapter 11 Case is likely to become longer and more complicated.

###### (f)       Failure to Consummate the Plan.

One condition to consummation of the Plan is the entry of the Confirmation Order that will approve, among other things, the assumption of all Deerfield's executory contracts and unexpired leases (other than those related to the Class 1, 2 and 5 Claims) and the execution of the 2014 Indenture Documents. As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring Transaction completed.

The risks to the Consummation of the Plan includes uncertainty with respect to the issuance of the Series 2014 Bonds. The Authority, which will be the issuer of the Series 2014 Bonds, has not yet approved the issuance of such Bonds. Shortly after the dissemination of this Disclosure Statement, Deerfield intends to formally request that the Authority take the actions necessary to approve the issuance of the Series 2014 Bonds upon the Consummation of the Plan. There can be no assurance that the Authority will take such action or that it will timely take such action. However, Deerfield knows of no reason why the Authority would refuse to timely take such action to approve the issuance of the Series 2014 Bonds and the execution of the 2014 Indenture Documents.

###### (g)       Extended Stay in Bankruptcy Proceeding.

While Deerfield expects that a Chapter 11 bankruptcy filing solely for the purpose of implementing the Plan would be of short duration (such as 45-60 days) and would not be unduly disruptive to Deerfield's business, Deerfield cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that Deerfield may spend in bankruptcy, and Deerfield cannot be certain that the Plan would be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on Deerfield's business. There is a risk, due to uncertainty about Deerfield's future, that:

- prospective residents could seek to acquire housing units from Deerfield's competitors, including competitors that have (or may appear to have)

> comparatively greater financial resources and that are in little or no
> relative financial or operational distress;
>
> • employees could be distracted from performance of their duties or more
> easily attracted to other career opportunities; and
>
> • vendors, suppliers or agents and other business partners could terminate
> their relationship with Deerfield or require financial assurances or
> enhanced performance.

A lengthy bankruptcy proceeding would also involve additional expenses and divert the attention of management from operating Deerfield's business, as well as creating concerns for employees, suppliers and residents.

The disruption that a bankruptcy proceeding may inflict upon Deerfield's business could increase with the length of time it takes to complete the proceeding and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties on whom Deerfield depends, including vendors, employees, agents and residents. If Deerfield is unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, Deerfield may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

**(h)    Failure to Receive Bankruptcy Court Approval of Use of Cash Collateral.**

On or shortly after commencing the Chapter 11 Case, Deerfield intends to ask the Bankruptcy Court to authorize it to use cash collateral to fund the Chapter 11 Case. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Case. There can be no assurance that the Bankruptcy Court will approve the use of cash collateral on the terms requested. Moreover, if the Chapter 11 Case takes longer than expected to conclude, Deerfield may exhaust its available cash collateral and could be forced to seek additional financing. There is no assurance that Deerfield will be able to obtain an extension of the right to use cash collateral from its secured creditors or obtain debtor-in-possession financing. In such case, the liquidity necessary for the orderly functioning of Deerfield's business may be materially impaired.

**(i)    Changes, Amendments, Modification or Withdrawal of the Plan.**

Except as otherwise specifically provided in the Plan and the Plan Support Agreement, Deerfield reserves the right to modify the Plan, whether such modification is material or immaterial, and seek confirmation of the Plan as modified, to the extent allowed by the Bankruptcy Court, the Bankruptcy Code and Bankruptcy Rules. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes. All holders of Claims will receive notice of such amendments

or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but before confirmation of the Plan, Deerfield seeks to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims.

If a Chapter 11 case is commenced by or against Deerfield, Deerfield reserves the right not to file the Plan and to revoke or withdraw the Plan at any time before confirmation of the Plan.  If Deerfield revokes or withdraws the Plan, all votes thereon will be deemed to be null and void.  In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of any claims by or against, Deerfield or any other person, or to prejudice in any manner Deerfield's rights or those of any other person.

### (j)    Termination of the Plan Support Agreement in Certain Circumstances.

While pursuant to the Plan Support Agreement certain holders of the Series 2007 Bonds and Lifespace have agreed to support and vote in favor of the Plan, such support can be terminated upon the occurrence of certain "Termination Events" (as defined therein) under the Plan Support Agreement.  Such Termination Events include, among other things, the failure of Deerfield to reach certain milestones in the Chapter 11 Case in a timely manner, such as orders from the Bankruptcy Court approving the Plan, and the occurrence of the Effective Date in accordance with the timeline set forth in the Plan Support Agreement.  While Deerfield believes that it will be able to meet such milestones, there can be no assurance that will be the case. Additional events that constitute Termination Events under the Plan Support Agreement include the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, a material breach by Deerfield of its obligations under the Plan Support Agreement, or a final determination by a court or governmental agency of competent jurisdiction that the transactions contemplated by the Plan cannot legally go forward.  See Exhibit 2 for additional detail.  If a Termination Event occurs and the support of the Plan Support Parties were to be withdrawn, Deerfield may need to amend the Plan and re-solicit votes thereon, or formulate a new Chapter 11 plan and solicit votes on such new plan.  Such amendment and/or re-solicitation could cause material delay in the Chapter 11 Case, and may adversely impact Deerfield's business and its ability to reorganize.

### (k)    Distributions Will Be Delayed.

If the Plan can be confirmed, the date of the distributions to be made pursuant to the Plan will be delayed until consummation of the Plan.  Deerfield estimates that the process of obtaining confirmation of the Plan will last approximately 30 to 45 days from the date of the commencement of Deerfield's Chapter 11 Case but could last considerably longer.  Distributions could be delayed for a minimum of 10 days thereafter and may be delayed for a substantially longer period if Deerfield has not received all required approvals (including the agreement of the Authority to issue the Series 2014 Bonds), or if other conditions to consummation have not yet been met.

(l)      **Objections to Classification of Claims and Interests.**

Bankruptcy Code § 1122 provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  Deerfield believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(m)      **Failure to Receive Bankruptcy Court Approval of First Day Orders.**

In the event of the commencement of the Chapter 11 Case, Deerfield will seek to address potential concerns of its residents, vendors, employees and other key parties-in-interest that might arise from the filing through its intention to seek appropriate court orders to permit them to pay accounts payable to key parties-in-interest in the ordinary course of business.  There can be no guarantee that Deerfield will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party-in-interest Deerfield may seek to treat in this manner.

**10.2**   *General Business Risks*

(a)      **General.**

The recent economic downturn has had a significant adverse impact on the Reorganized Debtor and the Facility.  Many factors, including the steep decline in the residential real estate market, which has impaired the ability of some potential residents to sell their houses and then move into the Facility, and increased competition, have resulted in the failure of the Facility to attract initial residents as quickly as was forecasted.  This slower occupancy and the resulting utilization of working capital, operating and funded interest reserves to fund debt service has meant less revenue and cash available for the Reorganized Debtor to pay operating expenses and to prepay certain outstanding indebtedness.  Together, these factors have resulted in the depletion of the cash, and the working capital, operating and funded interest reserves, of the Reorganized Debtor.

Deerfield's business is conducted primarily in the Des Moines area and, accordingly, Deerfield's business is dependent upon the general economic conditions of this region.  There can be no assurance that future economic conditions in this region, including as a result of the current global economic downturn, will not impact demand for Deerfield's services or cause residents to relocate to other regions, which may adversely impact Deerfield's business, revenue and cash flow.

Creditors of Deerfield face a number of risks related to the Facility or the financial condition of the Reorganized Debtor, and on its ability to pay future obligations, including debt service on the Series 2014 Bonds.  The following discussion of risk factors is not intended to be comprehensive and no representation can be made that other risk factors may not arise that could have a material adverse effect on the business or operations of the Reorganized Debtor.

**(b)    Limited Assets of the Reorganized Debtor; Adequacy of Revenues.**

The Reorganized Debtor has no material assets other than the Facility and the personal property associated therewith and is not expected to have any revenues except those derived from operations of the Facility.  Although it may seek donations from groups and individuals, the Reorganized Debtor currently has no sources of funds (other than those to be provided by Lifespace under its commitment to advance funds in exchange for the Series 2014C Bonds and Series 2014D Bonds) if revenues from operation of the Facility are not sufficient to cover expenses, including debt service on the Series 2014 Bonds.

As noted elsewhere, except to the extent that the Series 2014 Bonds will be payable from the proceeds thereof or investment income thereon or, under certain circumstances, proceeds of insurance, sale or condemnation awards, or by recourse to the 2014 Mortgage, each Series of the Series 2014 Bonds will be payable solely from payments or prepayments to be made by the Reorganized Debtor under the 2014 Loan Agreement as provided therein.  The ability of the Reorganized Debtor to make payments under the 2014 Loan Agreement is dependent upon the generation of revenues by the Reorganized Debtor in the amounts necessary for the Reorganized Debtor to pay the principal of, premium or purchase price, if any, and interest on the Series 2014 Bonds, as well as other operating and capital expenses.  The realization of future revenues and expenses are subject to, among other things, the capabilities of the management of the Reorganized Debtor, changes in occupancy or services provided by the Reorganized Debtor's facilities, government regulation and future economic and other conditions that are unpredictable and that may affect revenues and payment of principal and interest on the Series 2014 Bonds.  No representation or assurance can be made that revenues will be realized by the Reorganized Debtor in amounts sufficient to make its future required payments, including those with respect to debt service on the Series 2014 Bonds.

**(c)    Failure to Achieve and Maintain Turnover and Occupancy; Receipt of Entrance Fees.**

The economic feasibility of the Facility depends in large part upon the ability of the Reorganized Debtor to attract sufficient numbers of residents to the Facility and to achieve and maintain substantial occupancy throughout the term of the Series 2014 Bonds.  This depends to some extent on factors outside the Reorganized Debtor's control, such as the residents' right to terminate their Residency Agreements in accordance with the terms of the Residency Agreements, residents' ability, in certain circumstances, under the terms of their Residency Agreements to defer the payment of entrance fees for up to one year (or longer) following occupancy and general economic conditions.  A depressed housing market may prevent prospective residents from selling their homes and generating sufficient cash to pay entrance fees prior to or within a reasonable time following occupancy, if at all.  Moreover, if a substantial number of residents live beyond the anticipated life expectancies assumed by the Reorganized Debtor or if market changes require a reduction in the amount of the entrance fees payable by new residents, the receipt of additional entrance fees would be curtailed or reduced, with a consequent impairment of the revenues of the Facility.  Such impairment could also result if the Reorganized Debtor is unable to remarket units becoming available when residents die, withdraw, or are permanently transferred to a health care facility or any other facility.  If the Facility fails to maintain occupancy levels or resell, in a timely manner, units as they become

available, or if there is a reduction in the amount of entrance fees received, there may be insufficient funds to pay its obligations, including the debt service on the Series 2014 Bonds.

### (d)      Sale of Personal Residences.

It is anticipated that a number of prospective residents of the Facility will be required to sell their current homes to pay the entrance fee prior to occupancy or to meet other financial obligations under their residency agreements.  If prospective residents encounter difficulties in selling their current homes due to local or national economic conditions affecting the sale of residential real estate, such prospective residents may not have sufficient funds to pay the entrance fee or to meet other financial obligations under their Residency Agreements, thereby causing a delay in remarketing of vacated units that would have an adverse impact on the revenues of the Reorganized Debtor.

### (e)      Nature of Income and Assets of the Elderly.

A large percentage of the monthly income of the residents of the Facility is expected to be fixed in amount, consisting of income derived from savings, pensions, investments and Social Security payments.  If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in operating costs and other expenses, residents may have difficulty paying or may be unable to pay increased fees.  In addition, some residents may need to liquidate assets, such as by selling a home to pay the required fees.  The Reorganized Debtor's inability to collect from residents the full amount of their payment obligations, either when due or at all, may jeopardize the ability of the Reorganized Debtor to pay its obligations in the future, including amounts due under the 2014 Loan Agreement and the Series 2014 Bonds.

### (f)      Organized Resident Activity.

The Reorganized Debtor may, from time to time, be subject to pressure from organized groups of residents seeking, among other things, to raise the level of services or to maintain the level of monthly fees with respect to the Facility or other charges without increase. Moreover, the Reorganized Debtor may be subject to conflicting pressures from different groups of residents, some of whom may seek an increase in the level of services while others wish to hold down monthly fees and other charges.  No assurance can be given that the Reorganized Debtor will be able to satisfactorily meet the needs of such resident groups.

### (g)      Increases in Medical Costs.

Because the Reorganized Debtor is obligated to provide a majority of its residents with certain medical care, a deviation from the anticipated mortality rate or medical care requirements of the resident population or substantial unanticipated increases in the cost of medical care could have a negative impact on the operations of the Reorganized Debtor.  The undertaking to provide such medical care is a contractual obligation of the Reorganized Debtor, and no assurance can be given that the Reorganized Debtor will have sufficient funds to meet its anticipated obligations.  Residents are required to obtain Medicare Part A, Medicare Part B and supplemental insurance satisfactory to the Reorganized Debtor; however, Medicare does not cover the cost of nursing home care except under certain limited circumstances (including up to

100 days of skilled nursing care following a 3-day hospital stay).  In addition, the cost of providing healthcare services may increase due to increases in salaries paid to nurses and other healthcare personnel and due to shortages in such personnel that may require use of employment agencies.

**(h)      Nature of Financial Forecast.**

The financial information contained in Appendix B to the Exchange Disclosure attached as <u>Exhibit 3</u> hereto is based upon assumptions made by the management of the Reorganized Debtor.  There will usually be differences between the forecasted and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  In addition, the information is limited to the five fiscal years ending December 31, 2018.  Consequently, these projections do not cover the whole period during which the Series 2014 Bonds are expected to be outstanding.  The financial information attached to the Exchange Disclosure should be read in its entirety.

BECAUSE THERE IS NO ASSURANCE THAT ACTUAL EVENTS WILL CORRESPOND WITH THE ASSUMPTIONS MADE BY MANAGEMENT, NO GUARANTEE CAN BE MADE THAT THE FINANCIAL FORECAST WILL CORRESPOND WITH THE RESULTS ACTUALLY ACHIEVED IN THE FUTURE.  ACTUAL OPERATING RESULTS MAY BE AFFECTED BY MANY FACTORS, INCLUDING BUT NOT LIMITED TO, INCREASED COSTS, LOWER THAN ANTICIPATED REVENUES, EMPLOYEE RELATIONS, GOVERNMENT REGULATIONS, CHANGES IN POPULATION AND DEMOGRAPHICS TRENDS, CHANGES IN THE SENIOR LIVING INDUSTRY AND GENERAL ECONOMIC CONDITIONS WHICH ARE NOT KNOWN AT THIS TIME.

**(i)      Competition from other Retirement Communities.**

Competition from other continuing care retirement communities now or hereafter located in the service area of the Reorganized Debtor could adversely affect its operations.  The Reorganized Debtor could also be adversely affected by economic trends and changes in the demographics of its service area.

**(j)      Real Estate Taxes.**

The Reorganized Debtor currently pays local real estate taxes in Polk County.  Under current Iowa law, the Reorganized Debtor's facilities other than those listed above are generally exempt from local ad valorem property taxes.  There can be no assurances however, that future legislation will not subject such facilities to ad valorem property taxes or other similar payments or fees in lieu of property taxes.  Moreover, no assurances can be given that the effect of any such prospective property tax payments by the Reorganized Debtor would not be either adverse or material.

**(k)      Regulatory Risks.**

The Reorganized Debtor intends to be engaged in the life care retirement business which includes providing various levels of health care.  For a comprehensive discussion of the Regulatory Risks facing the Reorganized Debtor, please review the information contained under

the headings "Government Regulation of the Health Care Industry," "The Health Reform Law," "Medicare," "Annual Cost Reporting; Licensure and Certification," "Health Insurance Portability and Accountability Act," "State Statutes and Regulations Governing Continuing Care Retirement Communities," "Licensure," and "Statutes and Regulations Governing Long-Term Care Facilities; Relationships with Other Providers" contained under the heading "Bondholders' Risks" in the Exchange Disclosure attached as <u>Exhibit 3</u> hereto.

**(l)     Federal Budget Issues; Changes in Federal and State Law.**

As a result of ongoing disputes in Congress and with the President of the United States regarding the federal debt ceiling limit and attempts to decrease the federal debt, the Budget Control Act of 2011 was signed into law on August 3, 2011 (the "**Budget Control Act**"). The Budget Control Act requires certain immediate budget reductions, and requires the appointment of a committee (the "**Budget Committee**") consisting of six members of the House of Representatives and six United States Senators to formulate a plan for further reductions in federal expenditures and/or increases in revenues that result in a savings of at least $1.5 trillion. Because the Budget Committee did not submit such a plan, certain automatic spending reductions of federal funds went into effect on March 1, 2013, which reductions include certain cuts to Medicare payments to providers. It cannot be predicted what additional actions by the federal government may impact the revenues of the Reorganized Debtor and the ability of the Reorganized Debtor to pay its obligations, including debt service on the Series 2014 Bonds, on a timely basis, or at all.

**(m)     Environmental Risks.**

Health care facilities are subject to a wide variety of federal, state and local environmental and occupational and safety laws and regulations that address, among other things, health care operations or facilities and properties owned or operated by health care providers. Among the types of regulatory requirements improved upon by health care providers are: air and water quality control requirements; waste management requirements; specific regulatory requirements applicable to asbestos, polychlorinated biphenyls and radioactive substances; requirements for providing notice to employees and members of the public about hazardous materials handled by or located at health care facilities; and requirements for training employees in the proper handling and management of hazardous materials and wastes. In their role as owners and operators of properties or facilities, health care providers may be subject to liability for investigating and remedying any hazardous substances that have come to be located on the property, including any such substances that may have migrated off the property. Typical health care operations include, in various combinations, the handling, use, storage, transportation, disposal and discharge of hazardous, infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants or contaminants. For this reason, health care operations are particularly susceptible to the practical, financial and legal risks associated with compliance with such laws and regulations. Such risks may result in damage to individuals, property or the environment; may interrupt operations or increase their cost, or both; may result in legal liability, damages, injunctions or fines; or may trigger investigations, administrative proceedings, penalties or other government agency actions. There can be no assurance that the Reorganized Debtor will not encounter such risks in the future, and such risks may result in

material adverse consequences to the operations or financial condition of the Reorganized Debtor.

**(n)     Other Factors Generally Affecting Health Care Facilities.**

In the future, the following factors, among others, may affect the operations and financial performance of health care facilities, including those of the Reorganized Debtor, to an extent that cannot be determined at this time:

(1)     The recent focus on the billing and collection practices of tax-exempt entities nationwide could result in significant changes to those practices. Any such changes, to the extent they make billing and collection of fees more administratively burdensome or restrictive, could have a substantial impact on the Reorganized Debtor.

(2)     A shortage of qualified professional personnel, particularly registered nurses, could significantly increase payroll costs.    The Reorganized Debtor cannot control the prevailing wage rates in its service area, and any increase in such rates will directly affect its costs of operations and may inhibit the ability of the Reorganized Debtor to provide services of the levels necessary to meet the demands of the Reorganized Debtor's service area.

(3)     The possible inability to obtain future governmental approvals to undertake projects which the Reorganized Debtor deems necessary to remain competitive as to rates and charges and to maintain the quality and scope of care may adversely affect the Reorganized Debtor.

(4)     Iowa law requires that a health facility, including a nursing facility, obtain a certificate of need from the State Health Facilities Council before making certain capital expenditures or acquiring certain kinds of equipment or offering certain types of new services.   This requirement may prevent the Reorganized Debtor from adapting in a timely manner, or at all, to changes in the mix of services needed to meet the needs of its service area and/or to remain competitive with other health care providers. The law contains exemptions which eliminate the requirement for a certificate of need for replacement of previously existing buildings or equipment and for many other types of capital expenditures or new services.   If the certificate of need law is changed or eliminated in the future, the Reorganized Debtor could be subjected to unexpected competition from other healthcare providers which might then be able to enter the Reorganized Debtor's service area and offer some or all of the services provided by the Reorganized Debtor.

(5)     The occurrence of a natural or man-made disaster that could damage the Reorganized Debtor's facilities, interrupt utility service to the facilities, result in an abnormally high demand for healthcare services or otherwise

impair the Reorganized Debtor's operations and the generation of revenues from the facilities.

(6)    Various proposals have been made for tort reform or changes in medical malpractice liability laws or for a patient's bill of rights. It is not possible to predict whether such proposals will be enacted or, if enacted, how the Reorganized Debtor would be affected by tort reform legislation, if at all.

(7)    Changes in the economy and difficulties in increasing charges and other fees, coupled with the need to maintain or improve the scope and quality of health services, may affect the ability of the Reorganized Debtor to maintain sufficient operating margins.

(8)    The occurrence of a natural or man-made disaster that could damage the Reorganized Debtor's facilities, interrupt utility service to the facilities or otherwise impair the Reorganized Debtor's operations and the generation of revenues from the facilities.

**(o)**    **Management and Retention of Key Personnel.**

The Reorganized Debtor will have a Board of Directors who provide the overall management of the Reorganized Debtor. The continued operation of the Reorganized Debtor is heavily dependent upon the efforts of its management.

The Reorganized Debtor's success depends on the personal efforts of a small group of skilled employees and senior management. The location of the Facility provides for a smaller pool of skilled employees and increases the challenge of hiring employees. The challenge of hiring employees could be further increased by the Chapter 11 Case. The loss of key personnel could have a material adverse effect on the Reorganized Debtor's financial performance.

**(p)**    **Malpractice and General Liability Claims.**

In recent years, the number of general liability suits and the dollar amounts of damage awards have increased nationwide, resulting in substantial increases in insurance premiums, which may have an adverse financial impact on the Reorganized Debtor. Litigation may also arise against the Reorganized Debtor from its corporate and business activities, such as its status as an employer. While the Reorganized Debtor maintains general liability insurance coverage, the Reorganized Debtor is unable to predict the availability or cost of such insurance in the future. In addition, it is possible that certain types of liability awards may not be covered by insurance as in effect at the relevant times.

**(q)**    **Other Risks.**

The occurrence of any of the following events, or other anticipated events, could adversely affect the operations of the Reorganized Debtor:

(1)     Inability to control increases in operating costs, including salaries, wages and fringe benefits, supplies and other expenses, without being able to obtain corresponding increases in revenues.

(2)     Employee strikes and other adverse labor actions which could result in a substantial increase in expenditures without a corresponding increase in revenues.

(3)     Adoption of federal, state or local legislation or regulations having an adverse effect on the future operating or financial performance of the Reorganized Debtor.

(4)     A decline in the population, a change in the age composition of the population or a decline in the economic conditions of the market area of the Reorganized Debtor.

(5)     The cost and availability of energy that could, among other things, affect the cost of utilities of the Facility.

(6)     Increased unemployment or other adverse economic conditions in the service areas of the Reorganized Debtor that would increase the proportion of residents who are unable to fully pay entrance fees or other applicable costs.

(7)     Any increase in the quantity of indigent care provided that is mandated by law or required due to increased needs of the Facility in order to maintain the charitable status of the Reorganized Debtor.

(8)     Inflation or other adverse economic conditions.

(9)     Changes in tax, pension, social security or other laws and regulations affecting the provision of health care, retirement benefits and other services to the elderly.

(10)    Inability to control the diminution of patients' assets or insurance coverage with the result that the patients' charges are reimbursed from government reimbursement programs rather than private payments.

(11)    Scientific and technological advances that could reduce demand for services offered by the Reorganized Debtor.

(12)    Cost and availability of any insurance, such as malpractice, fire, automobile and general comprehensive liability, that organizations such as the Reorganized Debtor generally carry.

(r)    **Variances from Financial Projections.**

The projections attached hereto as Exhibit 6 reflect numerous assumptions concerning the Reorganized Debtor's anticipated future performance, some of which may not occur. Such assumptions include, without limitation, assumptions concerning the confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions, competition, adequate financing and other matters, many of which are beyond the Reorganized Debtor's control. Unanticipated events and circumstances occurring subsequent to the preparation of the projections may also affect the Reorganized Debtor's actual financial results. These unanticipated events and circumstances may be material and may adversely affect the Reorganized Debtor's ability to repay or refinance obligations with respect to indebtedness, including Series 2014 Bonds. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as a guarantee, representation or other assurance of the actual results that will occur.

(s)    **Restrictive Covenants in the 2014 Loan Agreement May Limit Operating Flexibility or Lead to a Default on the Series 2014 Bonds.**

The 2014 Loan Agreement will contain covenants that will, among other things, restrict the Reorganized Debtor's ability to take specific actions, even if the Reorganized Debtor's believes those actions to be in its best interest, including, without limitation, restrictions on the Reorganized Debtor's ability to:

- make certain types of restricted payments, including investments and acquisitions;

- sell certain assets;

- enter into specified transactions with affiliates;

- create a number of liens;

- consolidate, merge or transfer all or substantially all of Deerfield's assets; and

- change the nature of its business.

Additionally, the Reorganized Debtor has agreed to abide by certain financial covenants related to among other things, its Historical Debt Service Coverage Ratio, Net Operating Margin, and occupancy levels. All parties are encouraged to consult that 2014 Loan Agreement attached as Exhibit E to the Exchange Disclosure attached hereto as Exhibit 3 for a comprehensive discussion of such covenants, the measurements periods related to such covenants and the consequences of non-compliance with such covenants.

**10.3**    *Risks Specific to the Series 2014 Bonds.*

      **(a)**      **Matters Relating to Enforceability of Agreements.**

      The principal of, premium, if any, purchase price of, and interest on the Series 2014 Bonds, except to the extent that the Series 2014 Bonds will be payable from the proceeds thereof or investment income thereon or, under certain circumstances, proceeds of insurance, sale or condemnation awards or net amounts by recourse to the 2014 Mortgage or the pledge of Unrestricted Facility Receivables, are payable solely from amounts payable by the Reorganized Debtor under the 2014 Loan Agreement.  No representation or assurance is given or can be made that revenues will be realized in amounts sufficient to pay debt service on the Series 2014 Bonds when due and make other payments necessary to meet the obligations of the Reorganized Debtor.  The risk factors discussed below should be considered in evaluating the ability of the Reorganized Debtor to make payments in amounts sufficient to provide for the payment of the principal and accreted value of, and premium, if any, and interest on, the Series 2014 Bonds.

      The receipt of future revenues by the Reorganized Debtor will be subject to, among other factors, federal and state policies affecting the senior housing industry, increased competition from other senior housing and health care providers, the capability of the management of the Reorganized Debtor and future economic and other conditions that are impossible to predict.  The extent of the ability of the Reorganized Debtor to generate future revenues has a direct effect upon the payment of the principal or premium, if any, and interest on the Series 2014 Bonds.

      Holders of the Series 2014 Bonds shall have and possess all the rights of action and remedies afforded by the common law, the Constitution and statutes of the State of Iowa, and of the United States of America, for the enforcement of payment of their obligation, and the pledge of the revenues made pursuant to the 2014 Bond Indenture, and of all covenants of the Authority and the Reorganized Debtor pursuant to the 2014 Loan Agreement and the 2014 Bond Indenture, including, but not limited to, the right to a proceeding at law or in equity by suit, action or mandamus to enforce and compel performance of the duties, required by Iowa law and the 2014 Bond Indenture, or to obtain the appointment of a receiver to take possession of or operate the Reorganized Debtor and to perform the duties required by Iowa law and the 2014 Loan Agreement.  These remedies, however, may not be sufficient to prevent further losses.

      **(b)**      **The 2014 Mortgage.**

      The Reorganized Debtor will execute the 2014 Mortgage on the mortgaged property to secure its obligations under the 2014 Loan Agreement.  In the event that there is a default under the 2014 Loan Agreement or the 2014 Bond Indenture, the Trustee has the right to foreclose on the 2014 Mortgage under certain circumstances.

      All amounts collected upon foreclosure of the mortgage property pursuant to the 2014 Mortgage will be used to pay certain costs and expenses incurred by, or otherwise related to, the foreclosure, the performance of the 2014 Bond Trustee under the 2014 Mortgage, and then to pay amounts owing under the 2014 Bond Indenture and the 2014 Loan Agreement.

In the event the 2014 Mortgage is actually foreclosed, then, in addition to the customary costs and expenses of operating and maintaining the Facility, the party or parties succeeding to the interest of the Reorganized Debtor in the mortgaged property (including the 2014 Bond Trustee, if the 2014 Bond Trustee were to acquire the interest of the Reorganized Debtor in the mortgaged property) could be required to bear certain associated costs and expenses, which could include the cost of complying with federal, state or other laws, ordinances and regulations related to the removal or remediation of certain hazardous or toxic substances; the cost of complying with laws, ordinances and regulations related to health and safety; and the continued use and occupancy of the Facility, such as the Americans with Disabilities Act; and costs associated with the potential reconstruction or repair of the mortgaged property in the event of any casualty or condemnation.

The Facility is not comprised of general purpose buildings and generally would not be suitable for industrial or commercial use. Consequently, it will likely be difficult to find a buyer or lessee for the Facility, and, upon any default, the 2014 Bond Trustee may not realize the amount of the outstanding Series 2014 Bonds from the sale or lease of the Facility in the event of foreclosure.

Any valuation of the Facility is based on future projections of income, expenses, and capitalization rates. Additionally, the value of the Facility will at all times be dependent upon many factors beyond the control of the Reorganized Debtor, such as changes in general and local economic conditions, changes in the supply of or demand for competing properties in the same locality, and changes in real estate and zoning laws or other regulatory restrictions. A material change in any of these factors could materially change the value of the Facility. Any reduction in the market value of the Facility could adversely affect the security available to the owners of the Series 2014 Bonds. There is no assurance that the amount available upon foreclosure of the Facility after the payment of foreclosure costs will be sufficient to pay the amounts owing by the Reorganized Debtor under and pursuant to the 2014 Loan Agreement.

In the event of a foreclosure, a prospective purchaser of the mortgaged property may assign less value to the mortgaged property than the value of the mortgaged property while owned by the Reorganized Debtor since such purchaser may not enjoy the favorable financing rates associated with the Series 2014 Bonds and other benefits. To the extent that buyers whose income is not tax-exempt may be willing to pay less for the mortgaged property than nonprofit buyers, then the resale of the mortgaged property after foreclosure may require more time to solicit nonprofit buyers interested in assuming the financing now applicable to the mortgaged property. In addition, there can be no assurance that the mortgaged property could be sold at 100% of its fair market value in the event of foreclosure. Although the 2014 Trustee will have available the remedy of foreclosure of the 2014 Mortgage in the event of a default (after giving effect to any applicable grace periods, and subject to any legal rights that may operate to delay or stay such foreclosure, such as may be applicable in the event of the Reorganized Debtor's bankruptcy), there are substantial risks that the exercise of such a remedy will not result in recovery of sufficient funds to satisfy all the Reorganized Debtor's obligations, including the Series 2014 Bonds.

(c)        **Rights of Residents Under Residency Agreements.**

The Reorganized Debtor enters into Residency Agreements with its residents. Although these agreements give to each resident a contractual right to use space and not any ownership rights in the Facility, in the event that a Trustee or the holders of the Series 2014 Bonds were to seek to enforce any of the remedies provided by the 2014 Bond Indenture upon the occurrence of a default or the 2014 Bond Trustee seeks to enforce remedies under the 2014 Mortgage, it is impossible to predict the resolution that a court might make of competing claims among the 2014 Bond Trustee, the Authority or the holders of the Series 2014 Bonds and a resident of the Facility who has fully complied with all the terms and conditions of his or her Residency Agreement.

(d)        **Damage or Destruction.**

Although the Reorganized Debtor will be required to obtain certain kinds of insurance as set forth in the 2014 Loan Agreement, there can be no assurance that the Reorganized Debtor will not suffer uninsured losses in the event of damage to or destruction of the Facility due to fire or other calamity or in the event of other unforeseen calamities.

(e)        **Risks Related to Tax-Exempt Status.**

The Revenue Code of 1986, as amended (the "**Internal Revenue Code**") imposes a number of requirements that must be satisfied for interest with respect to state and local obligations, such as the Series 2014A Bonds, the Series 2014B Subordinate Bonds and the Series 2014D Bonds (together, the "**Tax-Exempt Bonds**"), to be excludable from gross income for federal income tax purposes. These requirements include limitations on the use of bond proceeds, limitations on the investment of bond proceeds prior to expenditure, a requirement that certain arbitrage earned on investment of bond proceeds be paid periodically to the United States, and a requirement that the Authority file an information report with the Internal Revenue Service (the "**IRS**"). The Reorganized Debtor has covenanted in certain documents referred to herein that it will comply with such requirements with respect to the Tax-Exempt Bonds. Failure to comply with any of these covenants by the Reorganized Debtor may result in the treatment of the interest received with respect to certain of the Tax-Exempt Bonds as included in federal gross income, retroactive to the date of their delivery.

Furthermore, the ongoing tax exempt status of interest on the Tax-Exempt Bonds, for federal income tax purposes, is conditioned, under relevant provisions of the Internal Revenue Code, on compliance by the Reorganized Debtor with various requirements set forth in Section 145 of the Internal Revenue Code, requiring, among other things, that the Facility be owned throughout the term of the Tax-Exempt Bonds by a governmental unit or an organization described in Section 501(c)(3) of the Internal Revenue Code and that not more than five percent of the proceeds of the Tax-Exempt Bonds (inclusive of proceeds applied to defray issuance costs) be applied to any "private business use," any use giving rise to "unrelated business income," or other uses inconsistent with the charitable purposes of the Reorganized Debtor, as an organization described in Section 501(c)(3) of the Internal Revenue Code, all as further provided in applicable statutes, regulations, rulings and decisions. Under Section 148 of the Internal Revenue Code, detailed requirements are set forth governing the expenditure and investment of

proceeds of tax exempt bonds and other moneys and requiring periodic computations in connection therewith. Moreover, certain "arbitrage" profits, as deemed generated from the investment of proceeds of the Tax-Exempt Bonds or other moneys, must be periodically rebated to the United States Treasury. Failure to comply with such requirements could result in the loss of the tax exempt status of interest on the Tax-Exempt Bonds to the owners thereof, and such interest could become taxable to such owners retroactive to the date of issuance of the Tax-Exempt Bonds.

The federal tax-exempt status of the Tax-Exempt Bonds depends upon the Reorganized Debtor maintaining its status as an organization described in Section 501(c)(3) of the Internal Revenue Code. The maintenance of such status is contingent on compliance with general rules promulgated in the Internal Revenue Code and related regulations and guidance regarding the organization and operation of tax-exempt entities, including their operation for charitable and educational purposes and their avoidance of transactions which may cause their assets to inure to the benefit of private individuals.

The IRS has provided guidance on a number of topics relating to tax-exempt organizations, including the importance of paying fair market value for goods and services, excess compensation and benefits to officers and other insiders, the implementation of the Intermediate Sanctions regulations, and the issues surrounding joint ventures and partnerships between tax-exempt and for profit entities. These issues pose risk to tax-exempt entities in the current health care environment.

The IRS has stressed the importance of ensuring that in relationships with for-profit entities or individuals, the exchange of consideration is consistent with fair market value for the goods or services provided. Areas of particular focus include leasing arrangements and the compensation paid to physicians and executives. Generally, payments must be consistent with what would be paid in an arms' length transaction, and should be supported by market data or an independent evaluation of reasonableness. Failure to ensure that payments are reasonable could result in the imposition of intermediate sanctions and/or the revocation of the organization's exempt status.

From time to time, there are Presidential proposals, proposals of various federal committees, and legislative proposals in the Congress and in the states that, if enacted, could alter or amend the federal and state tax matters referred to herein or adversely affect the marketability or market value of the Series 2014 Bonds or otherwise prevent holders of the Series 2014A Bonds; the Series 2014B Subordinate Bonds and the Series 2014D Bonds from realizing the full benefit of the tax exemption of interest on such Series 2014 Bonds. Further, such proposals may impact the marketability or market value of the Series 2014 Bonds simply by being proposed. It cannot be predicted whether or in what form any such proposal might be enacted or whether if enacted it would apply to bonds issued prior to enactment. In addition, regulatory actions are from time to time announced or proposed and litigation is threatened or commenced which, if implemented or concluded in a particular manner, could adversely affect the market value, marketability or tax status of the Series 2014 Bonds. It cannot be predicted whether any such regulatory action will be implemented, how any particular litigation or judicial action will be resolved, or whether the Series 2014 Bonds would be impacted thereby.

(f)     **Amendments to Documents.**

Certain amendments to the 2014 Bond Indenture, the 2014 Loan Agreement and the 2014 Mortgage may be made without the consent of the holders of the Series 2014 Bonds, and other amendments may be made with the consent of the 2014 Bond Trustee and the holders of a majority in aggregate principal amount of all outstanding Series 2014 Bonds. Such amendments could affect the security for the Series 2014 Bonds. Certain amendments, however, are not permitted, including (a) an extension of the maturity of the principal of or the scheduled date of payment of interest on any Series 2014 Bond; (b) a reduction in the principal amount, redemption premium or any interest payable on any Series 2014 Bond; (c) a privilege or priority of any Series 2014 Bond over any other Series 2014 Bond; (d) a reduction in the aggregate principal amount of Series 2014 Bonds the Owners of which are required for consent to any such Supplemental Indenture; or (e) the modification of the rights, duties or immunities of the 2014 Bond Trustee, without the written consent of the 2014 Bond Trustee.

(g)     **Redemption Prior to Maturity.**

In considering whether the Series 2014 Bonds might be redeemed prior to maturity, Bondholders should consider the information included in this Exchange Disclosure. The Series 2014A Bonds, the Series 2014C Bond and the Series 2014D Bonds are subject to optional redemption prior to their maturity. The Series 2014B Subordinate Bonds are subject to mandatory redemption prior to their maturity.

The Series 2014 Bonds may be called for extraordinary redemption prior to maturity should damage or destruction occur to the Facility, should condemnation of the Facility occur or the 2014 Bond Trustee receives a payment under the title insurance policy required to be maintained by the Reorganized Debtor. The Series 2014 Bonds may also be called for extraordinary redemption prior to maturity in the event of certain legislative changes. The Series 2014 Bonds could be accelerated should certain Events of Default occur under the 2014 Loan Agreement or the 2014 Bond Indenture, which would have the same effect as an early redemption at par.

(h)     **Additional Debt; Parity Obligations.**

Subsequent to the issuance of the Series 2014 Bonds, the 2014 Loan Agreement contains provisions permitting the Reorganized Debtor to issue additional debt subject to certain restrictions as set forth in the 2014 Bond Indenture and the 2014 Loan Agreement. The Reorganized Debtor is specifically permitted by the 2014 Loan Agreement to incur debt for the development and construction of up to 25 additional skilled nursing beds, which will increase the number of skilled nursing beds to 55, including to provide capitalized interest during construction, to provide any reserve fund relating to such debt, and to pay the costs and expenses of issuing or incurring such Health Care Expansion Debt, under the circumstances provided in the 2014 Loan Agreement. Such additional debt could increase the Reorganized Debtor's debt service and repayment requirements in a manner which would adversely affect debt service coverage on the Series 2014 Bonds and/or could be secured by assets of the Reorganized Debtor on a parity with the security granted by the 2014 Mortgage.

**If the Reorganized Debtor issues additional debt on as provided in the 2014 Loan Agreement, such additional Debt could be on a parity with the Series 2014A Bonds, the Series 2014C Bond and the Series 2014D Bonds, and superior in payment to the Series 2014B Subordinate Bonds. Such additional Debt could increase the Reorganized Debtor's debt service in a manner which could adversely affect the ability of the Reorganized Debtor to pay the principal of and interest on the Series 2014 Bonds.**

**(i)     Lack of Secondary Market.**

There is presently no secondary market for the Series 2014 Bonds and no assurance that a secondary market will develop or be maintained. Consequently, investors may find it difficult to resell the Series 2014 Bonds at an acceptable price.

**(j)     Absence of Rating.**

The Series 2014 Bonds are not rated. If an investor attempts to resell Series 2014 Bonds, the absence of a rating could adversely affect the market price and the marketability thereof.

**(k)     Subordination of Series 2014B Subordinate Bonds.**

The Series 2014B Subordinate Bonds are subordinate to the Series 2014A Bonds, the Series 2014C Bond, the Series 2014D Bonds and any additional debt that may be incurred by the Reorganized Debtor on a parity with the Series 2014A Bonds, the Series 2014C Bond and the Series 2014D Bonds ("**Additional Senior Debt**"). Interest will be paid annually on the Series 2014B Subordinate Bonds from and after May 15, 2014. Interest will be paid in cash (a) after the earlier of May 15, 2018 or achieving Stable Occupancy (i) to the extent that the Days Cash on Hand, as determined by the audited financial statements of the Reorganized Debtor for the prior Fiscal Year, exceeded 150 days, and (ii) in an amount up to 33% of Excess Cash and (b) in any event at all times on and after May 15, 2051. Any interest that is not so paid in cash shall be added to the principal balance of the Series 2014B Subordinate Bonds. From and after the earlier of May 15, 2018 or achieving Stable Occupancy and before May 15, 2051, principal prepayments on the Series 2014B Subordinate Bonds may be paid annually, but only (x) to the extent that the Days Cash on Hand, as determined by the audited financial statements of the Reorganized Debtor for the prior fiscal year, exceeded 150 days, and (y) in an amount up to 33% of Excess Cash, including in Excess Cash any interest payments made on the Series 2014B Subordinate Bonds on such interest payment date. In the event the Reorganized Debtor's Days Cash on Hand does not exceed 150 days or the Reorganized Debtor generates insufficient Excess Cash, interest on and principal of, the Series 2014B Subordinate Bonds may not be paid in cash, or until the Series 2014A Bonds, the Series 2014C Bond, the Series 2014D Bonds and any Additional Senior Debt are paid in full, or at all.

In the event of a default and acceleration of the Series 2014B Subordinate Bonds and any Additional Senior Debt or foreclosure of the 2014 Mortgage, the principal of, premium, if any, and interest on the Series 2014A Bonds, the Series 2014C Bond, the Series 2014D Bonds and any Additional Senior Debt will be paid and of such pledged collateral in full prior to the payment of the principal of and interest on the Series 2014B Subordinate Bonds.

(l)       **Enforceability of Remedies and Future Bankruptcy Proceedings.**

The practical realization of any rights of the 2014 Bond Trustee following a default on the Series 2014 Bonds will depend upon the exercise of various remedies specified in the 2014 Bond Indenture and otherwise available under applicable law.  The remedies available to the holders of the 2014 Bonds, in certain respects, may require judicial action, which is often subject to discretion and delay.  Under existing law, including specifically the federal Bankruptcy Code, certain of the remedies specified in the 2014 Bond Indenture may not be readily available or may be limited.  A court may decide not to order the specific performance of the covenants contained in the 2014 Bond Indenture.

If the security for the Series 2014 Bonds is inadequate for payment in full of the Series 2014 Bonds, bankruptcy proceedings and usual equity principles may also limit any attempt by the Trustee to seek payment from other property of the Reorganized Debtor, if any.

Bankruptcy proceedings and equity principles may delay or otherwise adversely affect the ability of the 2014 Bond Trustee to obtain amounts under the 2014 Bond Indenture, the 2014 Mortgage or the Series 2014 Bonds.  Remedies under the 2014 Loan Agreement, 2014 Bond Indenture and the 2014 Mortgage under existing law may not be readily available or may be limited.

The obligations of the Reorganized Debtor to make payments on the Series 2014 Bonds may also not be enforceable to the extent such payments are requested to be made from any assets which are donor-restricted or which are subject to a direct, express or charitable trust which does not permit the use of such assets for such payment.  Due to the absence of clear legal precedent in this area, the extent to which the assets of the Reorganized Debtor constitute assets which are so restricted or subject to such trusts cannot now be determined.  The amount of such assets could be substantial.

## ARTICLE XI.
## SECURITIES LAW MATTERS

**11.1**   *General.*

This section discusses certain securities law matters that are raised by the Plan.  This section should not be considered applicable to all situations.  Holders of the Series 2007 Bonds should consult their own legal counsel with respect to these and other issues.

**11.2**   *Issuance of the Series 2014 Bonds Under the Plan.*

In connection with the restructuring pursuant to the Plan under Chapter 11 of the Bankruptcy Code, Deerfield will rely on Bankruptcy Code § 1145 to exempt the issuance of the Series 2014 Bonds from the registration requirements of the Securities Act (and of any state securities or "blue sky" laws).  Bankruptcy Code § 1145 exempts from registration the sale of a debtor's securities under a Chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, such debtor.  In reliance upon this exemption, the Series 2014 Bonds will generally be exempt from the registration requirements of the Securities Act.  Accordingly, recipients will be able to

resell the Series 2014 Bonds without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of Bankruptcy Code § 1145(b), or an "affiliate" of Deerfield, within the meaning of Rule 144 under the Securities Act.  Bankruptcy Code § 1145(b) defines "underwriter" as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, or (ii) offers to sell securities issued under a plan for the holders of such securities, or (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Rule 144 under the Securities Act defines "affiliate" of an issuer as a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.

Notwithstanding the foregoing, statutory underwriters and affiliates may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act.  Parties that believe that they may be statutory underwriters as defined in Bankruptcy Code § 1145 or affiliates of Deerfield are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.

**11.3**    *Where You Can Find More Information.*

This Disclosure Statement contains summaries of certain agreements that Deerfield has entered into or expects to enter into in connection with the Plan.  The descriptions contained in this Disclosure Statement of these agreements are not purported to be complete and are subject to, or qualified in their entirety by reference to, the definitive agreements, copies of which, once complete, will be made available without charge to you by making a written request at the following address:

**Globic Advisors**
**One Liberty Plaza, 23rd Floor**
**New York, NY 10006**
**Attn: Robert Stevens**

**ARTICLE XII.**
**UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, ESTATE, GIFT, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.  HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

In addition, a substantial amount of time may elapse between the Solicitation of the Plan and the Consummation of the Plan.  Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated there under.  No ruling will be sought from the Internal Revenue Service with respect to any of the tax aspects of

the Plan and no opinion of counsel has heretofore been obtained by the Debtor with respect thereto (provided, however, in connection with the issuance of the Series 2014A Bonds and Series 2014B Subordinate Bonds an opinion, in form and substance reasonably acceptable to the 2014 Bond Trustee, of a nationally recognized bond counsel acceptable to the 2014 Bond Trustee will be delivered concluding that interest on the Series 2014A Bonds and the Series 2014B Subordinate Bonds will not be included in the gross income of the Holders thereof for purposes of federal income taxation). Accordingly, each Holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan to such Holder.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments of interest. The Reorganized Debtor will comply with all applicable reporting requirements of the Internal Revenue Code. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder complies with the applicable requirements of the backup withholding rules and: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

[Remainder of Page Intentionally Left Blank]

## ARTICLE XIII.
## <u>CONCLUSION</u>

Deerfield believes that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims and Interests.   Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims or Interests.  Further, Deerfield believes that the unimpairment of general unsecured creditors is vital to Deerfield's going concern value and thus urges that holders vote to accept the Plan.

Dated: November 18, 2013

Respectfully submitted,

Deerfield Retirement Community, Inc.

By: _____
       Scott Harrison
       President and Chief Executive Officer

Counsel for Deerfield:

DORSEY & WHITNEY LLP

David Grossklaus, Esq.
801 Grand Ave., Suite 4100
Des Moines, IA 50309

and

Steven Heim, Esq.
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402

**<u>Exhibits</u>**

- Plan (<u>Exhibit 1</u>)

- Plan Support Agreement (<u>Exhibit 2</u>)

- Exchange Disclosure Document (<u>Exhibit 3</u>)

- Audited Financial Statements for Deerfield for the fiscal year ended December 31, 2012 (<u>Exhibit 4</u>)

- Liquidation Analysis (<u>Exhibit 5</u>)

- Reorganized Company's Projected Financial Information (<u>Exhibit 6</u>)